**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEPHANIE CLIFFORD a.k.a. STORMY DANIELS, <br><br>                 Plaintiff, <br><br>            v. <br><br> DONALD J. TRUMP, <br><br>                 Defendant. | CIVIL ACTION NO. 18-cv-03842-JMF |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT DONALD J. TRUMP'S MOTION TO TRANSFER PURSUANT TO 28 U.S.C. § 1404(a) OR, IN THE ALTERNATIVE, TO DISMISS OR STAY PURSUANT TO THE "FIRST-FILED" RULE**

**HARDER LLP**
Charles J. Harder
Anthony J. Harwood
260 Madison Avenue, 16th Floor
New York, New York 10016
(212) 799-1400

*Attorneys for Defendant Donald J. Trump*

## TABLE OF CONTENTS

I.      **INTRODUCTION** ...................................................................................1

II.     **FACTUAL BACKGROUND** ...............................................................5

III.    **PROCEDURAL HISTORY** ................................................................8
    a.      **The Arbitration Filed By EC In California** ...................................8
    b.      **The First California Action** ...........................................................9
    c.      **The Second California Action** .....................................................10

IV.     **ARGUMENT** ......................................................................................11
    a.      **This Case Should Be Transferred Pursuant To 28 U.S.C. § 1404(a)** .............11
        i.      Transfer Is Particularly Appropriate Where, As Here, There Are Related Actions Pending In Another District ................................................11
        ii.     The Related Actions Need Not Be Identical For A Transfer ...........................13
        iii.    The Venue Provision In The Settlement Agreement Supports Transfer ........14
        iv.     The Convenience Factors Support A Transfer................................................15
            1.   Convenience of Witnesses ........................................................16
            2.   Convenience of Parties .............................................................18
            3.   Location of Documents.............................................................19
            4.   Locus of Operative Facts .........................................................19
            5.   Availability of Process to Compel Attendance of Witnesses .........................20
            6.   Familiarity with Governing Law .............................................21
            7.   Plaintiff's Choice of Forum .....................................................21
            8.   Relative Means of the Parties ...................................................21
    b.      **In The Alternative, This Case Should Be Dismissed Or Stayed Under The "First-Filed" Rule** ....................................................................22
        i.      This Case Is Substantially Similar To The First California Action ...............23
        ii.     There Is No Exception To The "First-Filed" Rule Where The Plaintiff Is The Same In Both Actions..................................................................24

V.      **CONCLUSION** ...................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*800-Flowers, Inc. v. Intercontinental Florist, Inc.*,
   860 F. Supp. 128 (S.D.N.Y. 1994) ........................................................................23

*AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*,
   626 F.3d 699 (2d Cir. 2010).............................................................................23, 25

*AIG Fin. Prod. Corp. v. Pub. Util. Dist. No. 1 of Snohomish Cty., Wash.*,
   675 F.Supp.2d 354 (S.D.N.Y. 2009)....................................................................16

*Akers Biosciences, Inc. v. Martin*,
   2015 WL 1054971 (S.D.N.Y. Mar. 10, 2015) ......................................................14

*Am. Eagle Outfitters, Inc. v. Tala Bros. Corp.*,
   457 F.Supp.2d 474 (S.D.N.Y. 2006)...............................................................19, 21

*APA Excelsior III L.P. v. Premiere Techs., Inc.*,
   49 F.Supp.2d 664 (S.D.N.Y. 1999) ...........................................................2, 11, 13

*Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*,
   571 U.S. 49 (2013)................................................................................................14

*Berman v. Informix Corp.*,
   30 F. Supp. 2d 653 (S.D.N.Y. 1998)...............................................................11, 12

*Blechman v. Ideal Health, Inc.*,
   668 F.Supp.2d 399 (E.D.N.Y. 2009) ....................................................................22

*Boehner v. Heise*,
   410 F.Supp.2d 228 (S.D.N.Y. 2006).....................................................................19

*Citicorp Leasing, Inc. v. United Am. Funding, Inc.*,
   2004 WL 102761 (S.D.N.Y. Jan. 21, 2004) .........................................................12

*Cole v. Edwards*,
   2004 WL 1874970 (S.D.N.Y. Aug. 13, 2004)......................................................25

*Columbia Pictures Industries, Inc. v. Fung*,
   447 F. Supp. 2d 306 (S.D.N.Y. 2006)........................................................14, 15, 21

*Dahl v. HEM Pharm. Corp.*,
   867 F.Supp. 194 (S.D.N.Y. 1994) .........................................................13, 18, 22

*Delta Air Lines, Inc. v. Ass'n of Flight Attendants, CWA*,
    720 F. Supp. 2d 213 (E.D.N.Y. 2010) ...................................................................13

*Eres N.V. v. Citgo Asphalt Refining Co.*,
    605 F.Supp.2d 473 (S.D.N.Y. 2009).................................................13, 14, 16

*First City Nat. Bank & Tr. Co. v. Simmons*,
    878 F.2d 76 (2d Cir. 1989).........................................................................23

*Herbert Ltd. v. Elec. Arts Inc.*,
    325 F.Supp.2d 282 (S.D.N.Y. 2004)........................................................16

*Hernandez v. Graebel Van Lines*,
    761 F. Supp. 983 (E.D.N.Y. 1991) ..........................................................22

*Intema Ltd. v. NTD Labs., Inc.*,
    654 F.Supp.2d 133 (E.D.N.Y. 2009) .......................................................24

*Iragorri v. United Techs. Corp.*,
    274 F.3d 65 (2d Cir. 2001).......................................................................21

*Kellen Co. v. Calphalon Corp.*,
    54 F.Supp.2d 218 (S.D.N.Y. 1999) .........................................................25

*Levy v. Welsh*,
    2013 WL 1149152 (E.D.N.Y. Mar. 19, 2013)........................................21

*Manufacturers Hanover Tr. Co. v. Palmer Corp.*,
    798 F.Supp. 161 (S.D.N.Y. 1992) ...........................................................23

*Marvel Entm't, LLC v. Kimble*,
    2010 WL 5174398 (S.D.N.Y. Dec. 20, 2010) ........................................13

*New York Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*,
    599 F.3d 102 (2d Cir. 2010).....................................................................22

*Nieves v. American Airlines*,
    700 F.Supp. 769 (S.D.N.Y. 1988) .......................................................2, 11

*Norwood v. Kirkpatrick*,
    349 U.S. 29 (1955)...................................................................................16

*Pence v. Gee Grp., Inc.*,
    236 F.Supp.3d 843 (S.D.N.Y. 2017)........................................................20

*Pergo, Inc. v. Alloc, Inc.*,
    262 F.Supp.2d 122 (S.D.N.Y. 2003)........................................................23

*Rabbi Jacob Joseph Sch. v. Province of Mendoza*,
  342 F. Supp. 2d 124 (E.D.N.Y. 2004) ......................................................................12

*Recoton Corp. v. Allsop, Inc.*,
  999 F.Supp. 574 (S.D.N.Y.1998) .............................................................................12

*Regions Bank v. Wieder & Mastroianni, P.C.*,
  170 F.Supp.2d 436 (S.D.N.Y. 2001)...................................................................22, 23

*Reliance Ins. Co. v. Six Star, Inc.*,
  155 F. Supp. 2d 49 (S.D.N.Y. 2001).........................................................................22

*Scherillo v. Dun & Bradstreet, Inc.*,
  684 F.Supp.2d 313 (E.D.N.Y. 2010) ........................................................................15

