HARDER LLP
CHARLES J. HARDER (CA Bar No. 184593)
RYAN J. STONEROCK (CA Bar No. 247132)
132 S. Rodeo Drive, Fourth Floor
Beverly Hills, California 90212
Telephone:   (310) 546-7400
Facsimile:   (310) 546-7401
Email:        CHarder@HarderLLP.com
              RStonerock@HarderLLP.com

Attorneys for Defendant
DONALD J. TRUMP

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHANIE CLIFFORD a.k.a. STORMY DANIELS,<br><br>Plaintiff,<br><br>v.<br><br>DONALD J. TRUMP,<br><br>Defendant. | Case No. 2:18-cv-06893-SJO-FFM<br><br>**NOTICE OF MOTION AND SPECIAL MOTION OF DEFENDANT DONALD J. TRUMP TO DISMISS/STRIKE COMPLAINT PURSUANT TO ANTI-SLAPP STATUTE OR, ALTERNATIVELY, TO DISMISS COMPLAINT PURSUANT TO FRCP 12(b)(6); MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>[Declaration of Charles J. Harder Filed Concurrently Herewith]<br><br>Assigned for All Purposes to the Hon. S. James Otero<br><br>**Date:        September 24, 2018**<br>**Time:        10:00 a.m.**<br>**Location:   350 West 1st Street**<br>**                 Courtroom 10C, 10th Floor**<br>**                 Los Angeles, CA 90012**<br><br>Action Filed:  April 30, 2018 |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on September 24, 2018, at 10:00 a.m., or as soon thereafter as the matter may be heard in Courtroom 10C, located at the United States District Court, 350 West 1st Street, Los Angeles, California 90012, the Honorable S. James Otero presiding, Defendant Donald J. Trump will move and hereby does move to dismiss Plaintiff's Complaint pursuant to Tex. Civ. Practice & Rem. Code § 27.001 *et seq*., or alternatively, to strike the Complaint pursuant to California Code of Civil Procedure section 425.15 *et seq*., or alternatively, to dismiss the Complaint pursuant to Federal Rules of Civil Procedure ("FRCP") Rule 12(b)(6).

This Motion shall be based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities and Declaration of Charles J. Harder, the anticipated reply papers, all materials that may be properly considered in connection with this motion, and oral argument at the hearing.

Pursuant to Local Rule 7-3, the parties met and conferred regarding this motion on August 20, 2018, and again on August 23, 2018.

Dated: August 27, 2018                     HARDER LLP

By:  */s/ Charles J. Harder*
        CHARLES J. HARDER
        Attorneys for Defendant
        DONALD J. TRUMP

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................... 1

II.   STATEMENT OF FACTS ......................................................................... 3

III.  ARGUMENT ............................................................................................ 7

      A. THIS ACTION IS GOVERNED BY TEXAS LAW ......................... 7

      B. THE TEXAS ANTI-SLAPP STATUTE APPLIES TO THIS
         ACTION ............................................................................................. 8

      C. THE COMMENT EXPRESSES A CONSTITUTIONALLY-
         PROTECTED OPINION ................................................................... 9

      D. INDEPENDENTLY, PLAINTIFF CANNOT ESTABLISH SHE
         SUFFERED ANY DAMAGES ....................................................... 11

      E. PLAINTIFF CANNOT SHOW ACTUAL MALICE ...................... 14

      F. PRESIDENT TRUMP IS ENTITLED TO AN AWARD OF HIS
         REASONABLE ATTORNEY'S FEES ........................................... 16

IV.   ALTERNATIVELY, THE COURT SHOULD STRIKE THE
      COMPLAINT PURSUANT TO CALIFORNIA'S ANTI-SLAPP
      STATUTE ............................................................................................... 16

V.    ALTERNATIVELY, THE COURT SHOULD DISMISS THE
      COMPLAINT PURSUANT TO FRCP 12(b)(6) .................................... 17

VI.   CONCLUSION ....................................................................................... 18

MOTION TO DISMISS

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) .................................................................................18

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) .................................................................................17

*Buckley v. Littell,*
    539 F.2d 882 (2d Cir. 1976) ...................................................................10

*Calder v. Jones,*
    465 U.S. 783 (1984) ...................................................................................7

*Condit v. Dunne,*
    317 F. Supp. 344 (S.D.N.Y. 2004) ...........................................................7

*Dallas Morning News, Inc. v. Tatum,*
    2018 WL 2182625 (Tex. May 11, 2018).............................................9, 10

*Gabrielson v. Montgomery Ward & Co.,*
    785 F.2d 762 (9th Cir. 1986) ...................................................................18

*Gertz v. Robert Welch, Inc.,*
    418 U.S. 323 (1974) .......................................................................9, 14, 15

*Greene v. State,*
    21 So.3d 348 (La. App. 2009) .................................................................10

*Gregory v. McDonnell-Douglas Corp.,*
    17 Cal. 3d 596 (1976) .............................................................................17

*Hancock v. Variyam,*
    400 S.W.3d 59 (Tex. 2013) .....................................................................11

*KTRK Television, Inc. v. Robinson,*
    409 S.W.3d 682 (Tex. App. 2013) .....................................................11, 12

*Letter Carriers v. Austin,*
    418 U.S. 264 (1974) .................................................................................10