*Semmes Motors, Inc. v. Ford Motor Co.*,
  429 F.2d 1197 (2d Cir. 1970)....................................................................................24

*Solar v. Annetts*,
  707 F.Supp.2d 437 (S.D.N.Y. 2010)..........................................................................11

*Mastr Asset Backed Sec. Tr. 2007-WMC1,*
  *ex rel. U.S. Bank Nat. Ass'n v. WMC Mortg. LLC*,
  880 F.Supp.2d 418 (S.D.N.Y. 2012)..........................................................................19

*U.S. Fid. & Guar. Co. v. Republic Drug Co.*,
  800 F.Supp. 1076 (E.D.N.Y. 1992) ..........................................................................16

*Wagner v. New York Marriott Marquis*,
  502 F.Supp.2d 312 (N.D.N.Y. 2007).........................................................................20

*Wells Fargo Advisors, L.L.C. v. Tucker*,
  195 F.Supp.3d 543 (S.D.N.Y. 2016)..........................................................................23

*Wyler-Wittenberg v. MetLife Home Loans, Inc.*,
  899 F.Supp.2d 235 (E.D.N.Y. 2012) ....................................................................23, 24

*Wyndham Assocs. v. Bintliff*,
  398 F.2d 614 (2d Cir. 1968)......................................................................................11

**Statutes**

28 U.S.C. § 1404(a) ......................................................................................2, 11, 25

California Code of Civil Procedure § 425.16 ................................................................10

**Other Authorities**

Federal Rules of Civil Procedure Rule 45(c)(1) ............................................................20

I.      **INTRODUCTION**

Defendant Donald J. Trump ("Mr. Trump") moves to transfer this action to the Central District of California ("CDCA"), where two closely related lawsuits filed by plaintiff Stephanie Clifford ("Plaintiff") are currently pending: (1) *Clifford v. Donald J. Trump, et al.*, Case No. 2:18-cv-02217 (the "First California Action"); and (2) *Clifford v. Keith Davidson, et al.*, Case No. 2:18-cv-05052 (the "Second California Action") (collectively, the "California Actions"). This case arises out of the same facts, transactions and/or occurrences as the California Actions: namely, Plaintiff's allegations of an intimate encounter with Mr. Trump in 2006, and a Confidential Settlement Agreement dated October 28, 2016 (the "Settlement Agreement") relating thereto.  If this case is not transferred (or dismissed or stayed), there is a substantial risk of duplicative litigation and inconsistent rulings between this case and the California Actions.

Plaintiff filed this action for defamation against Mr. Trump in the Southern District of New York ("SDNY"), rather than asserting the claim in her already pending First California Action against Mr. Trump, to circumvent an Order by U.S. District Judge S. James Otero on April 27, 2018 staying the First California Action (the "Stay Order").  [Declaration of Charles J. Harder ("Harder Decl."), Ex. A.]  The Stay Order was issued due to an ongoing criminal investigation of Michael Cohen, a defendant and key witness in both California Actions.  [*Id.*]

A few days before the Stay Order was issued, Plaintiff's lawyer, Michael Avenatti, publicly stated that Plaintiff intended to file her defamation claim against Mr. Trump **in the First California Action**.  During an interview with Wolf Blitzer on CNN on April 18, 2018, one day after Mr. Trump made the allegedly defamatory statement at issue, Mr. Avenatti stated:

> AVENATTI: We're likely going to be amending our complaint. We're looking at doing that now to **add a defamation claim directly against the president**… And we're likely to file it **in the same case that we're already in**, and we're going to add a claim.

1

> BLITZER: And file it in California?
> AVENATTI: Correct.

[Harder Decl., Ex. B.] (Emphasis added.)  However, on Monday, April 30, 2018, the **next court day** after issuance of the Stay Order, Plaintiff changed course and filed this action.[1]  The only reasonable conclusion as to why Plaintiff filed this action in the SDNY, as opposed to in the First California Action, is that Plaintiff engaged in forum shopping to avoid application of the Stay Order, and engaged in judge shopping to place her new defamation claim away from Judge Otero, who ruled against Plaintiff in imposing the Stay Order.

Thereafter, on June 6, 2018, Plaintiff again circumvented the Stay Order by filing the Second California Action in the Superior Court for the State of California, County of Los Angeles, rather than asserting those claims in the First California Action where they should have been filed.[2]  [Harder Decl., Ex. X.]

The substantial overlap between this action and the California Actions warrants a transfer to the CDCA in the interests of justice, for the convenience of the parties and witnesses, and to ensure consistent rulings by one court rather than potentially inconsistent rulings by multiple courts, pursuant to 28 U.S.C. § 1404(a).[3]  Plaintiff's claim for defamation in this action is closely related to her claims in the First California Action for: (1) declaratory relief against Mr. Trump

---

[1] Subsequently, on May 24, 2018, Plaintiff filed a Motion for Reconsideration of the Stay Order. On June 19, 2018, the Court denied that Motion.  [Harder Decl., Ex. W.]

[2] The Second California Action was subsequently removed to the CDCA by Mr. Cohen and transferred to Judge Otero pursuant to Mr. Cohen's Notice of Related Case.  [Harder Decl., ¶¶ 20-22, Ex. Y, Ex. Z.]  There is a pending Motion to Stay the Second California Action, based upon the Stay Order, which is scheduled for hearing on August 6, 2018.  [*Id.*, ¶ 23.]

[3] "It is well established that the existence of a related action pending in the transferee court weighs heavily towards transfer."  *APA Excelsior III L.P. v. Premiere Techs., Inc.*, 49 F.Supp.2d 664, 668 (S.D.N.Y. 1999); *see also Nieves v. American Airlines*, 700 F.Supp. 769, 773 (S.D.N.Y. 1988).  Further, as discussed in section IV.a.iv. below, each of the convenience factors under Section 1404(a) either weighs in favor of a transfer of this action, or is neutral.

and Essential Consultants, LLC ("EC") and (2) defamation against Mr. Cohen, as follows:

*First*, Plaintiff's claim against Mr. Trump for defamation in this action falls squarely within the same arbitration provision in the Settlement Agreement at issue in the First California Action.  [Harder Decl., Ex. 1 to Ex. C, p. 10.]  That provision is the subject of a pending Motion to Compel Arbitration ("Arbitration Motion") in the First California Action, in which Mr. Trump has joined.  [*Id.*, Ex. D, Ex. E.]  Plaintiff's opposition to the Arbitration Motion, and her declaratory relief cause of action in the First California Action, both seek a finding that the arbitration provision was never formed and is unenforceable.  [*Id.*, Ex. A, p. 2, Ex. C, p. 17.]

Thus, if this action is not transferred to the CDCA (or dismissed or stayed), this Court could be required to rule upon the enforceability of the very arbitration provision in the Settlement Agreement that is the subject of Plaintiff's declaratory relief claim, and the Arbitration Motion, in the First California Action, both of which predate the filing of the instant action.  This would create a substantial risk of duplicative litigation and inconsistent rulings between this case and the First California Action regarding the enforceability of the Settlement Agreement and arbitration provision therein.  There is also a substantial risk that this Court could be required to decide these issues while the First California Action is stayed, notwithstanding the fact that these issues are the subject of the earlier-filed declaratory relief claim and Arbitration Motion in the pending (yet stayed) First California Action.