*Locke v. Aston,*
    814 N.Y.S.2d 38 (N.Y.A.D. 2006)............................................................7

*McCabe v. Rattiner*,
    814 F.2d 839 (1st Cir. 1987) ...................................................................10

*Neely v. Wilson*,
    418 S.W.3d 52 (Tex. 2013) ....................................................................10

*Oilman v. Evans*,
    750 F.2d 970 (D.C. Cir. 1984)...............................................................10

*Sarver v. Chartier*,
    813 F.3d 891 (9th Cir. 2016) ...................................................................7

*Sondik v. Kimmel*,
    16 N.Y.S.3d 296 (N.Y.A.D. 2015) ..........................................................7

*St. Amant v. Thompson*,
    390 U.S. 727 (1968) ...............................................................................15

## **Statutes and Rules**

Cal. Civ. Code § 45a.....................................................................................17

Cal. Code Civ. Proc. § 425.16 ........................................................16, 17, 18

Fed. R. Evid. 201 ...........................................................................................3

Fed. R. Civ. Procedure 12.....................................................................2, 17, 18

Nev. Rev. Stat. § 287.280 .............................................................................12

Tex. Civ. Prac. & Rem. Code § 27.001 ...............................................8, 9, 18

Tex. Civ. Prac. & Rem. Code § 27.003 .........................................................8

Tex. Civ. Prac. & Rem. Code § 27.005 .........................................................8

Tex. Civ. Prac. & Rem. Code § 27.006 .........................................................8

Tex. Civ. Prac. & Rem. Code § 27.009 .......................................................16

Tex. Civ. Prac. & Rem. Code § 73.055 .......................................................14

## **Other Authorities**

*Restatement (Second) Conflicts of Law* § 150 cmt.......................................7

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

Plaintiff's Complaint is a classic SLAPP or "Strategic Lawsuit Against Public Participation."  Plaintiff Stephanie Clifford ("Plaintiff"), also known by her stage name, "Stormy Daniels," is a famous adult film star and exotic dancer who created (with her lawyer, Michael Avenatti, acting on her behalf) a highly publicized dispute with the President of the United States, Defendant Donald J. Trump.  In March 2018, during the course of publicizing her dispute with the President, Plaintiff—for the first time in seven years—made the claim that someone in 2011 (without specifying the date, week or even month), whom she assumes was acting on behalf of Mr. Trump, threatened her on a street in Las Vegas, Nevada.  President Trump tweeted his utter disbelief of Plaintiff's claim.  Plaintiff, claiming to be upset and harmed by the tweet, sued him in this action.

Plaintiff's suit is barred by numerous defamation doctrines.

First, the President's tweet is a protected opinion.  Politicians, in the course of public debate, are entitled to enter the debate and express their beliefs, including their disbeliefs, of the claims of their adversaries.  Plaintiff is a vocal adversary of the President; she and her lawyer, Mr. Avenatti, acting on her behalf, have publicly attacked the President in more than 140 television news appearances in the past five months.  Mr. Avenatti feels his attacks on the President (while acting on Plaintiff's behalf) have been so effective that he now is exploring a run for Presidency of the United States himself.

Second, Plaintiff has not pleaded and cannot prove that she suffered any damages as a result of the tweet.  Plaintiff has capitalized on her dispute with the President, embarking on a nationwide tour of adult live entertainment venues (a.k.a., strip clubs) for which she admittedly is being paid at least four times her normal appearance fee because of her public controversy with the President.  Her publicity campaign against the President has included an appearance on *60 Minutes* that

reportedly was watched by 22 million people, an appearance on *The View*, a national television news program, and an appearance on *Saturday Night Live*—poking fun at her public dispute with the President.  These appearances have generated massive publicity for Plaintiff, which in turn has generated sizeable audiences for her "Make America Horny Again" tour of strip clubs throughout America.  Even the name of her tour is an obvious parody of the President's successful campaign slogan, designed to further generate interest in, and audiences for, her strip club appearances.  Plaintiff is making money—not suffering economic harm—as a result of her disputes with the President, and her heavy promotion of her claim that an alleged unidentified man supposedly threated her on some day in 2011 (which she discussed in her appearances on *60 Minutes* and *The View*) is a major part of her publicity campaign attacking the President, touring strip clubs, and generating profits to her.

Third, Plaintiff is a clear public figure.  As such, she is required to plead and prove actual malice, *i.e.*, that the President had reckless disregard for the truth when he tweeted his expression of disbelief about her story regarding an alleged unidentified man who supposedly threatened her on some day in 2011—an alleged act that Plaintiff has never reported to law enforcement: not in 2011, nor in 2018, nor at any other time.  The Complaint fails to adequately plead actual malice, and Plaintiff cannot prove it with any evidence, because there was no reckless disregard.