*Second*, Plaintiff's defamation claims against Mr. Trump (in this action) and Mr. Cohen (in the First California Action) both arise out of statements that were allegedly "meant to convey that Ms. Clifford is a liar" and "someone who should not be trusted."  [Harder Decl., Ex. C, ¶ 67; Dkt. No. 1, ¶ 28.]  Mr. Cohen's statement allegedly relates to Plaintiff's "claims about her relationship with Mr. Trump"; whereas, Mr. Trump's statement allegedly relates to Plaintiff's

"claims about the threatening encounter" with an alleged unidentified "man regarding her intention to tell the story of her relationship with Mr. Trump."  [*Id*.]

As a result, many of the issues to be decided in connection with Plaintiff's defamation claims against Mr. Trump and Mr. Cohen, including whether the statements were substantially true (i.e. whether Plaintiff is a liar)[4], whether they were protected opinion, and whether Plaintiff has suffered any damages, heavily overlap.  These issues have already been raised by Mr. Cohen in his pending anti-SLAPP motion in the First California Action [Harder Decl., Ex. F] and will be raised by Mr. Trump at the appropriate time.  It therefore makes sense for the same court to adjudicate those interrelated legal challenges, for purposes of efficiency and consistency.

The Second California Action, wherein Plaintiff asserts claims for: (1) breach of fiduciary duty against Keith Davidson and (2) aiding and abetting breach of fiduciary duty against Mr. Cohen, is closely related to this action because it arises out of Mr. Davidson's representation of Plaintiff, and Mr. Cohen's alleged representation of Mr. Trump, in connection with the formation and performance of the Settlement Agreement.  [Harder Decl., Ex. X, ¶¶ 11-13.]  In that action, Plaintiff alleges that "[b]y virtue of [the Settlement Agreement] and his experience with Mr. Davidson, Mr. Cohen was well aware at all times that Mr. Davidson was Ms. Clifford's attorney…"  [*Id*., ¶ 12.]   Plaintiff alleges that Mr. Davidson breached his fiduciary duties to her by engaging "in numerous communications and concerted action with Mr. Cohen, the purpose of which was not to benefit Ms. Clifford, but to benefit Mr. Cohen and Mr. Trump."  [*Id*., ¶ 66.]

This action also should be transferred to the CDCA because Plaintiff expressly agreed in the Settlement Agreement that the venue for any dispute arising therefrom would be in

---

[4] As discussed in detail in Section II below, Plaintiff publicly denied six different times having any intimate relationship or encounter whatsoever with Mr. Trump.  These six denials started in 2006 and include two written denials in 2018.  Plaintiff now claims the opposite.

California, Nevada or Arizona.  Consistent with this provision, Plaintiff filed the First California Action in California, notwithstanding the fact that none of the parties were domiciled there.

For the reasons set forth herein, Mr. Trump respectfully requests that this action be transferred to the CDCA, or, in the alternative, be dismissed or stayed under the principles of judicial economy and federal comity embodied in the "first-filed" rule.  *See*, *infra*, Section IV.b.

## II.    FACTUAL BACKGROUND

Plaintiff has been an adult film performer and exotic dancer for more than fifteen years. Plaintiff alleges that she began "an intimate relationship with Mr. Trump in the summer of 2006 in Lake Tahoe."  [Harder Decl., Ex. C, ¶ 10.]  Plaintiff further alleges that, in 2007, she had "at least one 'meeting' with Mr. Trump in a bungalow at the Beverly Hills hotel located within Los Angeles County."[5]  [*Id*.]

Plaintiff further alleges that, in 2011, "in Las Vegas, Nevada, Ms. Clifford was approached and threatened by a man regarding her intention to tell the story of her relationship with Mr. Trump" (the "Alleged 2011 Incident").  [Dkt. No. 1, ¶ 7.]  Plaintiff further alleges that "it is reasonable to infer that the person who threatened Ms. Clifford could have only been acting directly or indirectly on behalf of Mr. Trump and/or Mr. Cohen."  [*Id*., ¶ 31.]

In October 2016, according to a news report, Plaintiff unsuccessfully attempted to sell her story about an alleged one-night-stand with Mr. Trump in 2006 to tabloid magazines and related outlets for $200,000.  [Harder Decl., Ex. G.]  Instead, Plaintiff signed the Settlement Agreement. [*Id*., Ex. C, ¶¶ 17-23.]  Plaintiff "was represented by counsel in California whose office is located in Beverly Hills, California" in connection with the Settlement Agreement.  [*Id*., Ex. C, ¶ 17.] That counsel was Keith Davidson.  [*Id*., Ex. 1 to Ex. C, pp. 14-15; Ex. X, ¶¶ 8, 10-11.]

---

[5] Plaintiff does not allege that an intimate encounter with Mr. Trump occurred in 2007.

In the Settlement Agreement, Plaintiff agreed to arbitrate any disputes between her and Mr. Trump.  [Harder Decl*.,* Ex. 1 to Ex. C, p. 10.]  That arbitration provision is broad, stating:

> Dispute Resolution.  In recognition of the mutual benefits to DD and PP of a voluntary system of alternative dispute resolution which involves binding confidential arbitration of all disputes which may arise between them, it is their intention and agreement that **any and all claims or controversies arising between DD on the one hand, and PP on the other hand**, shall be resolved by binding confidential Arbitration to the greatest extent permitted by law.

[*Id.*] (Emphasis added.)  According to Plaintiff, Peggy Peterson ("PP") is a pseudonym for Plaintiff, and David Dennison ("DD") is a pseudonym for Mr. Trump.  [*Id.*, Ex. C, ¶ 19.]  Plaintiff also promised not to publicly disclose any Confidential Information (as defined in the Settlement Agreement).  [*Id.*, Ex. 1 to Ex. C, pp. 4-8.]  The Settlement Agreement also contains a choice of law and venue provision:

> DD's Election of either California, Nevada, or Arizona Law & **Venue**.  This Agreement and **any dispute or controversy relating to this Agreement**, **shall in all respects** be construed, interpreted, **enforced** and governed by the laws of the State of California, Arizona or Nevada at DD's election.

[Harder Decl., Ex. 1 to Ex. C, p. 12.] (Emphasis added.)

As consideration for Plaintiff's promises under the Settlement Agreement, EC paid, and Plaintiff admittedly accepted and received, the sum of $130,000.  [Harder Decl., Ex. C, ¶ 24.]  Mr. Cohen negotiated the Settlement Agreement on behalf of EC and arranged for payment of the $130,000 to Plaintiff.  [*Id.*, Ex. A, p. 1.]  For the **next sixteen (16) months**, Plaintiff did not: reject the Settlement Agreement, assert that the Settlement Agreement was unenforceable, or make any attempt to return the $130,000 that she was paid by EC.  [*Id.*, Ex. H, ¶ 3.]

From in or about October 2016 through in or about February 2018, Plaintiff performed all of her obligations under the Settlement Agreement, and made no public statements disclosing Confidential Information.  [Harder Decl., Ex. H, ¶ 4.]  Prior to February 2018, Plaintiff's only

complaint relating to the Settlement Agreement was in October 2016, when she complained that she was not receiving the $130,000 payment **quickly enough**.  [*Id.*]

On January 10, 2018, Plaintiff issued a signed written statement expressly **denying** that she had a sexual and/or romantic affair with Mr. Trump (the "January 10, 2018 Written Denial"):

> I recently became aware that certain news outlets are alleging that I had a sexual and/or romantic affair with Donald Trump many, many, many years ago.  I am stating with **complete clarity** that this is **absolutely false**.  My involvement with Donald Trump was limited to a few public appearances and **nothing more**…If indeed I did have a relationship with Donald Trump, trust me, you wouldn't be reading about it in the news, you would be reading about it in my book.  But the fact of the matter is, these stories are **not true**.