This suit (and its companion suit filed on March 6, 2018, pending in the same Court), is nothing more than a public relations move by Plaintiff and her outspoken lawyer to obtain still more publicity and attention.  This suit improperly injects the United States courts into what is effectively a public debate involving a major politician and one (or two) of his public antagonists.  This suit is designed to chill the President's free speech rights on matters of public concern.  Accordingly, the Court should grant this special motion to dismiss the Complaint and award reasonable attorneys' fees to Mr. Trump.  In the alternative, the Court should dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

## II.   STATEMENT OF FACTS

Plaintiff is a Texas resident.  [Complaint, ¶ 1.]  She is a well-known adult film star with over 150 film credits, including titles such as *Dripping Wet Sex 4*, *Spreading My Seed*,  *Young & Anal*,  *Love In An Elevator*, *Pussy Sweat*, *Porking With Pride 2* and *Toxxxic Cumloads 6*.  [Declaration of Charles J. Harder ("Harder Decl."), Ex. A, Stormy Daniels' IMDB page.]

Plaintiff claims that in 2006 she engaged in adultery by having an intimate encounter with Mr. Trump, ten years before he became President—an allegation he has denied.  [Complaint, ¶ 5.]

The President resides and works at The White House in Washington, D.C., and did so at the time of sending the tweet in question.[1]  (The Complaint incorrectly alleges that he lives in New York.)

As the Court is aware, Plaintiff's claim of an intimate encounter in 2006, which she made public in March 2018, gave rise to a related case currently pending in this Court:  *Clifford v. Trump*, No. 2:18-CV-02217 (the "Related Case"). Coinciding with her filing of the Related Case, Plaintiff embarked on an extensive publicity campaign which has included appearances on *60 Minutes*, *The View*, *Saturday Night Live*, and press conferences outside of U.S. courthouses, as well as widespread television news appearances and press conferences by her litigation counsel, Michael Avenatti, amplifying her claims.  [Harder Decl., Ex. B, *60 Minutes* transcript; Ex. C, *The View* transcript; Ex. D, *Saturday Night Live* transcript; Ex. E, Chart of Interviews.]  Mr. Avenatti has parlayed his newfound fame into recent public statements that he is exploring a run for President of the United States in 2020, to unseat President Trump, and has made political appearances in Iowa and New Hampshire (the states of the first primary and caucus), and even released a statement

---

[1] The fact that the President lives and works at the White House is judicially noticeable under Fed. R. Evid. 201(b)(1).

of his political policy positions.  [Harder Decl., Ex. F, Avenatti Tweet; Ex. G, Avenatti Policy Positions; Ex. H, Des Moines Register article regarding Avenatti's Iowa political appearance; Ex. I, *Time* magazine article regarding Avenatti's New Hampshire political appearance; *see also*, television interview of Avenatti regarding his presidential campaign ambitions at https://www.nbcnews.com/ video/michael-avenatti-visits-iowa-state-fair-contemplates-presidential-run-1298423363691?v=raila.]

Plaintiff has embarked on a tour of appearances at strip clubs around the country, including Los Angeles, New York, Tampa, Myrtle Beach, Atlanta, and St. Louis, calling it the "Make America Horny Again" tour.  [Harder Decl., Ex. J, Appearance Schedules.]

In her *60 Minutes* interview, aired March 25, 2018 and reportedly watched by 22 million viewers, and subsequently during her interview on *The View* on April 17, 2018, Plaintiff claimed that sometime in 2011 (without specifying the date, week or even month), she was approached by an unidentified stranger in a parking lot in Las Vegas, Nevada when she was with her infant daughter.  [Harder Decl., Exs. B-C.] The stranger allegedly told her to "leave Trump alone" and "forget the story," and said that her daughter was beautiful and that it would be a shame if something happened to her mother.  [*Id*.]  Plaintiff implied that the alleged threat came from somewhere in the Trump organization.  [*Id*.]  Mr. Avenatti, acting on Plaintiff's behalf, has repeated this charge in television appearances attacking the President. [*See e.g.* Harder Decl., Exhibit C; Exhibit K, Interview Transcript; Exhibit M, *infra*.]

President Trump, faced with Plaintiff and her lawyer making numerous public attacks against him, including charging him with ordering threats to be made against Plaintiff in 2011, responded to this explosive allegation in the tweet that gave rise to this suit.

As part of her television appearances on *60 Minutes* and *The View* announcing for this first time this alleged thug encounter supposedly from seven years earlier,

-4-

1  Plaintiff (or her attorney, Mr. Avenatti, acting on her behalf) hired a professional
2  sketch artist to draw a picture of the alleged man whom she claims threatened her.
3  [Complaint, ¶ 15; *see also*, Harder Decl., Ex. L, Avenatti Tweet.]

4      An unrelated twitter user then posted a satirical tweet remarking on the
5  uncanny resemblance of the alleged man in the sketch to Plaintiff's estranged
6  husband, placing within the tweet a side-by-side of the sketch with a photograph of
7  Plaintiff's estranged husband.  [Complaint, ¶ 16.]  President Trump responded to that
8  tweet by replying to the third party tweet, commenting on the credibility of Plaintiff's
9  allegations about the alleged man in 2011 who supposedly threatened her:  "A sketch
10  years later about a nonexistent man. A total con job, playing the Fake News Media
11  for Fools (but they know it)!" (hereinafter the "Comment") [*Id.*, ¶ 15.]

12     Plaintiff's litigation counsel, Mr. Avenatti, reacted to the Comment on CNN by
13  calling it "another gift from the heavens."  [Harder Decl., Ex. M, Interview
14  Transcript.]  However, Plaintiff and Mr. Avenatti apparently changed their minds and
15  decided instead to allege that the Comment was highly damaging, and then filed the
16  instant lawsuit.