[Harder Decl., Ex. H, ¶ 5.] (Emphasis added.)  On January 30, 2018, Plaintiff issued a second signed written statement titled "Official Statement of Stormy Daniels," wherein she again expressly **denied** having a sexual relationship with Mr. Trump (the "January 30, 2018 Written Denial") (collectively, with the January 10, 2018 Written Denial, the "Written Denials"), stating:

> Over the past few weeks I have been asked countless times to comment on reports of an alleged sexual relationship I had with Donald Trump many, many, many years ago. [¶] The fact of the matter is that **each party to this alleged affair denied its existence in 2006, 20011 [sic], 2016, 2017 and now again in 2018**.  I am not denying this affair because I was paid 'hush money' as has been reported in overseas owned tabloids.  **I am denying this affair because it never happened**…

[Harder Decl., Ex. H, ¶ 6.] (Emphasis added.)

The Written Denials are consistent with an earlier denial made by Plaintiff in October 2011, when she told E! News that a story claiming that she and Mr. Trump had an affair was "bulls--t."  [Harder Decl., Ex. I.]  In the January 30, 2018 Written Denial, Plaintiff states that she also publicly denied the affair in 2006, 2016 and 2017.  Thus, Plaintiff denied she had any affair whatsoever with Mr. Trump on at least six (6) occasions, including the two (2) Written Denials in 2018, and the additional denials in 2006, 2011, 2016 and 2017.

Plaintiff alleges in the First California Action that, on February 13, 2018, Mr. Cohen

issued a public statement regarding the Settlement Agreement.  [Harder Decl., Ex. C, ¶ 27.]  As part of that statement, Plaintiff alleges that Mr. Cohen made the following defamatory statement, upon which she sued Mr. Cohen in the First California Action: "Just because something isn't true doesn't mean that it can't cause you harm or damage.  I will always protect Mr. Trump."  [*Id.*]

On February 22, 2018, EC filed an arbitration against Plaintiff in Los Angeles (*see* Section III.a.).  On March 6, 2018, Plaintiff filed the First California Action (*see* Section III.b.).

Plaintiff then repeatedly violated the Settlement Agreement by disclosing Confidential Information (her allegations of an alleged affair and related statements) to the news media, including in nationally televised interviews on *60 Minutes* on March 25, 2018, which reportedly was watched by twenty-two million viewers, and on *The View* on April 17, 2018.  [Harder Decl., Ex. J.]  Plaintiff further breached the Settlement Agreement by sending her lawyer, Mr. Avenatti, to participate in more than one-hundred twenty national television interviews from March 6, 2018 to the present, wherein he has repeatedly disclosed Confidential Information.  [*Id.*]

During their appearance on *The View*, Plaintiff and Mr. Avenatti released a sketch that they said depicted the unidentified man who they allege threatened Plaintiff in the Alleged 2011 Incident.  [Dkt. No. 1, ¶ 14; Harder Decl., Ex. K.]  Plaintiff alleges in this action that, on or about April 18, 2018, Mr. Trump Tweeted the following statement regarding the sketch of the alleged unidentified man in the Alleged 2011 Incident:  "A sketch years later about a nonexistent man.  A total con job, playing the Fake News Media for Fools (but they know it)!"  [Dkt No. 1, ¶ 15.]

## III.   PROCEDURAL HISTORY

### a.   The Arbitration Filed By EC In California

On or about February 22, 2018, EC filed an arbitration with ADR Services, Inc. ("ADRS") in Los Angeles (the "Arbitration"), pursuant to the arbitration provision in the

Settlement Agreement.  [Harder Decl., ¶ 24.]  On February 27, 2018, the arbitrator (a retired

California Superior Court judge) issued a temporary restraining order prohibiting Plaintiff from

violating the Settlement Agreement by, among other things, disclosing any Confidential

Information to the media or in court filings.  [*Id.,* Ex. AA.]  On March 13, 2018, the Arbitration

was stayed by ADRS, pending determination of the Arbitration Motion.  [*Id.,* ¶ 26.]

### b.    The First California Action

On March 6, 2018, Plaintiff filed the First California Action, asserting a single cause of

action for declaratory relief to invalidate the Settlement Agreement.[6]  [Harder Decl., Ex. A, p. 2,

Ex. C.]  On March 16, 2018, EC filed a Notice of Removal of the First California to the CDCA.

[*Id.*]  On March 26, 2018, Plaintiff filed a First Amended Complaint in the First California

Action, adding her claim for defamation against Mr. Cohen. [*Id.,* Ex. C, ¶¶ 36-71.]

On April 2, 2018, EC filed the Arbitration Motion [Harder Decl., Ex. A, p. 2, Ex. D], and

Mr. Trump filed a joinder in the Arbitration Motion.[7]  [*Id.,* Ex. E.]

On April 8, 2018, Plaintiff filed a Motion for Expedited Jury Trial "on the issue of the

formation and enforceability of the [Settlement] Agreement's arbitration provision," and for

leave to take the depositions of Mr. Cohen and Mr. Trump, on the basis that the depositions were

necessary to oppose the Arbitration Motion.  [Harder Decl., ¶ 14, Ex. A, p. 2.]

On April 9, 2018, Plaintiff filed an opposition to the Arbitration Motion, which asserted

"that a valid contract, and thus agreement to arbitrate, was never actually formed."  [Harder

Decl., Ex. A, p. 2.]  Also on April 9, 2018, Mr. Cohen filed a Motion to Strike Plaintiff's claim

---

[6] Plaintiff has never returned the $130,000 that she was paid pursuant to the Settlement
Agreement, nor has she interplead or otherwise deposited any sums into the CDCA in connection
with her declaratory relief cause of action.

[7] Mr. Trump reserves the right to separately move to compel arbitration of this action, if
necessary, pursuant to the arbitration provision in the Settlement Agreement.

for defamation under California Code of Civil Procedure § 425.16.  [*Id.*, Ex. A, p. 3, Ex. F.]

Also on April 9, 2018, the Federal Bureau of Investigation ("FBI") raided Mr. Cohen's residence, office, and hotel room, seizing various devices and documents, some of which reportedly contained information regarding the $130,000 payment to Plaintiff.  [*Id.*, Ex. A, p. 1.]

On April 13, 2018, Mr. Trump, EC and Mr. Cohen filed a Joint *Ex Parte Application* for a Stay of the California Action (the "Stay Motion").  [Harder Decl., Ex. A, p 1.]  On April 16, 2018, Plaintiff filed an Opposition to the Stay Motion.  [*Id.*]  On April 17, 2018, Mr. Trump, EC and Mr. Cohen filed a Reply in Support of the Stay Motion.  [*Id.*]

On April 20, 2018, Judge Otero held a hearing on the Stay Motion.  [Harder Decl., Ex. A, p. 1.]  On April 25, 2018, Mr. Cohen filed a declaration stating that he would "assert [his] 5th amendment rights in connection with all proceedings in this case due to the ongoing criminal investigation by the FBI and U.S. Attorney for the Southern District of New York."  [*Id*, pp. 2, 5.]

On April 27, 2018, Judge Otero issued the Stay Order.  [Harder Decl., Ex. A.]  Within one hour of issuance of the Stay Order, Mr. Avenatti Tweeted the following:  "We will likely be filing an immediate appeal to the Ninth Circuit early next week."  [*Id.,* Ex. V.]  Plaintiff did not appeal the Stay Order.  Rather, on April 30, 2018, the next court day after Mr. Avenatti's Tweet, Plaintiff filed this action.  [Dkt. No. 1.]  Judge Otero has scheduled a status conference regarding the stay for July 27, 2018.  [Harder Decl., Ex. A, p. 9.]