17     Regarding facts relating to Plaintiff's damages allegations, the Complaint
18  alleges that the Comment was defamatory *per se* because it (allegedly) accused
19  Plaintiff of a serious crime, *i.e.*, that she falsely accused an individual of threatening
20  her.  [Complaint, ¶ 19.]  The Complaint does not state a legal basis for how it could
21  be a criminal act for Plaintiff to falsely state on television that she received a threat
22  from an unidentified man seven years earlier.  The Complaint also does not identify
23  what law such an act supposedly would violate, or how such law could be violated
24  under these alleged facts.

25     The Complaint further alleges that Plaintiff would be subjected to threats of
26  violence and economic harm as a result of the Comment, and that she has retained
27  *extra* private security as a result of threats she has received.  [Complaint, ¶¶ 35-36.]
28  However, the Complaint does not allege that any such threats are specifically

connected to the Comment, as compared with the private security she presumably hired related to the preexisting public controversy—which she and her lawyer created and have fueled—arising from her claims that she committed adultery by allegedly having a romantic encounter with Mr. Trump in 2006,[2] and/or the massive attack campaign by Mr. Avenatti (acting on her behalf) against the President, which commenced more than a month prior to the Comment and has continued for months after the Comment.

The Complaint also does not specify any economic harm that Plaintiff allegedly has suffered as a result of the Comment (only), as opposed to the many other aspects of her public attack campaign against the President.

Shortly after filing the Related Case, Plaintiff made appearances at various adult entertainment clubs and boasted that her pay had "quadrupled" because of the publicity from her accusations against the President.  [Harder Decl., Exhs. P-Q.] Plaintiff's professional website even touts her campaign against the President to entice people to purchase a membership at her site, stating: "AS SEEN ON 60 MINUTES!!".  [*Id.*, Ex. R, Official Site of Stormy Daniels.]  Plaintiff also has used

_____

[2]  Plaintiff herself denied on six different occasions—in 2006, 2011, 2016, 2017 and twice in writing in January 2018—that she and Mr. Trump ever had a romantic encounter.  For example, on January 10, 2018, Plaintiff issued a signed written statement **expressly denying** that she had any form sexual or romantic affair with Mr. Trump (the "January 10, 2018 Written Denial").  [Harder Decl., Ex. N, ¶ 5.]  Twenty days later, on January 30, 2018, Plaintiff issued a second signed written statement titled "Official Statement of Stormy Daniels" wherein she again **expressly denied** having any sexual relationship with Mr. Trump (the "January 30, 2018 Written Denial") (collectively, with the January 10, 2018 Written Denial, the "Written Denials").  [*Id.*, Ex. N, ¶ 6.]  The Written Denials are consistent with an earlier denial made by Plaintiff in October 2011, when she told E! News that a story claiming that she and Mr. Trump had an affair was "bulls--t."  [*Id.*, Ex. O.]  In the January 30, 2018 Written Denial, Plaintiff states that she also publicly denied the affair in 2006, 2016 and 2017.  Thus, Plaintiff has expressly denied having any affair with Mr. Trump on at least six (6) occasions, including the Written Denials in 2018, and the additional denials in 2006, 2011, 2016 and 2017.

1  her dispute with President Trump to promote her strip club appearances through her

2  Instagram account.  [*Id.*, Ex. S, Instagram Promotions.]

3  **III.   ARGUMENT**

4  **A.   This Action Is Governed By Texas Law**

5        Because this action was transferred from New York, New York conflicts

6  principles apply to determine which substantive law to applies to this action.  *Sarver*

7  *v. Chartier*, 813 F.3d 891, 897 (9th Cir. 2016).  Under New York conflicts principles,

8  the law of the situs of the injury applies to a tort suit.  *Locke v. Aston*, 814 N.Y.S.2d

9  38, 42 (N.Y.A.D. 2006) ("Under New York's choice of law rules, where the plaintiff

10  and defendant are domiciled in different states, the applicable law in an action where

11  civil remedies are sought for tortious conduct is that of the situs of the injury.");

12  *Sondik v. Kimmel*, 16 N.Y.S.3d 296, 298 (N.Y.A.D. 2015) (New York law applied to

13  suit for privacy invasion against Jimmy Kimmel television show even though video

14  was edited in California, because the injury to the plaintiff, who is domiciled in New

15  York, happened in New York).

16        In *Condit v. Dunne*, 317 F. Supp. 344, 355 (S.D.N.Y. 2004), a true crime

17  author made allegedly defamatory statements on the Larry King television show and

18  the Laura Ingraham national radio show, of and concerning a former Congressman

19  living in California.  The court held that California law applied to these defamatory

20  comments.  *Cf. Restatement (Second) Conflicts of Law* § 150 cmt. e ("Rules of

21  defamation are designed to protect a person's interest in his reputation. When there

22  has been publication in two or more states of an aggregate communication claimed to

23  be defamatory, at least most issues involving the tort should be determined ... by the

24  local law of the state where the plaintiff has suffered the greatest injury by reason of

25  his loss of reputation.  **This will usually be the state of the plaintiff's domicile....**")

26  (emphasis added); *Calder v. Jones*, 465 U.S. 783, 788-89 (1984) (California courts

27  had personal jurisdiction over defendant who published defamatory statement of and

28  concerning California resident, because the injury was suffered in California).