### c.  The Second California Action

On June 6, 2018, Plaintiff filed the Second California Action in the Superior Court of the State of California, County of Los Angeles, Case Number SC129384.  [Harder Decl., Ex. X.]  On June 7, 2018, Mr. Cohen filed a Notice of Removal and Notice of Related Case in the Second California Action.  [*Id.*, ¶ 20, Ex. Y.]  On June 15, 2018, the Second California Action was

transferred to Judge Otero pursuant to the Notice of Related Case.  [*Id.*, Ex. Z.]

## IV.   ARGUMENT

### a.   This Case Should Be Transferred Pursuant To 28 U.S.C. § 1404(a)

Section 1404(a) provides that, "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  "[M]otions for transfer lie within the broad discretion of the district court and are determined upon notions of convenience and fairness on a case-by-case basis."  *Solar v. Annetts*, 707 F.Supp.2d 437, 441 (S.D.N.Y. 2010) (quoting *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 117 (2d Cir.1992)).

### i.   Transfer Is Particularly Appropriate Where, As Here, There Are Related Actions Pending In Another District

"There is a strong policy favoring the litigation of related claims in the same tribunal in order that pretrial discovery can be conducted more efficiently, duplicitous litigation can be avoided, thereby saving time and expense for both parties and witnesses, and inconsistent results can be avoided."  *Wyndham Assocs. v. Bintliff*, 398 F.2d 614, 619 (2d Cir. 1968).  Accordingly, "one of the most important factors considered by courts in evaluating a motion to transfer is the existence of similar litigation in the transferee district."  *Berman v. Informix Corp.*, 30 F. Supp. 2d 653, 660 (S.D.N.Y. 1998); *see also APA Excelsior III L.P. v. Premiere Techs., Inc.*, 49 F. Supp. 2d 664, 668 (S.D.N.Y. 1999) ("It is well established that the existence of a related action pending in the transferee court weighs heavily towards transfer."); *Nieves v. American Airlines*, 700 F.Supp. 769, 773 (S.D.N.Y. 1988) ("Transfer is particularly appropriate where there is a pending lawsuit in the transferee district involving the same facts, transactions, or occurrences.")

Indeed, "courts consistently recognize that the existence of a related action in the

transferee district is a strong factor to be weighed with regard to judicial economy, and may be determinative." *Rabbi Jacob Joseph Sch. v. Province of Mendoza*, 342 F. Supp. 2d 124, 130 (E.D.N.Y. 2004); *see also Citicorp Leasing, Inc. v. United Am. Funding, Inc.*, 2004 WL 102761, at *6 (S.D.N.Y. Jan. 21, 2004) ("The judicial economy factor is a separate component of the [c]ourt's [Section] 1404(a) transfer analysis ... and may be determinative in a particular case.")

In *Berman v. Informix Corp.*, 30 F.Supp.2d 653, 660 (S.D.N.Y. 1998), the court held that "[t]rying all the related actions in California is far more efficient than allowing separate actions to proceed in New York and California." The court further held: "Transfer will prevent duplicative litigation and avoid the risk of inconsistent results." *Id.*; *see also Recoton Corp. v. Allsop, Inc.*, 999 F.Supp. 574, 578 (S.D.N.Y.1998) ("[I]f this court were to deny [defendant's] motion to transfer, the parties may be subject to duplicative litigation. Therefore, in the interests of justice, and in the absence of any other factor weighing significantly on the side of maintaining the action in New York, the case should be transferred.")

Transfer of this action to the CDCA will prevent duplicative litigation and the risk of inconsistent results. As set forth above, this action is closely related to the California Actions because they all arise out of the same allegations of an intimate relationship between Plaintiff and Mr. Trump, and the Settlement Agreement related thereto, the terms of which have been subject to litigation in the Arbitration and First California Action since February 2018 – months before this action was filed. If this case is not transferred, this Court could be required to rule upon the arbitration provision at issue in the Arbitration Motion and Plaintiff's declaratory relief claim in the First California Action, while the First California Action is pending and/or remains stayed.[8] Moreover, the substantial overlap between Plaintiff's defamation claims against Mr.

---

[8] This is particularly problematic because Mr. Cohen is "the person with the most direct

Trump and Mr. Cohen makes it likely that this Court will decide the same or similar issues presented in the First California Action, if this case is not transferred.

### ii. The Related Actions Need Not Be Identical For A Transfer

"[T]he issue is not whether identical causes of action have been pled in the two actions but whether they hinge upon the same factual nuclei." *Dahl v. HEM Pharm. Corp.*, 867 F.Supp. 194, 197 (S.D.N.Y. 1994) (internal quotations omitted); *see also APA Excelsior III L.P. v. Premiere Techs., Inc.,* 49 F.Supp.2d 664, 670 (S.D.N.Y. 1999) (transferring New York case to Atlanta because "both actions hinge on the same core of operative facts and … a transfer will serve the interests of judicial economy and fairness by avoiding duplicative litigation and the possibility of inconsistent rulings.")

In *Eres N.V. v. Citgo Asphalt Refining Co.*, 605 F.Supp.2d 473 (S.D.N.Y. 2009), the court transferred the case to the Southern District of Texas, where a related case was being heard, because both cases required a court to interpret the same underlying contracts.  The court held:

> Judicial economy and the interests of justice support a transfer because a transfer would allow one court to perform a full analysis of the documents and the circumstances surrounding their execution, and that court can then render one ruling interpreting all of the contracts in their entirety.

*Id*. at 483.  In addition to supporting judicial economy, the court found that a transfer would prevent the risk of inconsistent rulings and issues of claim preclusion and issue preclusion.  *Id.*; *see also Marvel Entm't, LLC v. Kimble,* 2010 WL 5174398, at *3 (S.D.N.Y. Dec. 20, 2010) (transferring case to Arizona, where related action was already pending in Arizona and that court had already ruled on issues related to enforceability of agreements at issue in both cases); *Delta Air Lines, Inc. v. Ass'n of Flight Attendants, CWA*, 720 F. Supp. 2d 213, 221 (E.D.N.Y. 2010)

---

knowledge of the facts and circumstances surrounding [the Settlement Agreement's] formation" and has declared his intention to assert his Fifth Amendment rights.  [Harder Decl., Ex. A, p. 7.]

(transferring case to the District of Columbia where, "[a]fter review of the pleadings and motion papers in the two lawsuits, the Court believes that the District of Columbia and New York actions are sufficiently interrelated that the interests of justice and judicial economy demand that they be decided in the same forum, by one court familiar with the various legal and factual issues, and responsible for the resolution of all of them.")

In *Columbia Pictures Industries, Inc. v. Fung*, 447 F. Supp. 2d 306 (S.D.N.Y. 2006), the court transferred an action for copyright infringement by several movie studios from the SDNY to the CDCA, where a similar action was already pending, even though the CDCA case (which had been brought by the same plaintiffs) involved a different defendant.  Noting that "[a] comparison of the complaint in this case and the complaint in the California action reveals that although the defendants are different, the theories of liability … are substantially similar," the court held that "[t]he interest of judicial economy will … be served, and the possibility of inconsistent decisions avoided, by the same court hearing both cases."  *Id.* at 310.

As demonstrated herein, this action is sufficiently interrelated with the California Actions that the interests of justice and judicial economy warrant a transfer of this action to the CDCA.