Here, Plaintiff alleges in the Complaint that she is a Texas resident. Whatever personal injuries she claims to have suffered as a result of the Comment therefore occurred in Texas, where she is domiciled. Texas law therefore applies to this action.[3]

## B.    The Texas Anti-SLAPP Statute Applies to This Action

The Texas anti-SLAPP statute, Tex. Civ. Prac. & Rem. Code § 27.001 *et seq.*, applies to any "[e]xercise of the right to free speech," which in turn means "a communication made in connection with a matter of public concern." *Id.* § 27.001(3). A "matter of public concern" includes an issue related to a public official. *Id* § 27.001(7)(D).

The anti-SLAPP statute provides for a party to file a special motion to dismiss a covered Complaint. Tex. Civ. Prac. & Rem. Code § 27.003(a). "In determining whether a legal action should be dismissed under this chapter, the court shall consider the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based." *Id.* § 27.006(a). The Court must dismiss the action unless "clear and specific evidence [establishes] a prima facie case for each essential element of the claim in question". *Id.* § 27.005(c).

In the case at bar, it cannot seriously be disputed that the Comment was a communication in connection with a matter of public concern. Plaintiff appeared on *60 Minutes* to voice her allegations against the President of the United States, including her allegation of an alleged threat in 2011, and a reported 22 million people tuned in to watch her. Plaintiff subsequently appeared on *The View* to release the sketch of the alleged man who supposedly threatened her, and Plaintiff's attorney made numerous more television appearances, discussing the same allegation. [Harder

_____

[3] In the event the Court applies California law, the result is the same. *See infra*, Section IV, for a brief discussion of California's anti-SLAPP law and its application warranting the striking of the Complaint and award of reasonable attorneys' fees to Mr. Trump.

Decl., Exhs. C, K, M.]  The Comment was the President's expression of his disbelief of Plaintiff's allegation.  Thus, the Complaint concerns President Trump's exercise of his right to free speech, and the Complaint therefore is subject to a motion to dismiss unless **clear and specific evidence** is presented by Plaintiff in her opposition to this Motion, to support each of the essential elements of Plaintiff's defamation claim.  Tex. Civ. Prac. & Rem. Code § 27.001(7)(D).

### C.    <u>The Comment Expresses a Constitutionally-Protected Opinion</u>

The Comment expresses a constitutionally-protected opinion regarding the credibility of Plaintiff's allegation that she received a threat seven years earlier by an unnamed person.  The Comment responded to Plaintiff's implicit charge that the alleged man who supposedly threatened her was acting on behalf of Mr. Trump.  Mr. Trump's response was essentially that he strongly doubted the veracity of Plaintiff's accusation.  This is a classic constitutionally-protected opinion.

"However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas."  *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974).

Texas defamation law supplies robust protection for opinions.  The Texas Supreme Court recently held:  "[S]tatements that are not verifiable as false cannot form the basis of a defamation claim....And even when a statement is verifiable as false, it does not give rise to liability if the entire context in which it was made discloses that it is merely an opinion masquerading as fact."  *Dallas Morning News, Inc. v. Tatum*, 2018 WL 2182625 at *16 (Tex. May 11, 2018) (internal quotations omitted).  In *Tatum*, the newspaper ran a commentary that mentioned an obituary placed in the newspaper by the plaintiffs which allegedly underplayed the decedent's mental illness (which resulted in a suicide), and stated this was an example of how society underplays mental illnesses and this can lead to tragedy.  The plaintiffs sued, alleging this was defamatory because it implied they published a deceptive obituary.  The Court held this was not actionable, because the columnist "did not imply that he

had personal knowledge that any of the facts the Tatums assert were false." *Id.* at *17.

*Tatum* controls this case.  Here, the Comment nowhere implies that President Trump has any special information or insight as to what did or did not happen in a Las Vegas parking lot in 2011.  Rather, he gives an opinion that he does not find Plaintiff's account credible.  This is constitutionally-protected and therefore non-actionable, especially because the Comment arose from a public dispute between a major politician and one of his adversaries.

It does not matter that the President used strident language ("nonexistent," "con job," and "fake news") in expressing his opinion doubting the veracity of Plaintiff's allegation rather than using more genteel terminology.  Rhetorical hyperbole is not actionable as defamation.  *Neely v. Wilson*, 418 S.W.3d 52, 83-84 (Tex. 2013).  Courts throughout the United States have routinely held that terminology similar to that used by the President is constitutionally protected opinion and non-actionable.  *See e.g., McCabe v. Rattiner*, 814 F.2d 839, 843 (1st Cir. 1987) ("scam" not defamatory); *Oilman v. Evans*, 750 F.2d 970, 987 (D.C. Cir. 1984) (*en banc*) (political columnist labeling a political figure a "Marxist" not defamatory); *Letter Carriers v. Austin*, 418 U.S. 264, 282-83 (1974) (use of term "scab" in labor dispute not defamatory); *Buckley v. Littell*, 539 F.2d 882, 893-94 (2d Cir. 1976) (labeling political writer a "fascist" not defamatory); *Greene v. State*, 21 So.3d 348, 352 (La. App. 2009) (labeling state employee "pathological liar" not actionable).