### iii.    The Venue Provision In The Settlement Agreement Supports Transfer

Where a valid forum selection clause exists, as here, "the plaintiff's choice of forum merits no weight."  *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 63-65 (2013).  "Rather, as the party defying the forum-selection clause, the plaintiff bears the burden of establishing that transfer to the forum for which the parties bargained is unwarranted."  *Id*; *see also Eres*, 605 F. Supp. 2d at 479 ("When considering a motion to transfer venue involving a forum selection clause, the forum selection clause is a significant factor to be weighed along with a number of case-specific factors."); *Akers Biosciences, Inc. v. Martin*, 2015

14

WL 1054971, at *4 (S.D.N.Y. Mar. 10, 2015) ("[T]he Supreme Court has made clear that 'a proper application of § 1404(a) requires that a forum-selection clause be given controlling weight in all but the most exceptional cases.'") (quoting *Atl. Marine*, 571 U.S. at 59).

The Settlement Agreement that Plaintiffs signed, for which she was paid $130,000 (and has not returned or even interpleaded), contains a venue selection clause that requires "any dispute or controversy relating to [the Settlement] Agreement" to be venued in California, Nevada or Arizona. [Harder Decl., Ex. 1 to Ex. C, p. 12.] Consistent with that provision, Plaintiff filed and maintained the First California Action in California, notwithstanding her allegations that neither she, nor any of the other three parties, are California residents. [*Id*., Ex. C, ¶¶ 1-4.] Accordingly, transfer is appropriate to give effect to the parties' agreement to California as one of three possible states for venue.

### iv.    The Convenience Factors Support A Transfer

"In determining whether a case should be transferred under [Section] 1404(a), the relevant factors include: (1) the convenience of the witnesses, (2) the convenience of the parties, (3) the location of relevant documents and the relative ease of access to sources of proof, (4) the locus of operative facts, (5) the availability of process to compel the attendance of unwilling witnesses, (6) the relative means of the parties, (7) the forum's familiarity with governing law, (8) the weight accorded to plaintiff's choice of forum, and (9) trial efficiency and the interests of justice, based on the totality of the circumstances." *Columbia Pictures*, 447 F.Supp.2d at 309.

"There is no strict formula for the application of these factors, and no single factor is determinative." *Scherillo v. Dun & Bradstreet, Inc.*, 684 F.Supp.2d 313, 318–19 (E.D.N.Y. 2010). "Although these factors are essentially those considered in determining whether an action should be dismissed for *forum non conveniens*, section 1404(a) vests courts with power to

exercise broader discretion to grant transfers upon a lesser showing of inconvenience than is required under the *forum non conveniens* analysis." *U.S. Fid. & Guar. Co. v. Republic Drug Co.*, 800 F.Supp. 1076, 1080 (E.D.N.Y. 1992); *see also Norwood v. Kirkpatrick*, 349 U.S. 29, 32 (1955). Here, these factors militate heavily in favor of a transfer to the CDCA.

### 1. Convenience of Witnesses

"The convenience of witnesses is typically regarded by courts as the most important factor in considering a motion to transfer pursuant to § 1404(a)." *AIG Fin. Prod. Corp. v. Pub. Util. Dist. No. 1 of Snohomish Cty., Wash.*, 675 F.Supp.2d 354, 369 (S.D.N.Y. 2009). "Generally, the convenience of non-party witnesses is accorded more weight than that of party witnesses." *Id.* (internal quotations omitted). "In assessing this factor, 'a court does not merely tally the number of witnesses who reside in the current forum in comparison to the number located in the proposed transferee forum.'" *Id.* (quoting *Herbert Ltd. v. Elec. Arts Inc.*, 325 F.Supp.2d 282, 286 (S.D.N.Y. 2004)). Rather, "the court must qualitatively evaluate the materiality of the testimony that the witnesses may provide." *Id.* "The convenience of witnesses who reside in neither the current nor the transferee forum is irrelevant when considering a motion to transfer." *Herbert Ltd. P'ship v. Elec. Arts Inc.*, 325 F. Supp. 2d 282, 288 (S.D.N.Y. 2004); *see also Eres*, 605 F.Supp.2d at 480.

The following witnesses are believed to reside in California, and are expected to testify regarding the following subject matters:

- **Michael Avenatti**: Mr. Avenatti's principal place of business is in Newport Beach, California, located within the CDCA. [Harder Decl., ¶ 15.a., Ex. N.] It is anticipated that Mr. Avenatti will testify regarding the preparation of the sketch of the alleged perpetrator of the Alleged 2011 Incident (he apparently oversaw preparation of the sketch), along with his

numerous television appearances discussing the circumstances surrounding its creation.  [*Id*.]

- **Keith Davidson**:  Mr. Davidson's principal place of business is in Beverly Hills, California, located within Los Angeles County and the CDCA.  [Harder Decl., ¶ 15.b., Ex. O.] Mr. Davidson is Plaintiff's former attorney, represented her in connection with the Settlement Agreement, and appears to have represented her as recently as January 30, 2018.  [*Id*., Ex. H, ¶¶ 5-6, Ex. P, Ex. Q, Ex. X, ¶¶ 11-13.]  Mr. Davidson may have information that refutes Plaintiff's assertions relating to the formation, execution and performance of the Settlement Agreement; the Alleged 2011 Incident; and/or the sketch of the alleged perpetrator of the Alleged 2011 Incident. [*Id*.]

- **Gina Rodriquez**:  Ms. Rodriquez is located in Encino, California, located within Los Angeles County and the CDCA.  [Harder Decl., ¶ 15.c., Ex. R,.]  Ms. Rodriquez is Plaintiff's former manager and represented her in connection with the Settlement Agreement, and appears to have represented her as recently as February 2018.  [*Id*., Ex. S.]  On February 15, 2018, Ms. Rodriquez stated: "Everything is off now, and Stormy is going to tell her story."  [*Id*.] Mr. Rodriguez may have information that refutes Plaintiff's assertions relating to the formation, execution and performance of the Settlement Agreement; the 2011 Alleged Incident; and/or the sketch of the alleged perpetrator of the 2011 Alleged Incident.  [*Id*.]

- **Anthony Kotzev**:  Mr. Kotzev is located in Encino, California, located within Los Angeles County and the CDCA.  [Harder Decl., ¶ 15.d., Ex. T.]  Mr. Kotzev is Ms. Rodriguez's business partner.  [*Id*., Ex. U.]  According to Mr. Kotzev, Plaintiff's claim that she was intimidated and coerced into signing the January 30, 2018 Written Denial is "asinine," and "[s]he had no issues signing the paper when I was there."  [*Id*., Ex. P.]  Mr. Kotzev may have information that refutes Plaintiff's assertions relating to the formation, execution and

performance of the Settlement Agreement, the Alleged 2011 Incident, and/or the sketch of the alleged perpetrator of the Alleged 2011 Incident.  [*Id.*]

- **Stephanie Clifford**:  Plaintiff claims to be a resident of Texas.  [Dkt. No. 1, ¶ 1.] However, according to Plaintiff's Twitter page, she is located in "DFW [Dallas-Fort Worth], LA, and hotels everywhere."  [Harder Decl., ¶ 15.e., Ex. M.]  Thus, it appears that Plaintiff resides in Los Angeles, at least part of the time.  Moreover, Plaintiff filed both California Actions in Los Angeles.  It is anticipated that Plaintiff will testify regarding her allegations in this action, including her alleged relationship with Mr. Trump, the Alleged 2011 Incident, the negotiation, execution and performance of the Settlement Agreement, the preparation of the sketch depicting the purported unidentified male that allegedly threatened her in the Alleged 2011 Incident, and her claim of damages resulting from Mr. Trump's allegedly defamatory statement.  [*Id.*]

The only witness who is located in New York is Mr. Cohen.  However, Mr. Cohen stated in the First California Action that he would assert his Fifth Amendment rights in response to any questions posed in that action, and would presumably do so in this action given the substantial overlap between the cases.  [Harder Decl., Ex. A, p. 5.]  Regardless, Mr. Cohen is already a party to both California Actions.  Mr. Trump currently resides in the District of Columbia.  [Harder Decl., ¶ 16.a., Ex. C, ¶ 2.]  Lois Gibson, the person who prepared the sketch of the alleged perpetrator of the Alleged 2011 Incident, appears to reside in Houston, Texas.  [*Id.*, ¶ 16.b., Ex. L.]  Thus, this factor weighs in favor of a transfer.