Any finding by the Court that the Comment has a defamatory meaning and is not protected opinion could have a chilling effect on political debate throughout the United States forever.  Politicians frequently express their opinions about their political adversaries, often in strident and blunt terms.  In 1964, for instance, Lyndon Johnson ran an advertisement that implied his opponent, Barry Goldwater, would start a nuclear war.  John Kennedy campaigned against incumbent Vice President Richard Nixon in 1960 based on claims of a "missile gap" with the Soviet Union that turned out to be grossly misleading.  Bill Clinton allegedly misstated the budget

deficit in his 1992 campaign against George H.W. Bush.  None of these statements were anything more than opinions, and none could or should form the basis of a defamation suit.

Indeed, since the founding of our republic, politicians have often expressed their opinions by branding their opponents as "liars."  Doing so does not subject every such politician to a defamation claim.  President Trump himself has expressed his opinions regarding multiple adversaries, sometimes referring to his opponents by colorful names such as "Lyin' Ted" and "Crooked Hillary."  A defamation standard that turns typical political rhetoric into actionable defamation would chill expression that is central to the First Amendment and political speech.

## D.    Independently, Plaintiff Cannot Establish She Suffered Any Damages

Texas has a defamation *per se* doctrine that is limited to statements that "(1) unambiguously charge a crime, dishonesty, fraud, rascality, or general depravity or (2) are falsehoods that injure one in his office, business, profession, or occupation". *KTRK Television, Inc. v. Robinson*, 409 S.W.3d 682, 690 (Tex. App. 2013).  Under that standard, the Comment is not defamatory *per se*.  It does not "unambiguously" charge a crime, dishonesty, fraud, rascality, or general depravity and clearly does not injure Plaintiff in her office, business, profession, or occupation.

Texas law is clear that merely stating that someone has made a false statement is **not** defamation *per se*.  In *Hancock v. Variyam*, 400 S.W.3d 59, 67 (Tex. 2013), the Texas Supreme Court held that statements that the plaintiff lacked veracity and dealt in half-truths were not defamatory *per se*, because they did not injure the plaintiff in his vocation as a physician.  Similarly, there is nothing about Plaintiff's career as an adult entertainer that requires a reputation for honesty.  Importantly, Plaintiff has denied six times—in 2006, 2011, 2016, 2017 and 2018 (twice in writing)—that she ever had a romantic encounter with Mr. Trump, only to then claim that her denials were false in March 2018 (a reversal that quadrupled her appearance

1  fees). (*See supra*, note 2.)  If Plaintiff has acquired a reputation for dishonesty, it

2  would have occurred starting in March 2018, weeks before the Comment.[4]

3      The only pleaded ground for defamation *per se* in the Complaint is that the

4  Comment accuses Plaintiff of the so-called crime of making a false accusation of

5  criminal activity against someone.  However, Plaintiff never reported the alleged

6  incident to law enforcement, which is a required element of the crime of falsely

7  reporting criminal activity.  *See* Nev. Rev. Stat. § 287.280 ("Every person who

8  deliberately reports to any police officer, sheriff, district attorney, deputy sheriff,

9  deputy district attorney or member of the Department of Public Safety that a felony

10  or misdemeanor has been committed, which causes a law enforcement agency to

11  conduct a criminal or internal investigation, knowing such report to be false, is guilty

12  of a misdemeanor.")  Moreover, Plaintiff never named the alleged person who

13  allegedly threatened her.  Also, President Trump did not claim in his tweet that

14  Plaintiff violated any law by claiming on two television news shows that she was

15  threatened; he simply opined that he did not find her claim credible.

16      Accordingly, because defamation *per se* does not apply, Plaintiff must plead

17  and prove **actual damages** to recover for defamation.  *Robinson*, 409 S.W.3d at 689

18  ("Defamation claims are divided into two categories—defamation *per se* and

19  defamation *per quod*—according to the level of proof required to make them

20  actionable....Statements that are defamatory *per quod* are actionable only upon

21  **allegation and proof of damages**.") (Emphasis added.)

22

23  _____

24      [4] The use of the term "dishonesty" in the Texas defamation *per se* standard

25  must be read narrowly in light of the Texas Supreme Court's recent holding in
    *Hancock*, which held that statements that implied the plaintiff in that case was being

26  dishonest were insufficient to constitute defamation *per se*.  The Comment here is

27  analogous to the statements in *Hancock* that were held to not constitute defamation
    *per se*, especially since Plaintiff, like the plaintiff in *Hancock*, does not practice a

28  trade or profession where a reputation for honesty is essential.

1      Plaintiff has not alleged actual damages.  Her only allegations of damages are

2  (1) the hiring of "extra" security guards and (2) a general allegation that she lost

3  unspecified business opportunities as a result of the Comment.

4      With respect to (1), she cannot establish a causal relationship between the

5  hiring of "extra" private security and the publication of the Comment.  She has been

6  embroiled in a public dispute with the President which she herself created and has

7  continued to fuel—with the help of her lawyer, who has made more than 140 national

8  television appearances and apparently feels his over-the-top public animosity and

9  aggressive speech toward the President for the past five months qualifies him to run

10  for and become President himself.  There is no reason to connect any threats that

11  Plaintiff allegedly has received in 2018 that require the hiring of *additional* private

12  security guards to the specific Comment, rather than being attributable to the fact that

13  Plaintiff (herself and through her lawyer) picked a public fight with a President who

14  has many passionate supporters.