2.   Convenience of Parties

The fact that a plaintiff "has been prepared to litigate in the [transferee district] undermines the credibility of her argument that transferring this action to [the transferee] jurisdiction would be inconvenient."  *Dahl v. HEM Pharm. Corp.*, 867 F.Supp. 194, 198

18

(S.D.N.Y. 1994).  Here, Plaintiff filed the First California Action, which was actively litigated in

the CDCA for over a month prior to the Stay Order, and then filed the Second California Action

in Los Angeles.  Plaintiff also appears to partially reside in Los Angeles.  Thus, Plaintiff cannot

credibly argue that a transfer of this action to the CDCA would be inconvenient.

### 3.   Location of Documents

"The location of relevant documents is largely a neutral factor in today's world of faxing,

scanning, and emailing documents."  *Mastr Asset Backed Sec. Tr. 2007-WMC1, ex rel. U.S. Bank*

*Nat. Ass'n v. WMC Mortg.* LLC, 880 F.Supp.2d 418, 422 (S.D.N.Y. 2012); *see also Am. Eagle*

*Outfitters, Inc. v. Tala Bros. Corp.*, 457 F.Supp.2d 474, 478 (S.D.N.Y. 2006).  This case is not

document-intensive and it is believed that most, if not all, of the relevant documents were

transmitted electronically.  Thus, this factor is neutral.

### 4.   Locus of Operative Facts

The events that allegedly gave rise to this action occurred in: Lake Tahoe, Nevada, where

Mr. Trump and Plaintiff supposedly met; Beverly Hills, California, where Mr. Trump and

Plaintiff supposedly met a second time; and Las Vegas, Nevada, the location of the Alleged 2011

Incident.  Moreover, Mr. Trump made the allegedly defamatory statement over the internet while

residing in the District of Columbia.  Thus, none of the operative facts occurred in this district,

and at least a portion occurred in the CDCA.

Importantly, Plaintiff alleges in the First California Action that the "(a) the alleged

[settlement] agreement that is at issue in this Complaint was purportedly made and negotiated, at

least in substantial part, in the County of Los Angeles, and (b) many of the events giving rise to

this action arose in California, including within the County of Los Angeles."  [Harder Decl., Ex.

C, ¶ 9.]  Thus, this factor weighs in favor of a transfer.  *See Boehner v. Heise*, 410 F.Supp.2d

228, 242 (S.D.N.Y. 2006) (holding that venue was appropriate in New York because "while the defamation claims arose out of a letter allegedly written in Wisconsin, the locus of operative facts involves events that occurred in New York, thus favoring venue in New York.")

        5.      <u>Availability of Process to Compel Attendance of Witnesses</u>

Pursuant to Rule 45(c)(1) of the Federal Rules of Civil Procedure, "a court generally cannot issue a subpoena that would compel a non-party witness to travel more than 100 miles or out of state."[9] *Pence v. Gee Grp., Inc.*, 236 F.Supp.3d 843, 857 (S.D.N.Y. 2017).

The majority of non-party witnesses are California residents that live within 100 miles of the Los Angeles courthouse in which the California Actions are pending, including Mr. Avenatti, Mr. Davidson, Ms. Rodriguez and Mr. Kotzev.  If this action were to remain in the SDNY, Mr. Trump would be unable to compel the attendance of any of those witnesses at trial because they all reside well over 100 miles away from the courthouse and outside the state of New York.  The other non-party witnesses either are located more than 100 miles from the SDNY (Ms. Gibson), or are a party to the California Actions (Mr. Cohen), in which case a subpoena to compel him to attend trial in the CDCA is unnecessary.  Thus, this factor weighs in favor of transfer.  *See Wagner v. New York Marriott Marquis*, 502 F.Supp.2d 312, 316 (N.D.N.Y. 2007) (the availability of process factor weighed in favor of transfer where "none of defendants' non-party witnesses could be compelled to appear in the Northern District for either a deposition or for trial in each matter because according to defendants, they all reside in the Southern District.")

---

[9] Rule 45(c)(1) provides: "A subpoena may command a person to attend a trial, hearing, or deposition only as follows: (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person (i) is a party or a party's officer; or (ii) is commanded to attend a trial and would not incur substantial expense."

6.     Familiarity with Governing Law

"Familiarity with the governing law as a factor in determining transfer of venue is generally given little weight in federal courts." *Am. Eagle Outfitters, Inc. v. Tala Bros. Corp.*, 457 F.Supp.2d 474, 479 (S.D.N.Y. 2006). Thus, this factor is neutral.

7.     Plaintiff's Choice of Forum

Plaintiff's choice of venue is not entitled to any deference under the circumstances. A plaintiff's choice of forum "is accorded less deference where… 'the plaintiffs' chosen forum is neither their home nor the place where the operative facts of the action occurred.'" *Columbia Pictures*, 447 F. Supp. 2d at 310. "Moreover, when the plaintiff does not reside in the chosen district and only selected the forum for tactical advantage, the plaintiff is afforded little to no deference." *Levy v. Welsh*, 2013 WL 1149152, at *5 (E.D.N.Y. Mar. 19, 2013) (citing *Capmark Financial Group Inc. v. Goldman Sachs Credit Partners L.P.*, 2012 WL 698134, at *11 (S.D.N.Y. Mar. 5, 2012)). "[T]he more it appears that the plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons ... the less deference the plaintiff's choice commands." *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 72 (2d Cir. 2001). Here, Plaintiff alleges that she is a Texas resident. Moreover, Plaintiff engaged in flagrant forum shopping by filing this action here, rather than simply adding a claim in the already-pending First California Action.

8.     Relative Means of the Parties

Plaintiff cannot credibly argue that litigating this action in the CDCA, where the California Actions are already pending, would impose an undue hardship on her. To the contrary, it would necessarily pose far less of a financial hardship to litigate the claims in this action in the court where the two California Actions are pending. Neither Plaintiff nor her counsel live or work in the SDNY – Plaintiff claims to be a Texas resident who partially resides

in Los Angeles; her lead counsel lives and works within the CDCA; and her local counsel in this action is located in Connecticut (whose participation is required because Plaintiff's lead counsel is not admitted to practice in New York or this district).  Thus, this factor favors a transfer.  *See Dahl v. HEM Pharm. Corp.*, 867 F. Supp. 194, 198 (S.D.N.Y. 1994) (a plaintiff who "has been prepared to litigate in the [transferee action] undermines the credibility of her argument that transferring this action to [the transferee jurisdiction] would be inconvenient."); *Hernandez v. Graebel Van Lines*, 761 F. Supp. 983, 989 (E.D.N.Y. 1991) ("Here, while the defendant…is a corporation and the plaintiff is an individual, no showing has been made that litigating this action in the Southern District of Florida would impose an undue hardship upon the plaintiff.")