15      Importantly, shortly **before** the President sent the tweet containing the

16  Comment, Mr. Avenatti stated on *The View* (appearing with his client, the Plaintiff):

17  "If we read emails, if we just randomly picked 100 emails a day that her and I get and

18  we read them—first of all, we could not read them on network television. They're so

19  bad. **They're so threatening and over the top. There's a lot of crazy people out**

20  **there.**" [Harder Decl., Ex. C (emphasis added).]  This was Mr. Avenatti's description

21  of Plaintiff's security situation shortly **before** the tweet in question was sent.

22  Plaintiff and Mr. Avenatti also have continued their publicity campaign attacking the

23  President after the tweet was sent.  It would be impossible to determine which private

24  security was required for Plaintiff to address **pre**-Comment activities, versus private

25  security to address activity attributable **only** to the Comment itself, versus private

26  security to address activities attributable to Plaintiff's and Mr. Avenatti's attacks

27  against the President **after** the Comment.

28

1    With respect to (2), the evidence fairly shows that Plaintiff has benefitted from

2   the public controversies that she created, including the Comment which responded to

3   Plaintiff's allegation of an alleged threat by an alleged unidentified man seven years

4   earlier, which Plaintiff raised for the first time in 2018 during her two major

5   television appearances: on *60 Minutes* and *The View*.  Her lawyer, Mr. Avenatti, even

6   referred to the Comment as a "gift from the heavens."[5]  Plaintiff has capitalized on

7   her public notoriety, achieved because of her allegation of having had a romantic

8   encounter with Mr. Trump in 2006 (which she denied publicly six times, and he also

9   has denied), her two lawsuits filed against the him (the Related Action and then this

10   action), and her massive publicity campaign of all of it, tied to her "Make America

11   Horny Again" tour of strip clubs throughout the country.  Plaintiff has not alleged

12   any specific lost business or reputational damage as a result of the Comment,

13   presumably because there is none.

14       **E.       Plaintiff Cannot Show Actual Malice**

15       Plaintiff is a public figure.  She was already an adult film star with **more than**

16   **150 film credits**, and then her allegations against the President made her a household

17   name.  "In some instances an individual may achieve such pervasive fame or

18   notoriety that he becomes a public figure for all purposes and in all contexts."  *Gertz*,

19   *supra*, 418 U.S. at 351.

20       At the very least, Plaintiff is a limited purpose public figure with respect to the

21   issue of her allegations against the President.  She voluntarily injected herself into the

22   public debate about President Trump in an attempt to influence that debate, and also

23   to advance her own career and income.  *Gertz*, *supra*, 418 U.S. at 351.  She did this

24   through multiple national television appearances, social media posts, and press

25   _____

26       [5] Notably, Mr. Avenatti did not seek a timely retraction, which is a prerequisite
27   for a defamation action under Texas law pursuant to Tex. Civ. Prac. & Rem. Code §
    73.055, presumably because he saw the Comment as a "gift from the heavens" rather
28   than a defamatory statement of and concerning his client.

conference appearances, as well as more than 140 national television news appearances and press conferences by her lawyer, Mr. Avenatti. Plaintiff's actions (both her own and those of her lawyer, acting on her behalf), make her a limited purpose public figure, at the very least.

As a public figure, Plaintiff must show that the alleged defamatory statement in the Comment was made by the President with reckless disregard for the truth. *Gertz*, *supra*, at 342. Plaintiff cannot show this.

Plaintiff's only allegations in the Complaint on the issue of actual malice are that (1) any threat against her in 2011 must have come from Mr. Trump or his then lawyer, Michael Cohen, and/or that (2) Mr. Trump acted with actual malice (reckless disregard for the truth) because he did not know whether anyone had threatened Plaintiff in 2011.

Theory number (1) does not prove actual malice because the Complaint pleads that there were a number of other people who knew about Plaintiff's allegations of an affair in 2011, including Plaintiff's estranged husband, and *In Touch* magazine. [Complaint, ¶6.] Thus, a threat, if one occurred, could have come from any number of other sources other than Mr. Trump or Mr. Cohen. [*See also*, Harder Decl., Exhibit K.]

Theory number (2) does not prove actual malice because the standard requires conscious disregard of actual evidence that the statement is false, *i.e.*, that President Trump, at the time he tweeted the Comment, entertained "serious doubts" about the veracity of his statement, that is, a "high degree of awareness" that his Comment was probably false. *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). Plaintiff cannot show this, and the Complaint fails to even allege this—it merely pleads that President Trump said something without knowing whether it was true or not. This is not the standard for actual malice. Absent competent evidence that President Trump was actually aware that his Comment was false or had information that would cause him to entertain serious doubts about its truth, Plaintiff cannot prove actual malice. She

-15-
MOTION TO DISMISS

1  certainly has not adequately pled actual malice in the Complaint.

2  **F.      President Trump Is Entitled to An Award of His Reasonable**

3  **Attorney's Fees.**

4         A prevailing defendant who obtains dismissal of a SLAPP suit is entitled to an

5  award of his reasonable attorney's fees.  Tex. Civ. Prac. & Rem. Code § 27.009(a)(1).