## b.   In The Alternative, This Case Should Be Dismissed Or Stayed Under The "First-Filed" Rule

The "first-filed" rule also supports a transfer of this case.  *See Blechman v. Ideal Health, Inc.*, 668 F.Supp.2d 399, 404 (E.D.N.Y. 2009) (when "the first-filed rule is invoked in support of a motion to transfer, the court considers the rule as one among several factors in the overall calculus of efficiency and the interests of justice.") (citing *Am. Steamship Owners Mut. Prot. & Indem. Ass'n, Inc. v. Lafarge N. Am., Inc.*, 474 F. Supp. 2d 474, 481 (S.D.N.Y. 2007)).  In the alternative, "the Second Circuit has long followed the 'first-filed rule' in deciding whether a case should be stayed or dismissed in favor of a case pending in another federal court."  *Regions Bank v. Wieder & Mastroianni, P.C.*, 170 F.Supp.2d 436, 439 (S.D.N.Y. 2001).  "When two actions involving the same parties and issues are pending concurrently, courts in the Second Circuit follow the 'first-filed' rule whereby the court which first has possession of the action decides it."  *Reliance Ins. Co. v. Six Star, Inc.*, 155 F. Supp. 2d 49, 54 (S.D.N.Y. 2001); *see also New York Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 112 (2d Cir. 2010).

"While the decision whether or not to stay or dismiss a proceeding rests within a district judge's discretion, normally sound judicial discretion dictates that the second court decline its consideration of the action before it until the prior action before the first court is terminated…" *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 722–23 (2d Cir. 2010).

"The 'first filed' rule is based on principles of judicial economy, comity, and an interest in avoiding duplicative litigation." *Pergo, Inc. v. Alloc, Inc.*, 262 F.Supp.2d 122, 131 (S.D.N.Y. 2003). "The purposes of this rule are to 'avoid duplication of judicial effort, avoid vexatious litigation in multiple forums, achieve comprehensive disposition of litigation among parties over related issues, and eliminate the risk of inconsistent adjudication.'" *Regions Bank v. Wieder & Mastroianni, P.C.*, 170 F.Supp.2d 436, 439 (S.D.N.Y. 2001) (quoting *Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co.*, 342 U.S. 180, 183 (1952)). "The United States Supreme Court has acknowledged that application of the 'first-filed' rule promotes 'wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation....'" *Wyler-Wittenberg v. MetLife Home Loans, Inc.*, 899 F.Supp.2d 235, 244 (E.D.N.Y. 2012) (quoting *Kerotest Mfg. Co. v. C–O–Two Fire Equipment Co.*, 342 U.S. 180, 183 (1952)); *see also First City Nat. Bank & Tr. Co. v. Simmons*, 878 F.2d 76, 80 (2d Cir. 1989). "Generally, there is a strong presumption in favor of the forum of the first-filed suit." *800-Flowers, Inc. v. Intercontinental Florist, Inc.*, 860 F. Supp. 128, 131 (S.D.N.Y. 1994).

### i.   This Case Is Substantially Similar To The First California Action

"For the first-filed rule to apply, the two cases at issue must be substantially similar, but they need not be identical." *Wells Fargo Advisors, L.L.C. v. Tucker*, 195 F.Supp.3d 543, 552 (S.D.N.Y. 2016); *see also Manufacturers Hanover Tr. Co. v. Palmer Corp.*, 798 F.Supp. 161, 167 (S.D.N.Y. 1992) ("The interests of justice require that the cases be related, not identical.");

23

*Intema Ltd. v. NTD Labs., Inc.*, 654 F.Supp.2d 133, 141 (E.D.N.Y. 2009).  Further, application of the rule does not require *identical* parties in the cases, but merely requires substantial overlap." *Wyler-Wittenberg*, 899 F.Supp.2d at 244 (emphasis in original).

The First California Action and this case have substantially similar parties.  Plaintiff and Mr. Trump parties to both cases.  The other defendants in the First California Action, Mr. Cohen and EC, are closely related to the dispute between Plaintiff and Mr. Trump.  Mr. Cohen is a defendant and key witness in the First California Action, and is also a witness in this action. According to Plaintiff "it is reasonable to infer that the person who threatened Ms. Clifford could have only been acting directly or indirectly on behalf of Mr. Trump and/or Mr. Cohen."  [Dkt. No. 1, ¶ 31.]  EC is a defendant in the First California Action, a signatory to the Settlement Agreement, and it filed the Arbitration Motion, in which Mr. Trump joined.

Moreover, the First California Action and this case involve substantially similar claims. Plaintiff's declaratory relief claim in the First California Action, and her opposition to the Arbitration Motion, challenge the enforceability of the arbitration provision that applies to the claim in this action.  Further, Plaintiff's claims for defamation against Mr. Trump and Mr. Cohen substantially overlap because the two statements at issue both allegedly accuse Plaintiff of being a liar, both statements arise out of Mr. Trump's alleged relationship with Plaintiff, and both claims raise the same or similar issues, including that the statements were substantially true, that Plaintiff has suffered no damages, and that the statements are protected opinion.

### ii.     There Is No Exception To The "First-Filed" Rule Where The Plaintiff Is The Same In Both Actions

There is no exception to the "first-filed" rule where, as here, the same party is the plaintiff in both actions.  In *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1202 (2d

Cir. 1970), the "same party [was] plaintiff in both actions." The Second Circuit found

"insufficient grounds for departing from the general rule that in the absence of sound reasons the

second action should give way to the first," stating:

> …any exception for cases where the same party is plaintiff in both actions would
> entail the danger that plaintiffs may engage in forum shopping or, more accurately,
> judge shopping. When they see a storm brewing in the first court, they may try to
> weigh anchor and set sail for the hopefully more favorable waters of another
> district…

*Id.* at 1203; *see also Kellen Co. v. Calphalon Corp.*, 54 F.Supp.2d 218, 223 (S.D.N.Y. 1999)

("*Semmes Motors*…suggests that a case such as this, in which the plaintiff is the same in both

actions, should not be excepted from the first-filed rule because doing so would encourage forum

shopping."); *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 723 (2d

Cir. 2010). "More recently, in *Kellen*, a court in this district followed the holding of *Semmes* and

dismissed a second-filed action by a plaintiff who had previously initiated a similar action in

Ohio." *Cole v. Edwards*, 2004 WL 1874970, at *3-4 (S.D.N.Y. Aug. 13, 2004). "As in *Semmes*,

the *Kellen* Court found the first-filed doctrine to be equally applicable where the plaintiff in both

actions was the same…" *Id.* Accordingly, the fact that Plaintiff brought both this action and the

California Actions does not prevent application of the "first-filed" rule.

## V.   <u>CONCLUSION</u>

For the foregoing reasons, Mr. Trump respectfully requests that the Court transfer this

action to the Central District of California under 28 U.S.C. § 1404(a), or, in the alternative,

dismiss or stay this action pursuant to the "first-filed" rule.

Dated:  July 23, 2018

**HARDER LLP**

Respectfully submitted,

By:  */s/ Charles Harder*
Charles J. Harder, Esq.
charder@harderllp.com
Anthony Harwood, Esq.
aharwood@harderllp.com
260 Madison Avenue, 16th Floor
New York, New York 10016
(212) 799-1400

*Counsel for Defendant Donald J. Trump*