6  Here, this case is an obvious SLAPP.  Plaintiff filed the claim despite not having

7  suffered any damages, based on a tweet by a major politician whom she publicly

8  opposes (and whom her lawyer is preparing to run against in 2020), which expressed

9  a constitutionally-protected opinion doubting the veracity of her claim, which she

10  raised for the first time in 2018 regarding an alleged threat she received one day in

11  2011 (without identifying the actual date, week or even month), by an alleged person

12  whom she has no identifying information other than the fact that he looks

13  substantially similar to her estranged husband.  Moreover, Plaintiff did not report this

14  alleged threat to police—not in 2011, nor in 2018, nor at any other time.  Also,

15  Plaintiff's announcement of this alleged threat came at a time when she was seeking

16  to escalate her public war with the President—after having just filed a civil lawsuit

17  against him, and while her lawyer, acting on her behalf, had already made more than

18  100 national television interviews attacking the President.

19         Plaintiff filed this suit to try to chill the President's ability to respond to her

20  and her lawyer's attacks—speech protected by the First Amendment.

21         This is exactly the sort of litigation that anti-SLAPP laws were enacted to

22  prevent.  President Trump is entitled to dismissal and an award of attorney's fees.

23  **IV.   ALTERNATIVELY, THE COURT SHOULD STRIKE THE**

24  **COMPLAINT PURSUANT TO CALIFORNIA'S ANTI-SLAPP**

25  **STATUTE**

26         Should the Court apply California's anti-SLAPP statute, Cal. Code Civ. Proc. §

27  425.16, the result would be the same.  California's statute is substantially congruent

28  to Texas' statute, allowing a special motion to strike any causes of action arising

1   from acts in furtherance of the defendant's right to free speech in connection with a

2   public issue.  *Id.* § 425.16(b)(1).  The plaintiff must show, in response to such a

3   motion, a probability that she will prevail on the claim.  *Id.*  A prevailing defendant

4   on a motion under Section 425.16 is entitled to an award of attorney's fees.  *Id.* §

5   425.16(c)(1).

6         Under California law, the Comment is protected, non-actionable opinion.

7   *Gregory v. McDonnell-Douglas Corp.*, 17 Cal. 3d 596, 603 (1976) (employer's

8   statements that union officials were sacrificing the interests of their membership for

9   their own personal gain were protected opinion).

10         The Comment is also not defamatory *per se*, because its alleged defamatory

11   meaning requires reference to extrinsic facts (*i.e.*, whether or not anyone threatened

12   Plaintiff and whether or not the President had anything to do with such a threat if it

13   occurred).  Cal. Civ. Code § 45a (where extrinsic facts are necessary to prove

14   defamatory meaning, statement is not defamatory *per se*).  Accordingly, special

15   damages must be pleaded and proved.  *Id.*  As set forth above, Plaintiff has not and

16   cannot do so.

17         Finally, Plaintiff cannot plead and prove actual malice, a federal constitutional

18   requirement for defamation claims asserted by public figures, for the reasons stated

19   above.  Thus, Plaintiff cannot show any probability that she will prevail on her claim,

20   and Section 425.16 requires that it be stricken and that attorney's fees be awarded to

21   the President—if California law applies.

22   **V.    ALTERNATIVELY, THE COURT SHOULD DISMISS THE**

23           **COMPLAINT PURSUANT TO FRCP 12(b)(6)**

24         The Court may dismiss a complaint that fails to state a claim upon which relief

25   can be granted.  Fed. R. Civ. P., Rule 12(b)(6).  In analyzing a motion to dismiss, the

26   complaint must contain "enough facts to state a claim to relief that is plausible on its

27   face" and "raise [that] right to relief above the speculative level."  *Bell Atl. Corp. v.*

28   *Twombly*, 550 U.S. 544, 555, 570 (2007).  A plaintiff's claim meets the plausibility

1  threshold when he "pleads factual content that allows the court to draw [a] reasonable
2  inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*,
3  556 U.S. 662 (2009) (internal quotations omitted).

4  If the Court finds that Texas' anti-SLAPP statute somehow does not apply, nor
5  does California's, the Court nevertheless should dismiss the Complaint because
6  Plaintiff has not pled, and will never be able to plead, a valid claim for defamation.
7  For the reasons stated herein, Plaintiff has no viable claim against President Trump
8  as a matter of law.

9  Further, because any amendment would be futile, the Court should dismiss the
10  Complaint with prejudice. *Gabrielson v. Montgomery Ward & Co.*, 785 F.2d 762,
11  766 (9th Cir. 1986).

12  **VI.   CONCLUSION**

13  For the foregoing reasons, the motion to dismiss under Tex. Civ. Prac. & Rem.
14  Code § 27.001 *et seq.* should be granted and President Trump should be awarded his
15  attorney's fees, or in the alternative, the Complaint should be stricken under Cal.
16  Code Civ. Proc. § 425.16, or in the further alternative, the Complaint should be
17  dismissed pursuant to FRCP 12(b)(6).

18

19  Dated: August 27, 2018                    HARDER LLP
20
21                                            By:   */s/ Charles J. Harder*
21                                                  CHARLES J. HARDER
22                                                  Attorneys for Defendant
23                                                  DONALD J. TRUMP