# EXHIBIT 1

CHARLES E. GRASSLEY, IOWA, CHAIRMAN

ORRIN G. HATCH, UTAH
LINDSEY O. GRAHAM, SOUTH CAROLINA
JOHN CORNYN, TEXAS
MICHAEL S. LEE, UTAH
TED CRUZ, TEXAS
BEN SASSE, NEBRASKA
JEFF FLAKE, ARIZONA
MIKE CRAPO, IDAHO
THOM TILLIS, NORTH CAROLINA
JOHN KENNEDY, LOUISIANA

DIANNE FEINSTEIN, CALIFORNIA
PATRICK J. LEAHY, VERMONT
RICHARD J. DURBIN, ILLINOIS
SHELDON WHITEHOUSE, RHODE ISLAND
AMY KLOBUCHAR, MINNESOTA
CHRISTOPHER A. COONS, DELAWARE
RICHARD BLUMENTHAL, CONNECTICUT
MAZIE K. HIRONO, HAWAII
CORY A. BOOKER, NEW JERSEY
KAMALA D. HARRIS, CALIFORNIA

KOLAN L. DAVIS, Chief Counsel and Staff Director
JENNIFER DUCK, Democratic Chief Counsel and Staff Director

**United States Senate**

COMMITTEE ON THE JUDICIARY

WASHINGTON, DC 20510-6275

October 25, 2018

**VIA ELECTRONIC TRANSMISSION**

The Honorable Jeff Sessions
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

The Honorable Christopher A. Wray
Director
Federal Bureau of Investigation
935 Pennsylvania Avenue, NW
Washington, DC 20535

Dear Attorney General Sessions and Director Wray:

As you know, the Senate Judiciary Committee recently processed the nomination of Judge Brett M. Kavanaugh to serve as an Associate Justice on the Supreme Court of the United States, leading to his eventual confirmation on October 6, 2018. As part of that process, the Committee has investigated various allegations made against Judge Kavanaugh. The Committee's investigation has involved communicating with numerous individuals claiming to have relevant information. While many of those individuals have provided the Committee information in good faith, it unfortunately appears some have not. As explained below, I am writing to refer Mr. Michael Avenatti and Ms. Julie Swetnick for investigation of potential violations of 18 U.S.C. §§ 371, 1001, and 1505, for materially false statements they made to the Committee during the course of the Committee's investigation.

### ALLEGATIONS BY MR. AVENATTI AND MS. SWETNICK

On September 23, 2018, Mr. Avenatti posted a message on social media claiming that he was "represent[ing] a woman with credible information regarding Judge Kavanaugh and Mark Judge."[1] Minutes later, Committee staff contacted Mr. Avenatti acknowledging his claim and asking that he "advise [them] of this information immediately so that Senate investigators may promptly begin an inquiry."[2] Mr. Avenatti responded, failing to disclose the identity of his client but representing to Committee staff:

> We are aware of significant evidence of multiple house parties in the Washington, D.C. area during the early 1980s during which Brett Kavanaugh, Mark Judge, and others would participate in the targeting of

---

[1] https://twitter.com/MichaelAvenatti/status/1044006928416825344.
[2] Email exchange between the Chief Counsel for Nominations Mike Davis and Michael Avenatti on Sept. 23, 2018, enclosed below.

women with alcohol/drugs in order to allow a 'train' of men to subsequently gang rape them.[3]

Noting Mr. Avenatti's use of "we," Committee staff asked Mr. Avenatti if he did in fact have a client making these claims or was solely doing so himself.[4]  He responded that he did have a client, but again did not identify her.[5]  On September 24, 2018, Mr. Avenatti posted an additional message on social media "[w]arning …[t]he GOP and others" to "be very careful in trying to suggest that she [Mr. Avenatti's unnamed client] is not credible."[6]  Then, on September 26, 2018, Mr. Avenatti publicly revealed that his client was Ms. Julie Swetnick.[7]  Ms. Swetnick is a former client of the law firm of Ms. Debra Katz, the attorney for Dr. Christine Blasey Ford.[8]

That same day, September 26, 2018, Mr. Avenatti submitted a sworn statement to the Committee purportedly written and signed by Ms. Swetnick, in which she accused Judge Kavanaugh of repeatedly drugging women and/or spiking their punch with alcohol in order to render them inebriated and disoriented so that groups of boys, including Judge Kavanaugh, could gang rape them.[9]  Specifically, she alleged in her sworn statement that she met Brett Kavanaugh "in approximately 1980-1981," and that she "attended well over ten house parties in the Washington, D.C. area during the years 1981-1983," some of which she claimed Brett Kavanaugh also attended.  "During the years 1981-82," Ms. Swetnick declared, "I became aware of efforts by Mark Judge, Brett Kavanaugh and others to 'spike' the 'punch' at house parties I attended with drugs and/or grain alcohol so as to cause girls to lose their inhibitions and their ability to say 'No.'"  She said that at these parties, which "were a common occurrence in the area and occurred nearly every weekend during the school year," she witnessed Brett Kavanaugh participate in what she believed to be systematic sexual assaults of incapacitated women. "I … witnessed efforts by Mark Judge, Brett Kavanaugh and others to cause girls to become inebriated so they could then be 'gang raped' in a side room or bedroom by a 'train' of numerous boys.  I have a firm recollection of seeing boys lined up outside rooms at many of these parties waiting for their 'turn' with a girl inside the room," Ms. Swetnick declared, and "[t]hese boys included Mark Judge and Brett Kavanaugh."

Ms. Swetnick's sworn statement, which the Committee received on September 26, 2018, also mentioned for the first time the "Beach Week" parties in Ocean City, Maryland. Ms. Swetnick said that she was "told by other women this conduct also occurred during the Summer months in Ocean City, Maryland," and she "witnessed such conduct on one occasion in Ocean City, Maryland during 'Beach Week.'" However, Mr. Avenatti did not reference "Beach Week" in his September 23, 2018 email to the Committee. Mr. Avenatti's original email only alleged conduct at house parties in the Washington, D.C. area. Notably, Ms. Swetnick submitted her statement broadening the area of the alleged incidents from Washington, D.C.

---

[3] *Id.*

[4] *Id.*

[5] *Id.*

[6] https://twitter.com/MichaelAvenatti/status/1044233074609811456.

[7] https://twitter.com/MichaelAvenatti/status/1044960940884709378.

[8] Ariane de Vogue and Eli Watkins, *New Kavanaugh Accuser Has Tie to Firm of Christine Blasey Ford's Attorney*, CNN (Sept. 26, 2018). Available at: https://www.cnn.com/2018/09/26/politics/julie-swetnick-debra-katz-settlement/index.html.  Moreover, according to Dr. Ford's testimony, Ranking Member Feinstein's own staff facilitated Ms. Katz' representation of Dr. Ford.  *See* Mikhael Smits, *Christine Blasey Ford: Feinstein Recommended Attorney Debra Katz to Me,* THE WASHINGTON FREE BEACON (Sept. 27, 2018). Available at: https://freebeacon.com/politics/ford-feinstein-recommended-attorney-debra-katz/.

[9] Swetnick Sworn Statement, dated Sept. 25, 2018 and received on Sept. 26, 2018, enclosed below.

to Ocean City, Maryland, only after the Committee publicly released Judge Kavanaugh's 1982 calendar -
which included a notation for Beach Week during the week of June 6-12.[10]

<div align="center">

**DIVERSION OF COMMITTEE RESOURCES TO
INVESTIGATE MR. AVENATTI'S AND MS. SWETNICK'S ALLEGATIONS**

</div>

The sworn statement Mr. Avenatti submitted on behalf of Ms. Swetnick materially affected the
Committee's investigation of allegations against Judge Kavanaugh. Within hours of the submission, all the
Democrats on the Senate Judiciary Committee sent a letter to me stating:

> In light of shocking new allegations detailed by Julie Swetnick in a sworn
> affidavit, we write to request that the Committee vote on Brett Kavanaugh
> be immediately canceled and that you support the reopening of the FBI
> investigation to examine all of the allegations against Kavanaugh or
> withdrawal of his nomination.[11]

The Democrats' letter specifically referenced the fact that Ms. Swetnick's sworn statement was submitted
to the Committee "[u]nder penalty of perjury, which would cause Ms. Swetnick to be subject to criminal
prosecution" if her allegations are knowingly, willfully, and materially false.[12]

After receiving the allegations from Mr. Avenatti and Ms. Swetnick, Committee staff immediately
began investigating the claims, diverting significant resources to the effort. This included questioning
Judge Kavanaugh in a transcribed interview on September 25, 2018, about the allegations Mr. Avenatti
made to the Committee via his September 23, 2018 email.[13] It also included questioning Judge Kavanaugh
in another transcribed interview on September 26, 2018, about the specifics of Ms. Swetnick's allegations
after the Committee received her statement.[14] Under penalty of felony, Judge Kavanaugh categorically
denied the allegations and stated he did not know Ms. Swetnick. Committee staff also interviewed ten
associates of Ms. Swetnick, working late nights and weekends to gather information to determine the
veracity of Ms. Swetnick's claims and evaluate her credibility. Committee staff sought to interview Ms.
Swetnick, but Mr. Avenatti refused.

<div align="center">

**MS. SWETNICK'S AND MR. AVENATTI'S
SUBSEQUENT CONTRADICTIONS OF THEIR ALLEGATIONS**

</div>

In short, Mr. Avenatti and Ms. Swetnick made grave allegations against Judge Kavanaugh, and the
Committee diverted significant resources to investigate the claims. However, in light of Ms. Swetnick's
and Mr. Avenatti's own statements to the media, information obtained from Committee interviews of her

---

[10] Judge Kavanaugh's Summer 1982 Calendar, provided to Senate Judiciary Committee. Available at:
https://www.judiciary.senate.gov/imo/media/doc/Kavanaugh%20Summer%201982%20Calendar%20Pages1.pdf.
[11] Letter from Judiciary Committee Democrats to Chairman Grassley (Sept. 26, 2018). Available at:
https://www.feinstein.senate.gov/public/_cache/files/f/d/fd184cdb-c9fa-49bc-93b8-
972f63557de6/6E8DC1425692A07770016AB11DB35F1A.2018.09.26-jud-d-ltr-to-ceg-re-swetnick-withdrawl-or-
investigate.pdf
[12] *Id.*
[13] Senate Judiciary Committee Interview with Judge Kavanaugh 22-25 (Sept. 25, 2018). Available at:
https://www.judiciary.senate.gov/imo/media/doc/09.25.18%20BMK%20Interview%20Transcript%20(Redacted)..pd
f.
[14] Senate Judiciary Committee Interview with Judge Kavanaugh 5-10 (Sept, 26, 2018). Available at:
https://www.judiciary.senate.gov/imo/media/doc/09.26.18%20BMK%20Interview%20Transcript%20(Redacted).pd
f.

associates, and publicly reported information about her and Mr. Avenatti, it has become apparent that the
statements Mr. Avenatti and Ms. Swetnick submitted to the Committee likely contained materially false
claims.

On October 1, 2018, NBC News aired an interview of Ms. Swetnick by Ms. Kate Snow, in which
Ms. Swetnick contradicted key claims she had made to the Committee via Mr. Avenatti.[15]  When asked
about the claim in her sworn statement that she was aware of Brett Kavanaugh spiking punch at parties with
drugs and/or grain alcohol, Ms. Swetnick demurred, stating instead that "I saw [Kavanaugh] giving red
Solo cups to quite a few girls" but that "I don't know what he did" as far as spiking punch.  In this revised
account to NBC, she merely claimed she "saw him by" punch containers.  This materially contradicted her
statement in her sworn statement that she was "aware of efforts by … Brett Kavanaugh … to 'spike' the
'punch' at house parties … to cause girls to become inebriated and disoriented so they could then be 'gang
raped.'"[16]  Ms. Swetnick's sworn statement to the Committee claimed she had "personal knowledge of the
information" stated in it.  Yet, when CNN later questioned Mr. Avenatti about the clear contradictions
between Ms. Swetnick's statements in her sworn declaration and those to NBC about Judge Kavanaugh
spiking punch, he conceded:  "One of her friends informed her of what she just put in the declaration or
what was attested to in the declaration."[17]

When the NBC interview with Ms. Swetnick addressed claims in her sworn statement that she had
"**a firm recollection** of seeing boys," including Brett Kavanaugh, "**lined up** outside rooms at many of these
parties" to gang rape incapacitated women, Ms. Swetnick again contradicted her statement to the
Committee.  She denied both that there were lines of boys outside rooms and that she had any actual
knowledge at the time of any gang rapes in those rooms by these boys.

Ms. Snow and Ms. Swetnick had the following exchange in which Ms. Swetnick contradicted her
claim of seeing boys lined up outside rooms at these parties she supposedly attended:

> Ms. Swetnick: I would see boys standing outside of rooms, congregated
> together…. I would see them laughing, a lot of laughing.
> Ms. Snow: Standing in line outside a room?
> Ms. Swetnick: Not a line, but definitely huddled by doors.[18]

So, contradicting her sworn statement claim that she had "a firm recollection" of seeing boys lined up
outside bedrooms at parties to systematically rape women, her revised account to NBC merely claimed that
she saw groups of boys standing together and laughing in the general vicinity of doors at house parties.

Similarly, although Ms. Swetnick claimed in her sworn statement that, based on "personal
knowledge,"  it was her "firm recollection" that these boys were lined up for the purpose of "waiting for

---

[15] Kate Snow, *Kavanaugh Accuser Julie Swetnick Speaks Out on Sexual Abuse Allegations*, NBC News (Oct. 1,
2018). Available at https://www.nbcnews.com/politics/supreme-court/kavanaugh-accuser-julie-swetnick-speaks-out-
sexual-abuse-allegations-n915641.
[16] *See* Swetnick Sworn Statement.
[17] *See* Daniel Chaitin, *Michael Avenatti: One of Julie Swetnick's Friends Told Her Kavanaugh Was Spiking the
Punch*, THE WASHINGTON EXAMINER (Oct. 1, 2018) (quoting CNN interview). Available at:
https://www.washingtonexaminer.com/news/michael-avenatti-one-of-julie-swetnicks-friends-told-her-kavanaugh-
was-spiking-the-punch; Cuomo Prime Time, *Cuomo Pushes Back on Credibility of Swetnick,* CNN (Oct. 1, 2018).
Available at: https://www.cnn.com/videos/politics/2018/10/02/michael-avenatti-julie-swetnick-credibility-bts-cpt-
vpx.cnn.
[18] Kate Snow, *Kavanaugh Accuser Julie Swetnick Speaks Out on Sexual Abuse Allegations*, NBC News (Oct. 1,
2018).

their 'turn' with a girl inside the room," *i.e.*, for their turn to rape a victim incapacitated by punch spiked with drugs or alcohol, she contradicted this as well in her NBC interview, instead admitting that she did not have any knowledge at the time that any such activity was actually happening, but only assumed as much after the fact, stating: "I didn't know what was occurring ... and I didn't understand what it could possibly be." Ms. Snow attempted to clarify, asking: "So you're suggesting that, **in hindsight**, you **think** he [Kavanaugh] was involved in this behavior [gang rapes]?" Ms. Swetnick responded: "I would say [pause] yes. It's just too coincidental."[19]

Ms. Swetnick also contradicted the timeline she provided in her sworn statement, in which she stated: "I attended well over ten house parties in the Washington D.C. area during the years 1981-83 where Mark Judge and Brett Kavanaugh were present." In the NBC interview, Ms. Swetnick stated that she was sexually assaulted at one of these house parties when she was 19 and stopped going to them afterwards. According to public records, Ms. Swetnick would have turned 20 toward the end of 1982. So, her claim that she attended these parties through 1983 is contradicted by her claim she stopped attending when she was 19.[20]

In sum, the sworn statement Mr. Avenatti submitted to the Committee on behalf of Ms. Swetnick claimed she had "personal knowledge" that Judge Kavanaugh spiked punch with drugs and alcohol at house parties in 1981-83 in order to cause girls to become incapacitated so that lines of boys would systematically sexually assault them. She later contradicted each of those claims in her interview with NBC.

Those contradictions did not go unnoticed. When NBC introduced her interview segment, Ms. Snow explicitly stated: "There are things that she told us on camera that differ from her written statement last week."[21] When later asked by an MSNBC anchor whether Ms. Swetnick has credibility issues, Ms. Snow stated: "I would say yes because there are – just to be clear there are things that she said to me that differ from her initial statement, which was a sworn statement last week, submitted to the Judiciary Committee."[22] A CNN host similarly noted the contradictions and quizzed Mr. Avenatti about them.[23] While differences between a media report and a statement to the Committee would not necessarily rise to the level of warranting a referral, when the source of the contradictory media reports is the declarant herself, as is the case here, it does.

### LACK OF CREDIBLE EVIDENCE MS. SWETNICK EVER KNEW JUDGE KAVANAUGH

Not only did Ms. Swetnick materially contradict the allegations of sexual misconduct she and Mr. Avenatti made to the Committee about Judge Kavanaugh, there is simply no credible evidence that Ms. Swetnick ever even met or socialized with Judge Kavanaugh. On the contrary, there is substantial evidence they did not know each other. Ms. Swetnick was older and attended a different high school in a different town – one whose students were reportedly not known to regularly socialize with students from Judge Kavanaugh's high school. The only apparent commonality between Ms. Swetnick and Judge Kavanaugh is that they both lived in Montgomery County, Maryland in the early 1980s. That is not particularly

---

[19] *Id.*

[20] In addition to contradicting her statement to the Judiciary Committee, Ms. Swetnick's NBC interview was also internally inconsistent and contradictory, such as her baffling explanations of how and when she decided to come forward with her allegation.

[21] Kate Snow, *Kavanaugh Accuser Julie Swetnick Speaks Out on Sexual Abuse Allegations*, NBC News (Oct. 1, 2018).

[22] MSNBC Live with Craig Melvin (Oct. 2, 2018).

[23] Cuomo Prime Time, *Cuomo Pushes Back on Credibility of Swetnick*, CNN (Oct. 1, 2018).

meaningful for determining whether they knew each other; according to information from the U.S. Census Bureau, Montgomery County had a population of over 600,000 in 1982.

In addition to denying her allegations, Judge Kavanaugh told the Committee under penalty of felony that he did not know Ms. Swetnick.[24]  Mark Judge similarly denied the allegations and stated to the Committee, also under penalty of felony, "I do not know Julie Swetnick."[25]  Michael Fegan, a friend of Judge Kavanaugh's in high school who "attended most of the same social events" as Judge Kavanaugh, stated the following to the Committee under penalty of felony:

> I have never heard of Ms. Swetnick.  My understanding is that she graduated from Gaithersburg High School three years before we graduated from Georgetown Prep.  During my high school years, I did not know any girls from Gaithersburg High School.  We did not socialize with girls from Gaithersburg High School.[26]

Indeed, a letter to the Committee under penalty of felony signed by 64 "men and women who knew Brett Kavanaugh well in high school" called Ms. Swetnick's allegations "[n]onsense" and noted: "In the extensive amount of time we collectively spent with Brett, we do not recall having ever met someone named Julie Swetnick."[27]

For their part, it appears the media similarly could not find any evidence that Ms. Swetnick actually knew Judge Kavanaugh.  As Ms. Snow from NBC News reported:

> We've been trying independently to reach out to anyone who remembers attending parties with Julie Swetnick and Brett Kavanaugh, and we've been asking her attorney for names. So far, we've not found anyone who remembers that…. We asked him [Mr. Avenatti], I asked him at that point can you provide us with any names of people who went to the parties with her.  Just because we couldn't place her, NBC News has not since last week been able to place her in that time period at those house parties in that group of friends. There aren't other people coming forward as happens in many other stories we cover, who say 'yes I was there too.' … We're just trying to do our reporting…. To date, as of today, we haven't been able to find anyone who says 'yes, I saw her in the same room with Brett Kavanaugh,' and of course Judge Kavanaugh says he was not in the same room with her, he doesn't even know who she is.[28]

Ms. Swetnick did eventually provide NBC News the names of four people she said attended these alleged parties with her, but according to NBC: "One of them said he does not recall a Julie Swetnick.

---

[24] Senate Judiciary Committee Interview with Judge Kavanaugh 5-10 (Sept. 26, 2018). Available at: https://www.judiciary.senate.gov/imo/media/doc/09.26.18%20BMK%20Interview%20Transcript%20(Redacted).pdf.

[25] Letter from Mark Judge to Chairman Grassley and Ranking Member Feinstein (Sept. 28, 2018), enclosed below.

[26] Letter from Michael C. Fegan to Chairman Grassley (Oct. 1, 2018), enclosed below.

[27] Letter from Kavanaugh high school friends to Chairman Grassley and Ranking Member Feinstein (Sept. 26, 2018), enclosed below.

[28] Kate Snow, *Kavanaugh Accuser Julie Swetnick Speaks out on Sexual Abuse Allegations*, NBC News (Oct. 1, 2018).

Another of the friends she named is deceased. We've reached out to the other two, and haven't heard back."[29]

After the media hubbub about Ms. Swetnick's contradictory interview and the lack of any corroboration for her claims, Mr. Avenatti belatedly produced a vague and anonymous declaration he claimed supported her allegations.[30] Mr. Avenatti did not provide the identity of this supposed declarant to the Committee, nor did he make him or her available for an interview with Committee staff. It does not appear any media outlet has been able report any interview with the purported declarant or validate anything in the anonymous declaration. Indeed, it is unclear who actually wrote the anonymous declaration. Mr. Avenatti also apparently has a history of claiming to have anonymous clients who never materialize in any verifiable form.[31]

## ISSUES WITH MS. SWETNICK'S CREDIBILITY

During the course of the Committee's investigation of allegations against Judge Kavanaugh, Committee investigators spoke with 45 individuals, obtained 25 written statements, and reviewed numerous other materials. This included speaking with ten associates of Ms. Swetnick who knew her at various times in her life ranging from junior high to the present day. In doing so, Committee investigators did not find any information to corroborate Ms. Swetnick's claims. On the contrary, they received substantial information calling into question her credibility. Based on this and public reports, it appears Ms. Swetnick has a history of making false legal claims and false accusations of sexual misconduct.

Through his attorney, Richard Vinnecy provided the Committee a signed statement regarding Ms. Swetnick.[32] According to his statement, Mr. Vinnecy was in a romantic relationship with Ms. Swetnick for seven years, and he said he submitted his statement to the Committee "to exercise [his] civic duty and attest to the credibility or lack thereof of Ms. Swetnick." Among other odd behavior by Ms. Swetnick that Mr. Vinnecy noted, he described how she "harassed and stalked" him after he ended their relationship. When he told her to stop calling because he had entered a relationship with a woman (who he later married) and that he and his new girlfriend were expecting a child, Mr. Vinnecy says Ms. Swetnick: 1) threatened to murder him, his girlfriend, and their unborn child; 2) threatened to falsely tell the police he had raped her; 3) threatened to have him deported; 4) stated she would not grant him a divorce; and 5) claimed she was pregnant with twins. As Mr. Vinnecy told the Committee, he and Ms. Swetnick were never married, so he found her reference to not granting him a divorce bizarre. Mr. Vinnecy is an American citizen, so he also found her threats of deportation bizarre. He also stated that he confirmed that Ms. Swetnick's claim of being pregnant with twins "was a complete fabrication and that there was no pregnancy."

Because he was afraid that she would harm him and his family, as she had threatened, Mr. Vinnecy filed a restraining order against her. He stated that a temporary injunction was granted, but he understood that for a permanent injunction to be issued in Florida, there would first need to be a hearing which Ms. Swetnick would attend. Fearing for his and his family's safety if Ms. Swetnick confronted him at the

---

[29] Id.

[30] https://twitter.com/MichaelAvenatti/status/1047447758993547265. Mr. Avenatti emailed the same redacted declaration to the Committee on October 2, 2018.

[31] See, e.g., Avery Anapol, *Avenatti Claims He Represents Three More Women That Were Paid Hush Money*, THE HILL (July 27, 2018). Available at: https://thehill.com/homenews/administration/399133-avenatti-claims-three-more-women-were-paid-hush-money-by-trump-cohen.

[32] Statement of Richard Vinnecy for Senate Judiciary Committee Investigation (Oct. 4, 2018).

hearing, he did not go through with the hearing. Instead, he moved to a new residence and changed his phone numbers to avoid further contact from Ms. Swetnick.

In addition to describing those actions by Ms. Swetnick, Mr. Vinneccy also stated that during their seven-year relationship, Ms. Swetnick was often financially unstable and was "always seeking financial gain from frivolous law suits." He also described other odd behavior relevant to her mental stability.[33] Mr. Vinneccy closed his letter by stating:

> Based on my history with Ms. Swetnick, I do not believe her allegations against Judge Kavanaugh and it is my opinion that she is perpetuating a fraud against him. Her motives may be for financial gain or notoriety but they are certainly not to expose the truth.[34]

Furthermore, in a defamation lawsuit filed against Ms. Swetnick by one of her former employers, Webtrends, the company reportedly indicated that Ms. Swetnick engaged in a pattern of lies and made multiple false accusations of sexual misconduct.[35] The company stated Ms. Swetnick lied in her employment application, falsely claiming she had earned an undergraduate degree from Johns Hopkins University, but the company subsequently learned the University had no record of her attendance.[36] The company also stated that Ms. Swetnick misrepresented the length of time she had worked for a previous employer, and took medical leave while simultaneously claiming unemployment benefits in the District of Columbia.[37] Webtrends stated that a few weeks after Ms. Swetnick started working for the company, its human resources department received a complaint that she had engaged in unwelcome and inappropriate sexual conduct towards two male coworkers at a business lunch.[38] The company stated that, in response to the complaint received against her, Ms. Swetnick falsely accused multiple male coworkers of sexually harassing her and threatened to sue the company.[39] The company later found that Ms. Swetnick had engaged in misconduct but found no evidence to support her sexual harassment claims.[40]

The Committee was also contacted by multiple employees of a different company where Ms. Swetnick previously worked, who stated it was their understanding that when Ms. Swetnick was confronted there about possible misconduct on her part, she responded by making a false sexual harassment or assault claim against that company as well, which it settled in order to avoid negative publicity. The employees

---

[33] *Id.* Many other associates of Ms. Swetnick also described to the Committee issues with her mental health, substance abuse, and/or credibility issues, but requested confidential treatment from the Committee, which we are honoring. One former associate of Ms. Swetnick, Dennis Ketterer, did provide a signed public statement under penalty of felony in which he told the Committee that Ms. Swetnick's own father had told him "she had psychological and other problems." Statement by Dennis Ketterer to Senate Judiciary Committee (Oct. 2, 2018), enclosed below.

[34] Statement of Richard Vinneccy for Senate Judiciary Committee Investigation (Oct. 4, 2018), enclosed below.

[35] Mike Rogoway, *Julie Swetnick, a Brett Kavanaugh Accuser, Faced Misconduct Allegations at Portland Company*, THE OREGONIAN (Sept. 28, 2018) available at https://www.oregonlive.com/silicon-forest/index.ssf/2018/09/julie_swetnick_one_of_kavanaug html; Michael Kunzelman, Michael Biesecker, and Martha Medoza, *3rd Kavanaugh Accuser Has History of Legal Disputes*, THE ASSOCIATED PRESS (Sept. 30, 2018). Available at https://www.yahoo.com/news/3rd-kavanaugh-accuser-history-legal-disputes-100137653.html.

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] *Id.*

requested confidentiality from the Committee regarding their names and the name of the company, which we are honoring.

Ms. Swetnick also reportedly made false claims in a personal injury lawsuit against the Washington Metropolitan Area Transit Authority.[41]  According to the *Associated Press*, in the lawsuit Ms. Swetnick "claimed she lost more than $420,000 in earnings after she hurt her nose in a fall on a train."[42]  Ms. Swetnick reportedly claimed she was a model and actor with numerous modeling commitments with companies at the time of the accident, but lost them because of her purported injuries.[43]  To justify these claims, she reportedly named "Konam Studios" as one of the companies promising to employ her, and identified Nam Ko of "Kunam Studios" as a potential witness for her case.[44]  But, reporters from the *AP* spoke with Mr. Ko and discovered the following:

> Ko, however, told AP on Friday that he was just a friend of Swetnick's and that he had never owned a company with a name spelled either way and had never agreed to pay her money for any work before she injured her nose. He said he first met Swetnick at a bar more than a year after her alleged accident. "I didn't have any money back then. I (was) broke as can be," Ko said.  Ko said he has a hazy memory of Swetnick asking to use him as a "character reference" but doesn't recall hearing about her lawsuit. "I thought it was for a job application," he said.[45]

In short, it appears Ms. Swetnick has a substantial history of credibility issues.  When viewed in light of the fact there is no credible evidence she ever knew Judge Kavanaugh, and the fact she has contradicted key aspects of her allegations against him, this lends credence to the likelihood that she made materially false statements to the Committee in violation of 18 U.S.C. § 1001.  Those statements obstructed the Judiciary Committee's efforts to investigate allegations against Judge Kavanaugh and the processing of his nomination, potentially in violation of 18 U.S.C. § 1505.  Given Mr. Avenatti's role in this with Ms. Swetnick, along with Mr. Avenatti's own substantial credibility issues (discussed next), there may have been a conspiracy to violate these laws, in potential violation of 18 U.S.C. § 371.

### ISSUES WITH MR. AVENATTI'S CREDIBILITY

In addition to the credibility issues Committee investigators uncovered surrounding Ms. Swetnick, Mr. Avenatti has substantial credibility issues of his own.   For example, Mr. Avenatti appears to have several issues stemming from his involvement with Global Baristas, a company he reportedly formed with actor Patrick Dempsey in 2012, which purchased the Tully's Coffee chain out of bankruptcy.[46]  Mr.

---

[41] *3rd Kavanaugh Accuser Has History of Legal Disputes*, THE ASSOCIATED PRESS (Sept. 30, 2018). Available at: https://www.yahoo.com/news/3rd-kavanaugh-accuser-history-legal-disputes-100137653.html.
[42] *Id.*
[43] *Id.*
[44] *Id.*
[45] *Id.*
[46] *See* Kate Briquelet, *Michael Avenatti Lived the High Life While Owing Millions to IRS*, THE DAILY BEAST (Oct. 21, 2018). Available at: https://www.thedailybeast.com/michael-avenatti-lived-the-high-life-while-owing-millions-to-irs?ref=scroll.

Dempsey sued Mr. Avenatti in 2013, stating that Mr. Avenatti had lied to him about serious financial matters.[47] According to the *Seattle Times*:

> "My decision to become a member and manager of Global Baristas was based, in part, on Michael Avenatti's representation that he would provide both the capital to fund the entire Tully's acquisition and sufficient working capital to allow Global Baristas to operate the Tully's Coffee stores once the acquisition was completed," Dempsey said in the suit.

> Instead, he alleged, Avenatti used Global Baristas to borrow $2 million for working capital without telling him. The loan carries an "exorbitant" interest rate of 15 percent annually, the lawsuit says.[48]

Mr. Avenatti's company was also reportedly involved in additional litigation implicating his credibility, including one case in which a judge sanctioned his company for misconduct, "an acrimonious landlord-tenant dispute that led to court sanctions, fines and judgments against Avenatti's coffee firm, in part for failing to comply with court orders to produce evidence."[49]

Earlier this year, Mr. Avenatti was also reportedly under investigation by the State Bar of California as a result of a complaint regarding "what Mr. Avenatti has done in connection with Global Baristas," namely a claim that "he bought a company out of bankruptcy and then used it for a 'pump and dump' scheme to deprive federal and state taxing authorities out of millions of dollars."[50]

Mr. Dempsey's lawsuit against Mr. Avenatti was not the only time a business partner accused him of deception.[51] Jason Frank, a former partner at Mr. Avenatti's law firm Eagan Avenatti, "resigned in May 2016 after alleging that the firm didn't pay him millions of dollars that he was owed, misstated the firm's profits, and wouldn't provide copies of tax returns and other financial documents."[52] Mr. Frank filed for arbitration and "a three-judge panel found that Avenatti's former firm Eagan Avenatti 'acted with malice, fraud and oppression,'" by withholding relevant information from Mr. Frank.[53] On October 22, 2018, the

---

[47] *See* Melissa Allison, *Dempsey Walks Away From Tully's After Suing Partner*, THE SEATTLE TIMES (Aug. 23, 2013). Available at: https://www.seattletimes.com/business/dempsey-walks-away-from-tullyrsquos-after-suing-partner/.

[48] *Id.*

[49] *See* Lewis Kamb, *California Bar Investigating Attorney Avenatti's Dealings Involving Tully's, Letter Says*, THE SEATTLE TIMES (May 18, 2018). Available at: https://www.seattletimes.com/seattle-news/california-state-bar-investigating-avenattis-tully-dealings-according-to-letter/.

[50] Avenatti Bar Complaint, available at https://www.documentcloud.org/documents/4433390-Avenatti-Bar-Complaint.html; *see* Lewis Kamb, *California Bar Investigating Attorney Avenatti's Dealings Involving Tully's, Letter Says*, THE SEATTLE TIMES (May 18, 2018); *see also* California State Bar Letter, available at https://www.documentcloud.org/documents/4469101-California-State-Bar-letter-to-Nold.html; Kate Briquelet, *Michael Avenatti Lived the High Life While Owing Millions to IRS*, THE DAILY BEAST (Oct. 21, 2018).

[51] *See* Michael Balsamo, *Judge Orders Law Firm of Stormy Daniel's Lawyer to Pay $10M*, THE ASSOCIATED PRESS (May 22, 2018). Available at: https://www.apnews.com/f12a3b63b2964cf79f09315f8a1ad059; *see also* See Kate Briquelet, *Michael Avenatti Lived the High Life While Owing Millions to IRS*, THE DAILY BEAST (Oct. 21, 2018).

[52] Michael Balsamo, *Judge Orders Law Firm of Stormy Daniel's Lawyer to Pay $10M*, THE ASSOCIATED PRESS (May 22, 2018).

[53] Kate Briquelet, *Michael Avenatti Lived the High Life While Owing Millions to IRS*, THE DAILY BEAST (Oct. 21, 2018); *see* Michael Balsamo, *Judge Orders Law Firm of Stormy Daniel's Lawyer to Pay $10M*, THE ASSOCIATED PRESS (May 22, 2018).

California judge hearing the case on this issue ruled that Mr. Avenatti was personally liable and ordered him to pay $4.85 million in back pay to Mr. Frank.[54]

Moreover, Mr. Avenatti reportedly has credibility issues relating to the IRS.  According to a report by the *Los Angeles Times*, "Eagan Avenatti, [Mr. Avenatti's] Newport Beach firm, has defaulted on millions of dollars in debt and fallen years behind in paying its payroll taxes.… The firm has also defaulted on more than $800,000 in federal payroll taxes, penalties and interest that Avenatti had promised that it would pay."[55]  In response, federal prosecutors asked that the court hold Mr. Avenatti's firm in contempt, stating: "In this case, the Debtor and its responsible officer Michael Avenatti made misrepresentations to the detriment of the United States."[56]  Instead, the parties reached an agreement that Mr. Avenatti's firm will be allowed to make monthly payments of $75,000 towards paying back the owed taxes.[57]

In divorce proceedings from his second wife, Lisa Storie-Avenatti, she also referenced potential dishonesty by Mr. Avenatti regarding his earnings.[58]

> Storie-Avenatti said in court papers that in November 2016, Avenatti told her he earned $3.7 million, but that she suspected his actual take-home was "substantially higher" based on his self-publicized verdicts, the couple's 2016 expenses and his "secreting from me of his tax returns and bank records."[59]

There seem to be numerous additional press reports that cast doubt on Mr. Avenatti's credibility.  However, having reviewed several already, Committee investigators determined that delving into additional ones would be beating a dead horse.

Mr. Avenatti made allegations against Judge Kavanaugh in his email to Committee staff, and he submitted allegations to the Committee on behalf Ms. Swetnick.  He reportedly told the *Associated Press* that he "fully vetted" Ms. Swetnick before taking her claims public,[60] and he told CNN: "When I – when we made the allegations, guess what, I had done significant due diligence in connection with this before we made the allegations."[61]  However, given that he and Ms. Swetnick have contradicted key parts of the claims; that there is no credible evidence that Ms. Swetnick ever even knew Judge Kavanaugh and substantial evidence she did not; and the substantial credibility issues surrounding both Mr. Avenatti and Ms. Swetnick, I ask that the FBI investigate whether Mr. Avenatti criminally conspired with Ms. Swetnick to make materially false statements to the Committee and obstruct the Committee's investigation.

---

[54] Amanda Lee Myers and Michael Malsamo, *Judge: Michael Avenatti Must Pay $4.85M in Ex-Lawyer Suit*, THE ASSOCIATED PRESS (Oct. 22, 2018). Available at: https://www.apnews.com/53f6f2f316844b14bdbe24a7b80dcc7c .

[55] Michael Finnegan, *Michael Avenatti Gets Judge to Bar Media from his Testimony on Newport Beach Law Firm's Bankruptcy*, THE LOS ANGELES TIMES (July 25, 2018). Available at  http://www.latimes.com/politics/la-na-pol-avenatti-bankruptcy-20180725-story html.

[56] Kate Briquelet, *Michael Avenatti Lived the High Life While Owing Millions to IRS*, THE DAILY BEAST (Oct. 21, 2018).

[57] *Id*.

[58] *Id*.

[59] *Id*.

[60] *3rd Kavanaugh Accuser Has History of Legal Disputes*, THE ASSOCIATED PRESS (Sept. 30, 2018). Available at: https://www.yahoo.com/news/3rd-kavanaugh-accuser-history-legal-disputes-100137653 html.

[61] Cuomo Prime Time, *Cuomo Pushes Back on Credibility of Swetnick*, CNN (Oct. 1, 2018). Available at: https://www.cnn.com/videos/politics/2018/10/02/michael-avenatti-julie-swetnick-credibility-bts-cpt-vpx.cnn.

Attorney General Sessions and Director Wray
October 25, 2018
Page 12 of 12

### CONCLUSION

Committee investigations in support of the judicial nomination process are an essential part of the Committee's constitutional role. The Committee is grateful to citizens who come forward with relevant information in good faith, even if they are not one hundred percent sure about what they know. But when individuals intentionally mislead the Committee, they divert Committee resources during time-sensitive investigations and materially impede our work. Such acts are not only unfair; they are potentially illegal. It is illegal to knowingly and willfully make materially false, fictitious, or fraudulent statements to Congressional investigators. It is illegal to obstruct Committee investigations. It is illegal to conspire to do either of those things. When charlatans make false claims to the Committee -- claims that may earn them short-term media exposure and financial gain, but which hinder the Committee's ability to do its job – there should be consequences. These laws exist to ensure there are.

Accordingly, in light of the seriousness of these facts, and the threat these types of actions pose to the Committee's ability to perform its constitutional duties, I hope you will give this referral the utmost consideration. Thank you for your prompt attention to this matter. If you have any questions, please contact a professional investigative counsel in the Committee's Oversight and Investigations Unit at (202) 224-5225.

Sincerely,

Chuck Grassley

Charles E. Grassley
Chairman
Committee on the Judiciary

Enclosures:
1. Email exchange between the Chief Counsel for Nominations Mike Davis and Michael Avenatti on Sept. 23, 2018
2. Swetnick Sworn Statement
3. Letter from Mark Judge to Chairman Grassley and Ranking Member Feinstein
4. Letter from Michael C. Fegan to Chairman Grassley
5. Letter from Kavanaugh High School Friends to Chairman Grassley and Ranking Member Feinstein
6. Statement of Richard Vinneccy for Senate Judiciary Committee Investigation
7. Statement by Dennis Ketterer to Senate Judiciary Committee

cc:    The Honorable Dianne Feinstein
       Ranking Member
       Committee on the Judiciary

| | |
|---|---|
| **From:** | Michael J. Avenatti |
| **To:** | Davis, Mike (Judiciary-Rep) |
| **Subject:** | Re: SCOTUS -- Avenatti claim of evidence |
| **Date:** | Sunday, September 23, 2018 10:16:43 PM |

Mike: I represent a client. And seeing as we are talking about an appointment to the SCOTUS, there is nothing wrong with this process being public.

What is the status of Mark Judge's testimony?

I look forward to receiving the answers to the questions.

Michael

Michael J. Avenatti, Esq.

The preceding email message (including any attachments) contains information that may be confidential, protected by the attorney-client or other applicable privileges, or constitutes non-public information.  It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender by replying to this message and then delete it from your system.  Use, dissemination, or reproduction of this message by unintended recipients is not authorized and may be unlawful.

On Sep 23, 2018, at 6:26 PM, Davis, Mike (Judiciary-Rep) <█████████████████
███████████> wrote:

Mr. Avenatti,

Thank you for reaching out to me. I noticed that you just publicly Tweeted our email conversation below.

In your email below, you mentioned "we" several times. To clarify, are you representing a client? Or are you making these allegations yourself? On behalf of anyone else?

I look forward to receiving your evidence.

Thank you,
Mike Davis

Mike Davis, Chief Counsel for Nominations
United States Senate Committee on the Judiciary
Senator Chuck Grassley (R-IA), Chairman
224 Dirksen Senate Office Building
Washington, DC 20510
██████████████████
██████████████████

**From:** Michael J. Avenatti ███████████████████████████
**Sent:** Sunday, September 23, 2018 9:07 PM
**To:** Davis, Mike (Judiciary-Rep) <████████████████████████>
**Subject:** RE: SCOTUS -- Avenatti claim of evidence

Dear Mr. Davis:

Thank you for your email.  We are aware of significant evidence of multiple house parties in the Washington, D.C. area during the early 1980s during which Brett Kavanaugh, Mark Judge and others would participate in the targeting of women with alcohol/drugs in order to allow a "train" of men to subsequently gang rape them. There are multiple witnesses that will corroborate these facts and each of them must be called to testify publicly.  As a starting point, Senate investigators should pose the following questions to Judge Kavanaugh without delay and provide the answers to the American people:

1. Did you ever target one or more women for sex or rape at a house party? Did you ever assist Mark Judge or others in doing so?
2. Did you ever attend any house party during which a woman was gang raped or used for sex by multiple men?
3. Did you ever witness a line of men outside a bedroom at any house party where you understood a woman was in the bedroom being raped or taken advantage of?
4. Did you ever participate in any sexual conduct with a woman at a house party whom you understood to be intoxicated or under the influence of drugs?
5. Did you ever communicate with Mark Judge or anyone else about your participation in a "train" involving an intoxicated woman?
6. Did you ever object or attempt to prevent one or more men from participating in the rape, or taking advantage, of a woman at any house party?

Please note that we will provide additional evidence relating to the above conduct

both to the Committee and the American public in the coming days.

Regards,

Michael Avenatti

---

**From:** Davis, Mike (Judiciary-Rep) ████████████████████
**Sent:** Sunday, September 23, 2018 4:42 PM
**To:** Michael J. Avenatti
**Subject:** SCOTUS -- Avenatti claim of evidence

Dear Mr. Avenatti,

According to your Tweet from 7:33 p.m. E.T. this evening, you claim to have
information you consider credible regarding Judge Kavanaugh and Mark Judge. Please
advise of this information immediately so that Senate investigators may promptly begin
an inquiry.

Thank you,
Mike Davis

Mike Davis, Chief Counsel for Nominations
United States Senate Committee on the Judiciary
Senator Chuck Grassley (R-IA), Chairman
224 Dirksen Senate Office Building
Washington, DC 20510

## DECLARATION OF JULIE SWETNICK

I, JULIE SWETNICK, declare as follows:

1.      My name is Julie Swetnick and I am a resident of Washington, D.C. I fully understand the seriousness of the statements contained within this declaration. I have personal knowledge of the information stated herein and if called to testify to the same would and could do so.

2.      I am a graduate of Gaithersburg High School in Gaithersburg, MD.

3.      I presently hold the following active clearances associated with working within the federal government: Public Trust - U.S. Department of Treasury (DOT), U.S. Mint (USM), Internal Revenue Service (IRS).

4.      I have also previously held the following inactive clearances: Secret - U.S. Department of State (DOS), U.S. Department of Justice (DOJ) and Public Trust - U.S. Department of Homeland Security (DHS), Customs and Border Protection (CBP).

5.      My prior employment includes working with (a) Vietnam War Commemoration (VWC), Joint Services Providers (JSP), U.S. Department of Defense (DOD) in Arlington, Virginia; (b) U.S. Mint, U.S. Department of Treasury; (c) U.S. Internal Revenue Service (IRS), U.S. Department of Treasury; (d) Government Affairs and Communications Department, D.C. Department of General Services (DGS), Government of the District of Columbia (DC.Gov); (e) Customs and Border Protection (CBP), U.S. Department of Homeland Security; and (d) the U.S. Department of State (DOS). I was also one of the first 100 women in the world to achieve a Microsoft Certified Systems Engineering Certification (MCSE).

6.      I first met Mark Judge and Brett Kavanaugh in approximately 1980-1981. I was introduced to them at a house party that I attended in the Washington, D.C. area. I observed Mark Judge and Brett Kavanaugh as extremely close friends during the early 1980s when I knew them and interacted with them. I would describe them as "joined at the hip" and I consistently saw them together in many social settings. There is no question in my mind that Mark Judge has significant information concerning the conduct

-1-

of Brett Kavanaugh during the 1980s, especially as it relates to his actions toward women.

7.   Following that first introduction, I attended well over ten house parties in the Washington, D.C. area during the years 1981-1983 where Mark Judge and Brett Kavanaugh were present.   These parties were a common occurrence in the area and occurred nearly every weekend during the school year.   On numerous occasions at these parties, I witnessed Mark Judge and Brett Kavanaugh drink excessively and engage in highly inappropriate conduct, including being overly aggressive with girls and not taking "No" for an answer.   This conduct included the fondling and grabbing of girls without their consent.

8.   I observed Brett Kavanaugh drink excessively at many of these parties and engage in abusive and physically aggressive behavior toward girls, including pressing girls against him without their consent, "grinding" against girls, and attempting to remove or shift girls' clothing to expose private body parts.   I likewise observed him be verbally abusive towards girls by making crude sexual comments to them that were designed to demean, humiliate and embarrass them.   I often witnessed Brett Kavanaugh speak in a demeaning manner about girls in general as well as specific girls by name.   I also witnessed Brett Kavanaugh behave as a "mean drunk" on many occasions at these parties.

9.   I have been told by other women that this conduct also occurred during the Summer months in Ocean City, Maryland on numerous occasions. I also witnessed such conduct on one occasion in Ocean City, Maryland during "Beach Week."

10.   I have reviewed Brett Kavanaugh's recent claim on Fox News regarding his alleged "innocence" during his high school years and lack of sexual activity.   This claim is absolutely false and a lie.   I witnessed Brett Kavanaugh consistently engage in excessive drinking and inappropriate contact of a sexual nature with women during the early 1980s.

-2-
**DECLARATION OF JULIE SWETNICK**

11.    During the years 1981-82, I became aware of efforts by Mark Judge, Brett Kavanaugh and others to "spike" the "punch" at house parties I attended with drugs and/or grain alcohol so as to cause girls to lose their inhibitions and their ability to say "No." This caused me to make an effort to purposely avoid the "punch" at these parties. I witnessed efforts by Mark Judge, Brett Kavanaugh and others to "target" particular girls so they could be taken advantage of; it was usually a girl that was especially vulnerable because she was alone at the party or shy.

12.    I also witnessed efforts by Mark Judge, Brett Kavanaugh and others to cause girls to become inebriated and disoriented so they could then be "gang raped" in a side room or bedroom by a "train" of numerous boys. I have a firm recollection of seeing boys lined up outside rooms at many of these parties waiting for their "turn" with a girl inside the room. These boys included Mark Judge and Brett Kavanaugh.

13.    In approximately 1982, I became the victim of one of these "gang" or "train" rapes where Mark Judge and Brett Kavanaugh were present. Shortly after the incident, I shared what had transpired with at least two other people. During the incident, I was incapacitated without my consent and unable to fight off the boys raping me. I believe I was drugged using Quaaludes or something similar placed in what I was drinking.

14.    I am aware of other witnesses that can attest to the truthfulness of each of the statements above.

I declare, under penalty of perjury and under the laws of the United States of America, that the foregoing is true and correct. I have executed this declaration on September 25, 2018.

Julie Swetnick

-3-

**DECLARATION OF JULIE SWETNICK**



September 28, 2018

**VIA E-MAIL**

The Honorable Charles E. Grassley
Chairman
Committee on the Judiciary
United States Senate
224 Dirksen Senate Office Building
Washington, DC  20510

The Honorable Dianne Feinstein
Ranking Member
Committee on the Judiciary
United States Senate
224 Dirksen Senate Office Building
Washington, DC  20510

Dear Chairman Grassley and Ranking Member Feinstein:

In response to the Committee's request for information, I, MARK JUDGE, declare:

1.   The allegations in the Swetnick affidavit are so bizarre that, even while suffering from my addiction, I would remember actions so outlandish.  I categorically deny them.

2.   I do not know Julie Swetnick.

3.   I do not recall attending parties during 1981-1983 when I fondled or grabbed women in an aggressive or unwanted manner.

4.   I have never spiked punch to get anyone drunk or disoriented.  Nor have I witnessed Brett Kavanaugh spike punch.

5.   I have never engaged in gang rape of any woman, including Ms. Swetnick.

6.   I will cooperate with any law enforcement agency that is assigned to confidentially investigate these allegations.

I am submitting this letter under penalty of felony.

Sincerely,

Mark Judge

October 1, 2018

Michael C. Fegan

███████████
███████████

Chairman Grassley
Senate Judiciary Committee
Room SD-224
Dirksen Senate Office Building
Washington, DC 20510

Dear Chairman Grassley,

I am writing to you regarding the character of Judge Brett Kavanaugh. Brett and I attended Georgetown Prep High School together from 1979 to 1983. We were classmates, teammates and friends. I attended most of the same social events that Brett attended in high school, and many after high school as well. I also attended "Beach Week" with him in June 1982. I have never seen Brett out of control from drinking alcohol. I have never seen Brett out of control in any situation, whether it be in the classroom, on the football field, on the basketball court or in any social setting.

Regarding the allegation by Christine Blasey Ford, I never heard of such a gathering. We were a tight knit group, and I believe that if anything happened like Professor Ford described, I would have known about it. I never met Christine Blasey, and had never heard her name until mid-September 2018.

I cannot speak for the allegation from the Yale student, Deborah Ramirez, because I did not attend Yale. I can tell you that what Ms. Ramirez described would be completely out of character of the man I have known for almost 40 years.

As to the allegation made by Julie Swetnick, I have never heard of Ms. Swetnick. My understanding is that she graduated from Gaithersburg High School three years before we graduated from Georgetown Prep. During my high school years, I did not know any girls from Gaitherburg High School. We did not socialize with girls from Gaithersburg High School. We did not have any kind of punch drinks, hard liquor or drugs at our parties. I never witnessed any kind of sexual situation at any of our parties. If there was any kind of mis-treatment of girls at any of our parties, I assure you that my friends and I, including Brett Kavanaugh, would have put a stop to it immediately and would have reported it to the Montgomery County, MD Police Department.

I know that last week was tough on you, as it was for many people throughout our country, and I appreciate the way that you have conducted the confirmation hearings. I urge all senators to vote to confirm Judge Brett Kavanaugh. He is one of the most ethical and moral men I know, and has been for the almost 40 years that I have known him.

I appreciate your time in this matter and for your service to our country.


Sincerely,

Michael C. Fegan

September 26, 2018

The Honorable Charles Grassley
Chairman
Committee on the Judiciary
United States Senate
135 Hart Senate Office Building
Washington, D.C. 20510

The Honorable Dianne Feinstein
Ranking Member
Committee on the Judiciary
United States Senate
331 Hart Senate Office Building
Washington, D.C. 20510

Dear Chairman Grassley and Ranking Member Feinstein:

We are men and women who knew Brett Kavanaugh well in high school. We have seen reports today that Julie Swetnick, who says she graduated from Gaithersburg High School, submitted a declaration to the Committee alleging that Brett participated in horrific conduct during high school, including targeting girls for gang rape. Nonsense. We never witnessed any behavior that even approaches what is described in this allegation. It is reprehensible.

In the extensive amount of time we collectively spent with Brett, we do not recall having ever met someone named Julie Swetnick. Nor did we ever observe Brett engaging in any conduct resembling that described in Ms. Swetnick's declaration.

Brett Kavanaugh is a good man. He has always treated women with respect and decency. He is a man of honor, integrity, and compassion. These shameful attacks must end. This process is a disgrace and is harming good people.

Russell Aaronson
Daniel Anastasi
Steve Barnes
Patrick Beranek
Michael Bidwill
Michael Boland
David Brigati
Missy Bigelow Carr
Sharon Crouch Clark
Steve Combs
Citsi Conway
Mark Daly
DeLancey Davis
Julie DeVol
Meg Williams Dietrick
Paula Duke Ebel
Michael Fegan
Maura Fitzgerald
Susan Fitzgerald
Jim Foley

Timothy Gaudette
James Gavin
William Geimer
Mary Beth Greene
Mary Ellen Greene
Daniel Hanley
Melissa Hennessy
Beccy Moran Jackson
Brian H. Johnston
Maura Kane
Kevin Kane
Thomas Kane
Amarie Kappaz
George M. Kappaz
Timothy Kirlin
Kelly Leonard
Maura M. Lindsay
John F. Loome, IV
Suzanne Matan
Meghan McCaleb

Scott McCaleb
Bernard McCarthy, Jr.
Michael R. McCarthy
Stephanie McGill
Stephanie McGrail
Byron J. Mitchell
Sean Murphy
Paul G. Murray
Douglas D. Olson
John F. Ostronic
Elizabeth (Betsy) Manfuso Pothier
Matthew Quinn

Mark A. Quinn
Mae Joyce Rhoten
Mark Richardson
L. Maurice Rowe, IV
Stephen Royston
Alice Kelley Scanlon
James Sullivan
Cynthia Urgo
Donald Urgo, Jr
Patrick T. Waters
Megan Williams
Jodi Yeager



# Hansen
LAW FIRM

October 4th, 2018

## STATEMENT OF RICHARD VINNECCY

### For the Senate Judiciary Committee Investigation

I, Richard Vinneccy, do hereby swear and affirm that all of the statements made herein are true and accurate to the best of my knowledge.

First and foremost, I never wanted to come out publicly on this issue. However, numerous media outlets bombarded me with phone calls and questions when someone discovered the history of the restraining order I had sought against Ms. Swetnick in Miami, Florida. Unfamiliar in this arena, I mistakenly spoke to Politico, made a short two phrase statement to them which was then transmitted nationwide without my authority. Thereafter, I was thrown into the national spotlight and, consequently, I felt compelled to set the record straight against false accusations made by Ms. Swetnick's lawyer and, more importantly, to exercise my civic duty and attest to the credibility or lack thereof of Ms. Swetnick.

I was involved in a romantic relationship for 7 years with Julie Swetnick. For 2 out of those 7 years we lived together in Bethesda, Maryland. Thereafter, my work transferred me internationally to Panama and ultimately to Miami. Thus, due to geographics much of the relationship was long distance.

Despite the distance, we remained close and not once did Ms. Swetnick ever mention that she had been raped or sexually assaulted. Not once did Ms. Swetnick ever mention that she had attended any parties where she witnessed, train rapes, gang rapes, or other sordid sexual activity. Not once did she ever mention Brett Kavanaugh.

As to her mental stability, or lack thereof, throughout the relationship, I noticed odd behaviors exhibited by Ms. Swetnick. For the most part she was financially unstable and always seeking financial gain from frivolous law suits. She was abnormally possessive and jealous of me. She always wanted to be the center of attention and exaggerated everything in her life. When we would have disagreements she would try to provoke me to hit her. As to why she did that, I can only believe it was to instigate me to do something physically violent to her so that she could play the victim, contact the police and have me arrested. At times she threatened me not to mistreat her because she could do to me what she had done with her ex-boyfriend. While I do not know the entire story, I recall her telling me that her ex-boyfriend was in jail. Perhaps one of the most bizarre things about her was a closet that she kept in our Bethesda home. The closet was



# Hansen
## LAW FIRM

"off limits" to me, however, one day I opened it and found three large boxes filled with years and years of receipts from grocery stores.

Looking back, I am not sure why I stayed in this relationship for so long. As a 60 year old wiser and more experienced man now, I can only blame inexperience, immaturity and whatever else it is that causes one to stay in an unhealthy relationship for too long. Ultimately, once I was transferred to Miami, I finally decided it would be best to end the relationship. I did and thereafter, Ms. Swetnick harassed and stalked me for almost 2 months via telephone and appeared at a trade show conference in Seattle that I was attending, unannounced and uninvited.

For obvious reasons this was difficult and uncomfortable for me, but even more so since I began a new relationship with the woman who would ultimately become my wife of 12 years and with whom I had two children.  Finally, I told her to stop the calls, that I had moved on, that I had met someone and that we were expecting a baby.

Ms. Swetnick's reaction was scary, frightening and bizarre causing me to fear for my life and that of my new girlfriend and our unborn child. In a nutshell she: 1) told me that she was going to kill me, my girlfriend and our unborn child; 2) she was going to report me to the FBI and have me deported; 3) she was going to tell the police that I raped her in Seattle; 4) she was not going to grant me a divorce and; 5) that she was pregnant with twins.

- I have been a citizen of this country since the 80's so as far as deporting me, this did not make sense.
- I have never raped Ms. Swetnick.
- Ms. Swetnick and I were never married however in her opinion we were due to a Maryland statute, which she claimed, qualified us as a married couple since we co-habitated in that state for 2 years.
- I asked Ms. Swetnick for the medical records proving that she was pregnant with twins and after consulting with her "doctor", I confirmed the story was a complete fabrication and that there was no pregnancy.

I decided to file a restraining order in Miami, Florida because that is where I was residing and I was afraid she was going to come to Miami to do harm to my family and I as she had threatened. The temporary injunction was granted. (In Florida, the legal process to obtain a restraining order consists of a two phase process. First, one applies for a temporary injunction via a petition. A judge then reviews the petition and if that is granted, a temporary injunction is put in place until a hearing for a permanent injunction is held.)

Ultimately, I did not go through with the hearing on the permanent injunction for several reasons. First, not being a lawyer and never having done this before, I did not know that the final step to obtain the permanent injunction would entail confronting Ms. Swetnick personally in court at the hearing. When I found out about this, I thought it over with my girlfriend at the time



# Hansen
### LAW FIRM

who was fearful for her own life, and together we determined not to perpetuate my connection with Ms. Swetnick or instigate her any further. I was not sure how Ms. Swetnick was going to retaliate if she was forced to fly down to Miami and confront me in court in front of a judge. So, instead we moved to a new residence and changed our telephone numbers in hopes that we would never have to see Ms. Swetnick again.

Thankfully, we never did see or hear from her again.

Based on my history with Ms. Swetnick, I do not believe her allegations against Judge Kavanaugh and it is my opinion that she is perpetuating a fraud against him. Her motives may be for financial gain or notoriety but they are certainly not to expose the truth.

_____

Richard Vinneccy

Date: ___Oct 4, 2018___

October 2, 2018

My name is Dennis Ketterer.

I am a former weeknight meteorologist for Channel 7 (WJLA) in Washington, D.C., and won an EMMY in 1995.

I want to preface this by saying, I am neither proud of nor guiltless in the actions about to be mentioned in this letter. I hope my family, friends, and church members can forgive me.

I first met Julie Swetnick in 1993 at a Washington, D.C. bar near Wisconsin Circle. I was at a going-away party for channel 7 anchor Dale Solly. I left the party to go to the bar to buy a soda. I haven't drunk alcohol since my 18th birthday.

As I sat alone at the end of the bar, Julie approached me. She was alone, quite beautiful, well-dressed and no drink in hand. Consequently, my initial thought was that she might be a high end call girl because at the time I weighed 350lbs so what would someone like her want with me?

But, there was no conversation about exchanging sex for money so I decided to talk with her a few minutes. I had never been hit on in a bar before.

I didn't leave with her that night, although we talked about getting together. Over the next couple of weeks we met at what I believed and still believe was Julie's place. From the beginning Julie knew I was married and that I was having marital issues.

As we shared conversations, my lasting impression of Julie was that she was smart, fun and funny. But she was also an opportunist. I felt she only had interest in my 350lb self because I was on television and well known.

Although we were not emotionally involved there was physical contact. We never had sex despite the fact she was very sexually aggressive with me. I'm not implying I didn't like her advances, I just wasn't ready to make the jump. It came to a head so we talked about sex.

During a conversation about our sexual preferences, things got derailed when Julie told me that she liked to have sex with more than one guy at a time. In fact sometimes with several at one time. She wanted to know if that would be ok in our relationship.

I asked her if this was just a fantasy of hers. She responded that she first tried sex with multiple guys while in high school and still liked it from time-to-time. She brought it up because she wanted to know if I would be interested in that.

A.I.D.S. was a huge issue at the time. And I had children. Due to her having a directly stated penchant for group sex, I decided not to see her anymore. It put my head back on straight. That was the last conversation we had.

Julie never said anything about being sexually assaulted, raped, gang-raped or having sex against her will. She never mentioned Brett Kavanaugh in any capacity.

In 1996 I decided to run again for Congress in Maryland's 8th district as a Democrat. I thought Julie could help my primary campaign in some way because of her personality, great smile

and good looks. Also, in the course of our past conversations, she told me that she too was a Democrat.

Because I had lost Julie's number I called her father to get it. When I talked to him about possibly bringing her on to help with my campaign, he told me that she had psychological and other problems at the time. When I asked he would not go into detail and said that I wouldn't want her to work on my campaign. His response was rather abrupt. He hung up on me.

That was the end of my Julie saga...or so I thought.

On Wednesday, September 26th, I heard that Mr. Kavanaugh had a third accuser. When Julie's name was mentioned as the accuser, and due to the type of accusation, I was deeply troubled and felt a moral dilemma. Do I reach out and tell the truth of what I knew and risk family relationships, or remain silent.

The whole Kavanaugh confirmation process over the last few days brought out very deep issues within me. I know what it's like to be sexually assaulted and not be believed. I was 9 years old when it happened at the hands of my grandfather's best friend.

I also know what it's like to be accused of something significant that I didn't do and not be believed. Because of this and eternal considerations, the pressure on me built throughout the afternoon and early evening.

That evening was very difficult for me as I had to explain to my wife of three years what had happened 25 years ago, before we met and long before we were married. I explained my situation and she said she knew that if I didn't do the right thing, I couldn't live with myself.

Because of my less than perfect past, and having repented of this, I felt the need for spiritual guidance. I reached out to a church leader. We talked for a while. I explained that I felt horribly about this more-than-indiscretion. I knew if I came forward that in addition to me, it would affect my children, my grandchildren, my ex-wife, my wife, Julie, the Kavanaughs.

Finally, after much thought and frankly tears of remorse, I decided to be forth-coming with what I knew first-hand. I had to take the advice I'd always given my children. That is; Doing the right thing is almost never the easy thing, but it's always the right thing.

My heart felt very heavy because of the possible familial risks. But I knew I had to do the right thing. At my request, he put me in touch with another church leader we knew, who then reached out to Senator Hatch's Salt Lake office in my behalf.

As I watched part of the afternoon confirmation hearing the next day, and saw Mrs. Kavanaugh looking so sad I felt that she needed to know that in this instance, her husband was being mischaracterized.

My heart still feels heavy, for me as well as Julie and the Kavanaughs. That said, based on my direct experience with Julie, I do not believe her allegations against Mr. Kavanaugh.

Sincerely,

Dennis Ketterer

JS-6

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

===========================================================================

**CASE NO.:** <u>CV 18-06893 SJO (FFMx)</u>        **DATE:** <u>October 15, 2018</u>

**TITLE:**    <u>Stephanie Clifford v. Donald J. Trump</u>

===========================================================================

**PRESENT: THE HONORABLE S. JAMES OTERO, UNITED STATES DISTRICT JUDGE**

Victor Paul Cruz                           Not Present
Courtroom Clerk                            Court Reporter

**COUNSEL PRESENT FOR PLAINTIFF:**         **COUNSEL PRESENT FOR DEFENDANTS:**

Not Present                                Not Present

===========================================================================

**PROCEEDINGS (in chambers): ORDER GRANTING DEFENDANT DONALD J. TRUMP'S SPECIAL MOTION TO DISMISS/STRIKE COMPLAINT** [Docket No. 28]**; ORDER DENYING AS MOOT DEFENDANT DONALD J. TRUMP'S ALTERNATIVE MOTION TO DISMISS COMPLAINT** [Docket No. 28]

This matter is before the Court on Defendant Donald J. Trump's Special Motion To Dismiss/Strike Plaintiff Stephanie Clifford's Complaint Pursuant To Anti-SLAPP Statute ("Special Motion") Or Alternatively Defendant's Motion To Dismiss Complaint Pursuant To FRCP 12(b)(6) ("Motion"), filed August 27, 2018. Plaintiff opposed the Special Motion and the Motion ("Opposition") on September 3, 2018. Plaintiff replied ("Reply") on September 10, 2018. The Court held argument on the Special Motion and the Motion on September 24, 2018. (*See* Transcript of Proceedings, ECF No. 34.) For the following reasons, the Court **GRANTS** Defendant's Special Motion To Dismiss/Strike. The Court **DENIES AS MOOT** Defendant's alternative Motion To Dismiss.

I.    FACTUAL AND PROCEDURAL BACKGROUND

    A.    Plaintiff's Allegations In The Operative Complaint

Plaintiff Stephanie Clifford filed the operative Complaint against Defendant Donald J. Trump on April 30, 2018 in the Southern District of New York. In the Complaint, Ms. Clifford alleges as follows.

Ms. Clifford began an intimate relationship with Mr. Trump in the summer of 2006. (Compl.¶ 5, ECF No. 1.) In May of 2011, she agreed to cooperate with *In Touch Magazine* in connection with an article about her relationship with Mr. Trump. (Compl. ¶ 6.) She agreed to speak to the magazine after her ex-husband approached the magazine without her approval. (Compl. ¶ 6.) A few weeks after agreeing to speak to the magazine, a man approached and threatened Ms. Clifford in Las Vegas, Nevada. (Compl.¶ 7.) The man purportedly approached Ms. Clifford, threatened Ms. Clifford's daughter, and told her to "Leave Trump alone. Forget the story." (Compl. ¶¶ 8-9.)

JS-6

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority     _____
Send         _____
Enter        _____
Closed       _____
JS-5/JS-6    _____
Scan Only    _____

**CASE NO.:   CV 18-06893 SJO (FFMx)          DATE: October 15, 2018**

After Mr. Trump was elected President of the United States on November 8, 2016, Ms. Clifford worked with a sketch artist to render a sketch of the person who had purportedly threatened her in 2011. (Compl. ¶ 14.) Ms. Clifford released the sketch publicly on April 17, 2018. (Compl. ¶ 14.)

The next day, on April 18, 2018, Mr. Trump, from his personal Twitter account (@RealDonaldTrump), posted a purportedly false statement regarding Ms. Clifford, the sketch, and Ms. Clifford's account of the threatening incident that took place in 2011. (Compl.¶ 15.) Mr. Trump's tweet read as follows: "A sketch years later about a nonexistent man. A total con job, playing the Fake News Media for Fools (but they know it)!" (Compl.¶ 15.) Mr. Trump posted this tweet in response to another tweet posted by an account named DeplorablyScottish (@ShennaFoxMusic), which showed side-by-side images of the sketch released by Ms. Clifford and a picture of Ms. Clifford and her husband. (Compl. ¶ 16.)

Based on this tweet, Ms. Clifford brings the instant lawsuit against Mr. Trump for defamation. (*See* Compl. ¶¶ 21-38.) She argues that Mr. Trump's tweet attacks the veracity of her account of the threatening incident that took place in 2011. (Compl.¶ 17.) She also contends that Mr. Trump's tweet suggests that she is falsely accusing an individual of committing a crime against her. (Compl. ¶ 17.) According to Plaintiff, "Mr. Trump meant to convey that Ms. Clifford is a liar, someone who should not be trusted, that her claims about the threatening encounter are false, and that she was falsely accusing the individual depicted in the sketch of committing a crime, where no crime had been committed." (Compl. ¶ 28.) As a result, she contends that Mr. Trump's tweet was false and defamatory, and that the tweet was defamation *per se* because it charged her with committing a serious crime. (Compl. ¶¶ 17, 19.)

Ms. Clifford goes on to claim that Mr. Trump acted with actual malice in issuing the tweet because he knew the falsity of his tweet. This is because, according to Ms. Clifford, the person who threatened her in 2011 acted at the direction of Mr. Trump or Mr. Trump's attorney, Michael Cohen. (Compl. ¶ 31.) In the alternative, she contends that Mr. Trump acted with reckless disregard for the truth or falsity of his tweet because he had no way of knowing whether the 2011 incident had occurred. (Compl. ¶ 32.)

Finally, Ms. Clifford contends that she suffered damages as a result of the tweet because Mr. Trump's statement exposed her to "hatred, contempt, ridicule, and shame, and discouraged others from associating or dealing with her." (Compl.¶ 33.) Therefore, she "has suffered damages in an amount to be proven at trial, including but not limited to, harm to her reputation, emotional harm, exposure to contempt, ridicule, and shame, and physical threats of violence to her person and life." (Compl. ¶ 34.) Mr Clifford claims that she has retained the services of professional bodyguards and other protective services because of the threats that she has received. (Compl. ¶ 36.)

B.     <u>Procedural History</u>

JS-6                    **UNITED STATES DISTRICT COURT**
                         **CENTRAL DISTRICT OF CALIFORNIA**

                            **CIVIL MINUTES - GENERAL**

| Priority | ___ |
| Send | ___ |
| Enter | ___ |
| Closed | ___ |
| JS-5/JS-6 | ___ |
| Scan Only | ___ |

**CASE NO.:** <u>CV 18-06893 SJO (FFMx)</u>      **DATE:** <u>October 15, 2018</u>

Ms. Clifford first brought this lawsuit in the United States District Court for the Southern District of New York. She initially contended that venue was appropriate in the Southern District of New York because it is the district in which Mr. Trump resides. (Compl. ¶ 4.)

On July 23, 2018, Mr. Trump filed a motion to transfer the case from the Southern District of New York to this Court pursuant to 28 U.S.C. § 1404(a). (*See* Motion To Transfer, ECF No. 11.) Defendant argued in part that this lawsuit relates to other litigation before this Court involving Plaintiff and Defendant concerning the enforceability of a non-disclosure agreement. (*See* Memorandum In Support of Motion To Transfer at 1, ECF No. 11-1.)

Plaintiff initially opposed the transfer, arguing in part that the instant action was not closely related to the other litigation before this Court. (*See* Response In Opposition To Motion To Transfer, ECF No. 13 at 1.) After a meet and confer process, Plaintiff and Defendant jointly agreed to transfer Plaintiff's defamation case to this Court. On August 8, 2018, the district court in the Southern District of New York granted Plaintiff and Defendant's joint stipulation to transfer. (*See* ECF No. 17, ECF No. 18.)

On August 27, 2018, Defendant brought the instant Special Motion To Dismiss/Strike Plaintiff's Complaint. In the Special Motion, Defendant contends that Ms. Clifford's Complaint fails to state a cause of action for defamation because (1) Mr. Trump's tweet is a protected opinion, (2) Ms. Clifford did not suffer damages as a result of the tweet, and (3) Mr. Trump did not act with malice or reckless disregard for the truth when he issued the tweet. (*See* Special Motion at 1.) Defendant argues that Ms. Clifford's lawsuit is a Strategic Lawsuit Against Public Participation ("SLAPP"). (*See id.*)

The Court held argument on September 24, 2018 and subsequently submitted this matter.

II.     <u>ANALYSIS</u>

        A.     <u>Choice of Law</u>

Before addressing the substance of Defendant's Special Motion To Dismiss/Strike, this Court must decide which state's substantive law governs its analysis. Applying New York choice-of-law principles, Defendant argues that the Texas Citizens Participation Act ("TCPA" or "Texas Anti-SLAPP statute") governs this case. (*See* Special Motion at 7-9.) Plaintiff disagrees, arguing that New York's anti-SLAPP law governs this dispute because Mr. Trump is a citizen of the state of New York. (*See* Opposition at 8.)

The Court applies the Texas anti-SLAPP statute because Ms. Clifford brought this diversity action in the Southern District of New York, and a state court in New York would apply the TCPA to this case.

JS-6

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.:  CV 18-06893 SJO (FFMx)**      **DATE:  October 15, 2018**

1.    <u>New York Choice-of-Law Provisions Govern This Court's Analysis of Defendant's Special Motion.</u>

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a).  In *Van Dusen v. Barrack*, the United States Supreme Court held that where a defendant seeks to transfer an action to another district court in the country, "the transferee district court must be obligated to apply the state law that would have been applied if there had been no change of venue." 376 U.S. 612, 639 (1964).  In *Ferens v. John Deere Company*, the Supreme Court extended this rule to those cases where a plaintiff initiates a transfer.  494 U.S. 516, 525 (1990).

Ms. Clifford, a citizen of the state of Texas, brings this defamation action against Mr. Trump, a citizen of the state of New York.[1]  This Court has diversity jurisdiction under 28 U.S.C. Section 1332.  The instant case is a diversity action transferred to this Court from the Southern District of New York with the consent of both parties.  Therefore, the Court applies New York choice-of-law principles to determine which forum's substantive law governs the Court's analysis of the Special Motion To Dismiss/Strike.

2.    <u>Under New York Choice Of Law Principles, Texas Law Applies To Plaintiff's Allegations of Defamation and the Special Motion To Dismiss/Strike.</u>

Under New York's choice-of-law principles, the law of the situs of the injury generally applies to a tort lawsuit involving diverse parties.  *See Stoyanovskiy v. Amerada Hess Corp.*, 286 A.D.2d 727, 728 (2001).  However, in this day and age, with the publication of statements in online fora, the tort of defamation often involves a plaintiff injured in several jurisdictions.  For multistate defamation actions, where the situs of the injury may be in multiple jurisdictions, "New York applies the law of the state with the most significant interest in litigation," which generally is the state where a plaintiff is domiciled.  *See Lee v. Bankers Trust Co.*, 166 F.3d 540, 545 (2d. Cir. 1999).  Plaintiff alleges in the Complaint that Ms. Clifford is a "resident of the State of Texas," (Compl. ¶ 1), and  conceded during argument on September 24, 2018 that Ms. Clifford is domiciled in Texas. (*See* Transcript of Proceedings at 11: 7.)  Therefore, this Court applies Texas law to Plaintiff's allegations of defamation and Defendant's Special Motion To Dismiss/Strike.[2]

---

[1]  Defendant Mr. Trump argues that he is a citizen of Washington D.C. because he resides at the White House, not in New York city.  For purposes of the Court's choice-of-law analysis here, the Court is required to apply Texas law to Ms. Clifford's defamation action, whether Mr. Trump is a citizen of New York or Washington D.C.

[2]  In analyzing Defendant's Special Motion To Dismiss/Strike under the TCPA, the Court borrows from courts' analysis of California's anti-SLAPP statute. "The California

JS-6     **UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority   ____
Send   ____
Enter   ____
Closed   ____
JS-5/JS-6   ____
Scan Only   ____

**CASE NO.:**   <u>CV 18-06893 SJO (FFMx)</u>     **DATE:** <u>October 15, 2018</u>

---

The Restatement (Second) Conflicts of Law supports this Court's holding that Texas law applies. In defamation lawsuits involving "multistate communication," a court must apply "the local law of the state where the plaintiff has suffered the greatest injury by reason of [her] loss of reputation," which "will usually be the state of the plaintiff's domicil if the matter complained of has there been published." Restatement (Second) of Conflict of Laws § 150 (1971).

> B.   <u>Defendant's Special Motion To Strike/Dismiss Is Analogous To A Motion To Dismiss Under Federal Rule of Civil Procedure 12(b)(6).</u>

Having concluded that the TCPA applies to the Complaint and the Special Motion, the Court next determines if it is appropriate to adjudicate the Special Motion at the present stage of litigation before any discovery has taken place. Plaintiff argues that Mr. Trump's Special Motion should be adjudicated as a motion for summary judgment. (*See* Opposition at 5-6; Transcript of Proceedings at 15:3-16:6, 17:5-24.) If this were the case, the parties would be permitted to pursue discovery prior to a ruling on the Special Motion. Plaintiff's argument, however, has no merit.

For purposes of the Federal Rules of Civil Procedure, a motion brought on anti-SLAPP grounds can either be analogous to a motion to dismiss or a motion for summary judgment. If a defendant moves to strike/dismiss based on purely legal arguments and the fact that a complaint does not allege sufficient facts to support its stated causes of action, this Court analyzes the motion under the standards set out in Federal Rule of Civil Procedure 8 and 12(b)(6). *See Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 833–34 (9th Cir. 2018). If a defendant makes a factual challenge to a complaint, including by providing alternate facts to challenge the allegations in a complaint, this Court treats the motion to strike/dismiss as a motion for summary judgment. *See id.*

Here, Mr. Trump's Special Motion is analogous to a motion to dismiss because it makes three main arguments, all of which assume the truth of the allegations in the Complaint and ask this Court to dismiss Plaintiff's action because these facts do not sustain a cause of action for defamation. First, Defendant argues that although Plaintiff alleges that the President made a defamatory statement in a tweet,[3] the statement, as alleged in the Complaint, is a constitutionally-

---

statute—section 425.16 of the California Code of Civil Procedure—was one of the earliest 'anti-SLAPP' laws and has been a primary model or influence on similar laws subsequently enacted in other states, including, directly or indirectly, the TCPA." *Serafine v. Blunt*, 466 S.W.3d 352, 386 (Tex. App. 2015).

[3] For purposes of arguing the Motion To Strike/Dismiss, Defendant accepts that Mr. Trump sent the tweet stating "A sketch years later about a nonexistent man. A total con job, playing the Fake News Media for Fools (but they know it)!" Defendant assumes that Mr. Trump issued this tweet and argues that Plaintiff cannot sue Defendant for defamation

Case 2:18-cv-02217-SJO-FFM   Document 98-2   Filed 11/13/18   Page 36 of 63   Page ID
#:3832
Case 2:18-cv-06893-SJO-FFM   Document 38   Filed 10/15/18   Page 6 of 14   Page ID #:1028

JS-6

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:** **CV 18-06893 SJO (FFMx)**          **DATE:** **October 15, 2018**

protected opinion. (*See* Special Motion at 9-10.) Second, Defendant argues that Plaintiff has not sufficiently alleged damages as a result of Mr. Trump's purported defamation because the damages that she suffered could have arisen from an alternate cause. (*See* Special Motion at 11-14.) Third, Defendant argues that Plaintiff has not alleged sufficient facts to show that Mr. Trump acted with actual malice or reckless disregard for the truth, aside from Plaintiff's conclusory statements that Mr. Trump had knowledge of the threat that Plaintiff received in 2011. (*See* Special Motion at 14-16.) Each of these arguments largely assume the truth of the Complaint, but nevertheless make the point that the Complaint does not allege sufficient facts to meet each prong of the defamation standard.

In addition to these three arguments, Defendant's Special Motion sets forth some facts beyond those alleged in the Complaint.[4]  For example, Defendant argues that Ms. Clifford did not sufficiently allege that she suffered damages because, in fact, she benefitted economically from Mr. Trump's defamatory statement.  To prove this, Defendant points to evidence outside the Complaint of Ms. Clifford's economic well-being.  (*See* Special Motion at 13-14.)  In making its ruling, the Court takes no position as to any argument concerning the purported benefit that Ms. Clifford received as a result of the tweet in question.  The remainder of Defendant's arguments are properly brought at the present stage of litigation.

C.     Defendant's Special Motion To Dismiss/Strike Is Timely.

The next threshold inquiry is whether the Special Motion is timely.  Plaintiff contends that it is not, because Mr. Trump should have brought the Special Motion within 60 days of May 23, 2018, as required by the TCPA.  This is the date on which Mr. Trump waived service of Ms. Clifford's defamation action.  (*See* Opposition at 7.)

The Court holds that although  Mr. Trump may not have complied with the filing deadline, there is good cause to permit the Special Motion to proceed given the procedural history of this case, which includes a transfer to this Court from a district court in the Southern District of New York.

---

based on the content of the tweet.

[4]  Plaintiff and Defendant have filed evidentiary objections to several of the factual submissions.  In doing so, both parties correctly point out that this Court should not take into account facts outside the Complaint in deciding this Special Motion.  Aside from otherwise judicially-noticeable facts, the Court does not take into account facts outside the Complaint in reaching its final holding that Mr. Trump's tweet is a non-actionable opinion that cannot be the subject of a defamation claim.

Case 2:18-cv-02217-SJO-FFM   Document 98-2   Filed 11/13/18   Page 37 of 63   Page ID
Case 2:18-cv-06893-SJO-FFM   Document 32   Filed 10/15/18   Page 7 of 14   Page ID #:1029
#:2823

JS-6

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:** CV 18-06893 SJO (FFMx)        **DATE:** October 15, 2018

Plaintiff's argument concerning the applicability of the 60-day deadline in federal court raises an unresolved issue of law. Like the TCPA, California's anti-SLAPP statute contains a 60-day requirement. No court in this Circuit, or the Fifth Circuit, has ruled on whether an anti-SLAPP motion, brought as a motion to dismiss as opposed to a motion for summary judgment, is subject to the 60-day deadline. To be sure, federal courts have held that the 60-day deadline in California's anti-SLAPP statute does not apply to anti-SLAPP motions that are analogous to motions for summary judgment. *See Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 846 (9th Cir. 2001) (citing *Rogers*, 57 F. Supp. 2d at 982). The 60-day deadline is a procedural rule under the *Erie* doctrine that conflicts with Federal Rule of Civil Procedure 56. *See Sarver v. Chartier*, 813 F.3d 891, 900 (9th Cir. 2016). This is because the 60-day deadline seeks to limit discovery and allow for anti-SLAPP motions at an early stage of litigation, while Rule 56 seeks to promote discovery, requiring motions for summary judgment after litigation has proceeded for some time. *See id*. As analyzed above, however, Mr. Trump's anti-SLAPP motion is analogous to a motion to dismiss, not a motion for summary judgment. The discovery rationale that underpins a case like *Metabolife International* does not exist here.

Nevertheless, the Court does not need to address the applicability of the 60-day deadline to the Special Motion because there is "good cause" to permit it to proceed. *See Schimmel v. McGregor*, 438 S.W.3d 847, 856 (Tex. App. 2014) (holding that the TCPA allows a court to waive the motion filing deadline where "good cause" exists). Ms. Clifford initially filed her defamation action in the Southern District of New York, and there was some dispute as to whether that district was the appropriate venue for this case. After briefing on the matter, Ms. Clifford's defamation action was transferred to this Court on August 8, 2018. After the transfer, Defendant did not delay bringing this Special Motion, filing it on August 27, 2018, nineteen days after the transfer and well-within the 21-day deadline in which a defendant must normally file a responsive pleading after a plaintiff files a complaint. *See* Fed. Rule Civ. P. Rule 12(a). Importantly, the instant case did not proceed in any material respect after Plaintiff's initial filing of the Complaint in April 2018. This limits the prejudice that Plaintiff may face from an untimely anti-SLAPP motion. *See New.Net, Inc. v. Lavasoft*, 356 F. Supp. 2d 1090, 1100 (C.D. Cal. 2004). Defendant's filing of this Special Motion after the 60-day deadline also does not frustrate the TCPA's purpose of dismissing improper lawsuits at an early stage of litigation. *See id*. (holding that one purpose of California's 60-day deadline for anti-SLAPP motions was to dismiss lawsuits early in litigation). Accordingly, "good cause" exists to allow Defendant to proceed with this Special Motion, even if the filing did not comply with the TCPA's 60-day deadline.

   D.    Standard Under The TCPA

Having determined (1) that the TCPA applies to the Special Motion and Ms. Clifford's defamation action, (2) that this Court treats the Special Motion as analogous to a motion to dismiss under

Case 2:18-cv-02217-SJO-FFM   Document 98-2   Filed 11/13/18   Page 38 of 63   Page ID
#:2824
Case 2:18-cv-06893-SJO-FFM   Document 32   Filed 10/15/18   Page 8 of 14   Page ID #:1030

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:**  CV 18-06893 SJO (FFMx)        **DATE:** October 15, 2018

Federal Rule of Civil Procedure 12(b)(6), and (3) that there is "good cause" to permit the Special Motion after the expiration of 60 days from the initial filing of the Complaint, the Court next applies the substantive requirements of the TCPA to the Special Motion and the allegations in the Complaint.

Texas offers robust protection for the freedom of speech. The TCPA, like analogous anti-SLAPP statutes in other jurisdictions including California, seeks to "encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." Tex. Civ. Prac. & Rem. Code § 27.002.

Analysis of an anti-SLAPP motion under the TCPA proceeds in three steps. First, a defendant must show, by a preponderance of the evidence, that a plaintiff's complaint is based on, relates to, or is in response to the defendant's exercise of: (1) the right of free speech; (2) the right to petition; or (3) the right of association. *See* Tex. Civ. Prac. & Rem. Code § 27.005(b); *In re Lipsky*, 460 S.W.3d 579, 586 (Texas 2015). The TCPA defines "exercise of the right of free speech" as "a communication made in connection with a matter of public concern." Tex. Civ. Prac. & Rem. Code § 27.001(3). A communication includes "the making or submitting of a statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic." *Id.* § 27.001(1). A "matter of public concern" includes an issue related to: "(A) health or safety; (B) environmental, economic, or community well-being; (C) the government; (D) a public official or public figure; or (E) a good, product, or service in the marketplace." *Id.* § 27.001(7). Second, the burden then shifts to the plaintiff to "establish[ ] by clear and specific evidence a prima facie case for each essential element of the claim in question." *Id.* § 27.005(c). Third, the defendant can still prevail under the TCPA if he/she "establishes by a preponderance of the evidence each essential element of a valid defense" to the plaintiff's claim. *Id.* § 27.005(d). *See also ExxonMobil Pipeline Company v. Coleman*, 512 S.W.3d 895, 898-99 (summarizing the standard under the TCPA).

Here, Defendant's Special Motion does not allege any defenses to plaintiff's defamation claim. The Court addresses the other two steps of the TCPA analysis in turn.

        1.    <u>Plaintiff's Defamation Lawsuit Relates To Defendant's Right of Free Speech.</u>

There is little dispute that Ms. Clifford's Complaint relates to Mr. Trump's exercise of his right of free speech on an issue of public concern. In reaching this conclusion, the Court is mindful of the fact that Texas "look[s] to the entire communication as well as the context of the communication in which the allegedly defamatory statement is made." *Cruz v. Van Sickle*, 452 S.W.3d 503, 514 (Tex. App. 2014). Here, the statement at issue is Mr. Trump's reaction to Plaintiff's release of the

JS-6

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:**  **CV 18-06893 SJO (FFMx)**          **DATE:**  **October 15, 2018**

sketch of a person who threatened Plaintiff in connection with a purported affair that she had with Mr. Trump.  Although Mr. Trump was not the President at the time of the purported affair or the purported threat that Plaintiff received, Mr. Trump is now the President and was the President at the time of the tweet.  Moreover, Mr. Trump issued the tweet in the context of Plaintiff publicly styling herself as an adversary to the President, including in filings before this Court.  (*See, e.g.*, First Amended Complaint in *Stephanie Clifford v. Donald Trump et al.* at ¶ 17, No. 2:18-cv-02217-SJO-FFM (arguing that "Mr. Trump, with the assistance of his attorney Mr. Cohen, aggressively sought to silence Ms. Clifford as part of an effort to avoid her telling the truth, thus helping to ensure he won the Presidential Election").)  The tweet in question, therefore, relates to an issue involving a public official on a matter of public concern.  *See id.* (holding that the TCPA applies to a defamation claim involving "a public official or public figure," including a candidate for judicial office).  Accordingly, the TCPA applies to the Special Motion To Dismiss/Strike.

> 2.    Plaintiff Fails To Establish a Prima Facie Case For Defamation.

The Court next analyzes whether Plaintiff has established a prima facie case for defamation.  To prevail on a cause of action for defamation under Texas law, Plaintiff must allege that: (1) Mr. Trump published a false statement; (2) that defamed Ms. Clifford; (3) with the requisite degree of fault regarding the truth of the statement (negligence if Ms. Clifford is a private individual or malice if Ms. Clifford is a public individual); and (4) damages (unless the statement constitutes defamation per se).  *See D Magazine Partners, L.P. v. Rosenthal*, 529 S.W.3d 429, 434 (Tex. 2017).

> a.    False Statement

In the Special Motion, Mr. Trump argues that the tweet at issue is a non-actionable opinion, not a statement of fact about Ms. Clifford.  (Special Motion at 9.)  "Expressions of opinion may be derogatory and disparaging; nevertheless they are protected by the First Amendment of the United States Constitution and by article I, section 8 of the Texas Constitution."  *Shaw v. Palmer*, 197 S.W.3d 854, 857 (Tex. App. 2006).

The Court agrees with Mr. Trump's argument because the tweet in question constitutes "rhetorical hyperbole" normally associated with politics and public discourse in the United States.  The First Amendment protects this type of rhetorical statement.

"It is well settled that 'the meaning of a publication, and thus whether it is false and defamatory, depends on a reasonable person's perception of the entirety of a publication and not merely on individual statements." *See Bentley v. Bunton*, 94 S.W.3d 561, 579 (Tex. 2002) (quoting *Turner v. KTROK Television, Inc.*, 38 S.W. 3d 103, 115 (Tex. 2000)).  To assess whether a statement is "rhetorical hyperbole," this Court looks to the statement "as a whole in light of the surrounding circumstances and based upon how a person of ordinary intelligence would perceive it."

JS-6

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority      ____
Send          ____
Enter         ____
Closed        ____
JS-5/JS-6     ____
Scan Only     ____

---

**CASE NO.:   CV 18-06893 SJO (FFMx)**        **DATE:   October 15, 2018**

---

*Campbell v. Clark*, 471 S.W.3d 615, 625 (Tex. App. 2015).  Because Mr. Trump's tweet involves a matter of public concern, including purported acts committed by the now President of the United States, the Court applies the following three principles to determine if the tweet is actionable for defamation (the "*Bentley/Milkovich*" analysis). *See Bentley*, 94 S.W.3d at 580.  *See also Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19 (1990) (setting out the standard summarized below).

1.    A statement on matters of public concern must be provable as false before there can be liability for defamation.

2.    The United States Constitution protects statements that cannot reasonably be interpreted as stating actual facts about an individual made in debate over public matters in order to provide assurance that public debate will not suffer for lack of imaginative expression or the rhetorical hyperbole which has traditionally added much to the discourse of the United States.

3.    Where a statement of "opinion" on a matter of public concern reasonably implies false and defamatory facts regarding public figures or officials, those individuals must show that such statements were made with knowledge of their false implications or with reckless disregard of their truth, and where such a statement involves a private figure on a matter of public concern, a plaintiff must show that the false connotations were made with some level of fault.

Mr. Trump's tweet stated as follows: "A sketch years later about a nonexistent man.  A total con job, playing the Fake News Media for Fools (but they know it)!"  When the first step in the *Bentley/Milkovich* analysis is applied to this tweet, Plaintiff correctly points out that Mr. Trump's tweet contains two verifiably true/false statements: (1) that the man who threatened Ms. Clifford in 2011 does not exist and therefore, that Plaintiff is lying about her encounter with him; and (2) that Ms. Clifford is engaging in a "con job" or is lying to Mr. Trump, the public, and the media about the threat (and by implication her affair with Mr. Trump).  If the man who threatened Ms. Clifford in 2011 does exist, or if Ms. Clifford is not lying to Mr. Trump, the public, and the media about the threats that she received or her affair with Mr. Trump, Mr. Trump's tweet would be verifiable as false.

Plaintiff's argument crumbles when it comes to the second step in the *Bentley/Milkovich* analysis.  Mr. Trump's tweet constitutes "rhetorical hyperbole," which is "'extravagant exaggeration [that is] employed for rhetorical effect.'" *Backes v. Misko*, 486 S.W.3d 7, 26 (Tex. App. 2015) (quoting *Am. Broad. Cos. v. Gill,* 6 S.W.3d 19, 30 (Tex. App. 1999)).  Specifically, Mr. Trump's tweet displays an incredulous tone, suggesting that the content of his tweet was not meant to be understood as

---

Case 2:18-cv-02217-SJO-FFM   Document 98-2   Filed 11/13/18   Page 41 of 63   Page ID
#:2827
Case 2:18-cv-06893-SJO-FFM   Document 27   Filed 10/15/18   Page 11 of 14   Page ID #:1033

JS-6

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:** **CV 18-06893 SJO (FFMx)**        **DATE:** **October 15, 2018**

a literal statement about Plaintiff.  Instead, Mr. Trump sought to use language to challenge Plaintiff's account of her affair and the threat that she purportedly received in 2011.  As the United States Supreme Court has held, a published statement that is "pointed, exaggerated, and heavily laden with emotional rhetoric and moral outrage" cannot constitute a defamatory statement.  *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 32 (1990).

Mr. Trump also issued the tweet in the context of Plaintiff presenting herself as a political adversary to the President.  *Rehak Creative Services, Inc. v. Witt* is instructive in this regard.  *See* 404 S.W.3d 716 (Tex. App. 2013), *disapproved on other grounds by In re Lipsky*, 460 S.W.3d 579 (Tex. 2015).  In *Rehak*, an advertising agency that worked with Jim Murphy, a state representative serving in the Texas House of Representatives, sued Ann Witt, a candidate who ran against Murphy in the Republican primary.  *Id.* at 722.  The advertising agency sued Witt for defamation on the grounds that Witt's website contained a series of defamatory statements against Murphy, including Witt's accusations that Murphy "sidestepped" the Texas Constitution by serving as a legislator while receiving payment as a consultant.  *Id.* at 720.  Witt's website also compared Murphy to a character in the book and musical, *How to Succeed in Business Without Really Trying*, accused Murphy of "ripping off taxpayers," and stated that among Jim Murphy's "sleazy steps" to success included "STEP 6: Reward your supporters with government contracts." *Id.* at 721.  The Texas Court of Appeals held that none of the statements on Witt's website constituted defamation in large part because Witt's "website's tone" and the "campaign context" of the statements suggested that the statements constituted "rhetorical hyperbole" that was part of politics.  *Id.* at 730.  The website "demonstrate[d] an attempt to deliver a political message about the use of public money in an exaggerated, provocative and amusing way," expression that lies at "the heart of the First Amendment." *Id.* at 730. *See also Campbell v. Clark*, 471 S.W.3d 615, 625 (Tex. App. 2015) (collecting cases on "rhetorical hyperbole" in the political context).

The instant case is similar to *Rehak* in that Mr. Trump, as President, made a hyperbolic statement against a person who has sought to publicly present herself as a political adversary to him.  In filings before this Court, Ms. Clifford has challenged the legitimacy of Mr. Trump's victory in the 2016 Presidential election.  Mr. Trump's tweet served as a public rejoinder to allegations made by Plaintiff.  If this Court were to prevent Mr. Trump from engaging in this type of "rhetorical hyperbole" against a political adversary, it would significantly hamper the office of the President.  Any strongly-worded response by a president to another politician or public figure could constitute an action for defamation. This would deprive this country of the "discourse" common to the political process.  In short, should Plaintiff publicly voice her opinions about Mr. Trump, Mr. Trump is entitled to publicly voice non-actionable opinions about Plaintiff.  To allow Plaintiff to proceed with her defamation action would, in effect, permit Plaintiff to make public allegations against the President without giving him the opportunity to respond.  Such a holding would violate the First Amendment.

Case 2:18-cv-06893-SJO-FFM   Document 28   Filed 10/15/18   Page 12 of 14   Page ID #:1034

JS-6

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.:** **CV 18-06893 SJO (FFMx)**        **DATE:** **October 15, 2018**

Mr. Trump also made a one-off rhetorical comment, not a sustained attack on the veracity of Plaintiff's claims. This distinguishes the instant case from other cases where courts have determined that public statements constituted defamation. In *Bentley*, for example, the host of a call-in talk show on a public-access channel repeatedly accused a judge of being corrupt. *See Bentley*, 94 S.W.3d at 584. When confronted about the veracity of the allegations, the talk show host doubled down, falsely claiming that he had proof of the judge's corruption, including public records and records of conversations with courthouse employees. *See id.* The Texas Supreme Court held that while a "single, excited reference to [the judge's corruption] might be taken to be rhetorical hyperbole . . . [the host's] characterization of [the judge's] conduct as criminal is only part of [the host's] efforts over many months to prove [the judge] corrupt." *Id.* at 581. Here, Mr. Trump's tweet falls far more in line with a "single, excited reference." Unlike the defendant in *Bentley*, Mr. Trump provided no support for his views in the tweet nor did not he repeat the allegations in the tweet.

Accordingly, the Court grants the Special Motion because Mr. Trump's statement constituted "rhetorical hyperbole" that is protected by the First Amendment.

### b.    Actual Malice or Reckless Disregard For The Truth

Having determined that Mr. Trump's tweet is non-actionable, the Court's analysis of the Special Motion ends. In the interest of completeness, the Court briefly addresses a few of the other arguments made by the parties in the briefing.

The parties spend some time debating whether Mr. Trump acted with "actual malice" or "reckless disregard for the truth" in issuing the tweet in question. Assuming that Plaintiff is a "public figure," Plaintiff would have to show that Defendant acted with "actual malice" or "reckless disregard for the truth" to prevail on a cause of action for defamation. *See Bentley*, 94 S.W.3d at 580.

Plaintiff's focus on the actual malice argument comes as no surprise because Plaintiff stands on thin ice in asserting that Mr. Trump's tweet is an actionable statement. Instead, Plaintiff seeks to use her defamation action to engage in a "fishing expedition" concerning the conclusory allegations in the Complaint. The Court will not permit Plaintiff to exploit the legal process in this way.

Specifically, Plaintiff contends that she needs to conduct discovery to determine if Mr. Trump was involved in the 2011 threat against her or if he purposefully avoided learning about the 2011 threat. *See* Opposition at 11. Plaintiff believes that discovery pertaining to these issues will help her to establish that Mr. Trump acted with actual malice or reckless disregard for the truth (i.e. if Ms. Clifford can provide evidence showing that Mr. Trump knew of the 2011 threat, then he tweeted a lie when he challenged Plaintiff's reporting of the 2011 threat). (*See* Transcript of Proceedings

JS-6

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.:** <u>CV 18-06893 SJO (FFMx)</u>        **DATE:** <u>October 15, 2018</u>

at 29:23-30:4.)  However, Plaintiff's reasoning is entirely circular.  She assumes that Mr. Trump knew of the 2011 threat, argues in her Complaint and her briefing that Mr. Trump knew of the 2011 threat, and then asks this Court for discovery to prove that Mr. Trump knew of the 2011 threat. In doing so, Plaintiff does not allege facts establishing how Mr. Trump knew or did not know about the 2011 threat in the first place.  Plaintiff must do this to sustain a cause of action for defamation.

      c.    <u>Damages</u>

Defendant's Special Motion also alleges that Plaintiff has not adequately pleaded damages. (Special Motion at 11-14.)  The Court declines to address this.  As with the issue of actual malice, the Court does not need to reach the damages question because it grants the Special Motion on other grounds.

    D.    <u>Leave To Amend</u>

Having granted the Special Motion, the Court next determines if it should grant Plaintiff leave to amend the Complaint.  While recognizing that courts in this Circuit sometimes do grant plaintiffs the opportunity to amend a complaint before granting an anti-SLAPP motion to strike, the Court holds that Ms. Clifford should not have this opportunity because any amendment would be futile. *See Verizon Delaware, Inc. v. Covad Communications Co.*, 377 F.3d 1081, 1091 (2004) ("[G]ranting a defendant's anti-SLAPP motion to strike a plaintiff's initial complaint without granting the plaintiff leave to amend would directly collide with Fed. R. Civ. P. 15(a)'s policy favoring liberal amendment."); *Gardner v. Martino*, 563 F.3d 981, 992 (9th Cir. 2009) (denying leave to amend on futility grounds).

The Court holds that Mr. Trump's tweet is "rhetorical hyperbole" and is protected by the First Amendment.  Plaintiff cannot amend the Complaint in a way that challenges this holding.  During argument on this matter, Plaintiff suggested that she could amend her Complaint to "shore up the malice allegations" and to "provide context for the statement to show that, in fact, it was not political nature at the time it was made." (Transcript of Proceedings at 44: 8-13.)  The former amendments are futile because this Court rules that Mr. Trump's tweet is protected by the First Amendment.  The issue of malice is irrelevant to this holding.  The latter amendments are futile because there is no way for Plaintiff to amend the Complaint to transform the tweet from "rhetorical hyperbole" into an actionable statement. *See Gardner*, 563 F.3d at 992.  "A party cannot amend pleadings to 'directly contradic[t] an earlier assertion made in the same proceeding.'" *Airs Aromatics, LLC v. Opinion Victoria's Secret Stores Brand Mgmt., Inc.*, 744 F.3d 595, 600 (9th Cir. 2014) (quoting *Russell v. Rolfs,* 893 F.2d 1033, 1037 (9th Cir.1990)).  Plaintiff cannot change Mr. Trump's tweet or the basic context of the tweet.  Nor can Plaintiff withdraw factual allegations that she has made in pleadings before this Court.  In the other litigation before

JS-6

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.:**  **CV 18-06893 SJO (FFMx)**          **DATE:** **October 15, 2018**

this Court, Ms. Clifford argues that Mr. Trump sought to silence her as a strategy to win the Presidential election, a clear argument against the legitimacy of Mr. Trump's Presidency. (*See* First Amended Complaint in *Stephanie Clifford v. Donald Trump et al.* at ¶ 17, No. 2:18-cv-02217-SJO-FFM.)   Mr. Trump issued the tweet as a rejoinder against an individual challenging him in the public arena.   This is the definition of protected rhetorical hyperbole.   The Court denies Plaintiff leave to amend the Complaint.

       E.    <u>Attorney's Fees</u>

Having granted the Special Motion and denied Plaintiff leave to amend, the Court finally holds that Defendant is entitled to attorney's fees.  Texas law is unambiguous that "the TCPA requires an award of 'reasonable attorney's fees' to the successful movant." *Sullivan v. Abraham*, 488 S.W.3d 294, 299 (Tex. 2016).  "A 'reasonable' attorney's fee 'is one that is not excessive or extreme, but rather moderate or fair.'" *Id.* (quoting *Garcia v. Gomez*, 319 S.W.3d 638, 642 (Tex.2010)).

III.    <u>RULING</u>

For the foregoing reasons, the Court **GRANTS** Defendant's Special Motion To Strike/Dismiss.  Defendant is entitled to attorney's fees under the Texas Citizen Participation Act.   Should Defendants move for attorneys' fees, the motion must be filed within **fourteen (14)** days from the date of this order.  The Court **DENIES AS MOOT** Defendant's Motion To Dismiss.

IT IS SO ORDERED.

# EXHIBIT 2

Case 2:18-cv-02217-SJO-FFM   Document 98-2   Filed 11/13/18   Page 46 of 63   Page ID
#:2832
Case 2:18-cv-06893-SJO-FFM   Document 38   Filed 10/15/18   Page 1 of 14   Page ID #:1023

JS-6

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:**  <u>CV 18-06893 SJO (FFMx)</u>      **DATE:** <u>October 15, 2018</u>

**TITLE:**   <u>Stephanie Clifford v. Donald J. Trump</u>

========================================================================

**PRESENT: THE HONORABLE S. JAMES OTERO, UNITED STATES DISTRICT JUDGE**

Victor Paul Cruz                              Not Present
Courtroom Clerk                            Court Reporter

**COUNSEL PRESENT FOR PLAINTIFF:**        **COUNSEL PRESENT FOR DEFENDANTS:**

Not Present                                  Not Present

========================================================================

**PROCEEDINGS (in chambers):  ORDER GRANTING DEFENDANT DONALD J. TRUMP'S
SPECIAL MOTION TO DISMISS/STRIKE COMPLAINT** [Docket No. 28]**; ORDER DENYING AS
MOOT DEFENDANT DONALD J. TRUMP'S ALTERNATIVE MOTION TO DISMISS
COMPLAINT** [Docket No. 28]

This matter is before the Court on Defendant Donald J. Trump's Special Motion To Dismiss/Strike
Plaintiff Stephanie Clifford's Complaint Pursuant To Anti-SLAPP Statute ("Special Motion") Or
Alternatively Defendant's Motion To Dismiss Complaint Pursuant To FRCP 12(b)(6) ("Motion"),
filed August 27, 2018.  Plaintiff opposed the Special Motion and the Motion ("Opposition") on
September 3, 2018.  Plaintiff replied ("Reply") on September 10, 2018.  The Court held argument
on the Special Motion and the Motion on September 24, 2018.  (*See* Transcript of Proceedings,
ECF No. 34.)  For the following reasons, the Court **GRANTS** Defendant's Special Motion To
Dismiss/Strike.  The Court **DENIES AS MOOT** Defendant's alternative Motion To Dismiss.

I.    FACTUAL AND PROCEDURAL BACKGROUND

     A.    Plaintiff's Allegations In The Operative Complaint

Plaintiff Stephanie Clifford filed the operative Complaint against Defendant Donald J. Trump on
April 30, 2018 in the Southern District of New York.  In the Complaint, Ms. Clifford alleges as
follows.

Ms. Clifford began an intimate relationship with Mr. Trump in the summer of 2006.  (Compl.¶ 5,
ECF No. 1.)  In May of 2011, she agreed to cooperate with *In Touch Magazine* in connection with
an article about her relationship with Mr. Trump.  (Compl. ¶ 6.)  She agreed to speak to the
magazine after her ex-husband approached the magazine without her approval.  (Compl. ¶ 6.)
A few weeks after agreeing to speak to the magazine, a man approached and threatened Ms.
Clifford in Las Vegas, Nevada.  (Compl.¶ 7.)  The man purportedly approached Ms. Clifford,
threatened Ms. Clifford's daughter, and told her to "Leave Trump alone.  Forget the story."
(Compl. ¶¶ 8-9.)

JS-6

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

---

**CASE NO.:  CV 18-06893 SJO (FFMx)**          **DATE: October 15, 2018**

---

After Mr. Trump was elected President of the United States on November 8, 2016, Ms. Clifford
worked with a sketch artist to render a sketch of the person who had purportedly threatened her
in 2011. (Compl. ¶ 14.) Ms. Clifford released the sketch publicly on April 17, 2018. (Compl. ¶ 14.)

The next day, on April 18, 2018, Mr. Trump, from his personal Twitter account
(@RealDonaldTrump), posted a purportedly false statement regarding Ms. Clifford, the sketch,
and Ms. Clifford's account of the threatening incident that took place in 2011. (Compl.¶ 15.) Mr.
Trump's tweet read as follows: "A sketch years later about a nonexistent man.  A total con job,
playing the Fake News Media for Fools (but they know it)!" (Compl.¶ 15.) Mr. Trump posted this
tweet in response to another tweet posted by an account named DeplorablyScottish
(@ShennaFoxMusic), which showed side-by-side images of the sketch released by Ms. Clifford
and a picture of Ms. Clifford and her husband. (Compl. ¶ 16.)

Based on this tweet, Ms. Clifford brings the instant lawsuit against Mr. Trump for defamation. (*See*
Compl. ¶¶ 21-38.) She argues that Mr. Trump's tweet attacks the veracity of her account of the
threatening incident that took place in 2011. (Compl. ¶ 17.) She also contends that Mr. Trump's
tweet suggests that she is falsely accusing an individual of committing a crime against her.
(Compl. ¶ 17.)  According to Plaintiff, "Mr. Trump meant to convey that Ms. Clifford is a liar,
someone who should not be trusted, that her claims about the threatening encounter are false,
and that she was falsely accusing the individual depicted in the sketch of committing a crime,
where no crime had been committed." (Compl. ¶ 28.)  As a result, she contends that Mr. Trump's
tweet was false and defamatory, and that the tweet was defamation *per se* because it charged her
with committing a serious crime. (Compl. ¶¶ 17, 19.)

Ms. Clifford goes on to claim that Mr. Trump acted with actual malice in issuing the tweet because
he knew the falsity of his tweet.  This is because, according to Ms. Clifford,  the person who
threatened her in 2011 acted at the direction of Mr. Trump or Mr. Trump's attorney, Michael
Cohen. (Compl. ¶ 31.)  In the alternative, she contends that Mr. Trump acted with reckless
disregard for the truth or falsity of his tweet because he had no way of knowing whether the 2011
incident had occurred. (Compl. ¶ 32.)

Finally, Ms. Clifford contends that she suffered damages as a result of the tweet because Mr.
Trump's statement exposed her to "hatred, contempt, ridicule, and shame, and discouraged others
from associating or dealing with her." (Compl.¶ 33.) Therefore, she "has suffered damages in an
amount to be proven at trial, including but not limited to, harm to her reputation, emotional harm,
exposure to contempt, ridicule, and shame, and physical threats of violence to her person and
life." (Compl. ¶ 34.)  Mr Clifford claims that she has retained the services of professional
bodyguards and other protective services because of the threats that she has received. (Compl.
¶ 36.)

        B.    Procedural History

JS-6

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

| Priority | ___ |
| Send | ___ |
| Enter | ___ |
| Closed | ___ |
| JS-5/JS-6 | ___ |
| Scan Only | ___ |

**CASE NO.:** <u>CV 18-06893 SJO (FFMx)</u>     **DATE:** <u>October 15, 2018</u>

Ms. Clifford first brought this lawsuit in the United States District Court for the Southern District of New York. She initially contended that venue was appropriate in the Southern District of New York because it is the district in which Mr. Trump resides. (Compl. ¶ 4.)

On July 23, 2018, Mr. Trump filed a motion to transfer the case from the Southern District of New York to this Court pursuant to 28 U.S.C. § 1404(a). (*See* Motion To Transfer, ECF No. 11.) Defendant argued in part that this lawsuit relates to other litigation before this Court involving Plaintiff and Defendant concerning the enforceability of a non-disclosure agreement. (*See* Memorandum In Support of Motion To Transfer at 1, ECF No. 11-1.)

Plaintiff initially opposed the transfer, arguing in part that the instant action was not closely related to the other litigation before this Court. (*See* Response In Opposition To Motion To Transfer, ECF No. 13 at 1.) After a meet and confer process, Plaintiff and Defendant jointly agreed to transfer Plaintiff's defamation case to this Court. On August 8, 2018, the district court in the Southern District of New York granted Plaintiff and Defendant's joint stipulation to transfer. (*See* ECF No. 17, ECF No. 18.)

On August 27, 2018, Defendant brought the instant Special Motion To Dismiss/Strike Plaintiff's Complaint. In the Special Motion, Defendant contends that Ms. Clifford fails to state a cause of action for defamation because (1) Mr. Trump's tweet is a protected opinion, (2) Ms. Clifford did not suffer damages as a result of the tweet, and (3) Mr. Trump did not act with malice or reckless disregard for the truth when he issued the tweet. (*See* Special Motion at 1.) Defendant argues that Ms. Clifford's lawsuit is a Strategic Lawsuit Against Public Participation ("SLAPP"). (*See id.*)

The Court held argument on September 24, 2018 and subsequently submitted this matter.

II.     <u>ANALYSIS</u>

    A.     <u>Choice of Law</u>

Before addressing the substance of Defendant's Special Motion To Dismiss/Strike, this Court must decide which state's substantive law governs its analysis. Applying New York choice-of-law principles, Defendant argues that the Texas Citizens Participation Act ("TCPA" or "Texas Anti-SLAPP statute") governs this case. (*See* Special Motion at 7-9.) Plaintiff disagrees, arguing that New York's anti-SLAPP law governs this dispute because Mr. Trump is a citizen of the state of New York. (*See* Opposition at 8.)

The Court applies the Texas anti-SLAPP statute because Ms. Clifford brought this diversity action in the Southern District of New York, and a state court in New York would apply the TCPA to this case.

# EXHIBIT 3

1

2

3

4

5

6

7

8    **IN THE UNITED STATES DISTRICT COURT**

9    **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10   **SAN JOSE DIVISION**

11

NOT FOR PUBLICATION

| | |
|---|---|
| 12  VERIZON DELAWARE, INC., et al., | Case Number C-01-20524-JF |
| 13            Plaintiffs, | ORDER[1] (1) GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND |
| 14      v. | AND (2) DEFERRING CONSIDERATION OF SPECIAL |
| 15  COVAD COMMUNICATIONS CO., et al., | MOTION TO STRIKE |
| 16            Defendants. | |
| 17 | [Doc. Nos. 48, 49] |

18

19

20

21        On November 19, 2001, the Court heard Defendants' (1) motion to dismiss Plaintiffs'

22   complaint for failure to state a claim and (2) special motion to strike pursuant to Cal. Civ. P. Code §

23   425.16.  For the reasons set forth below, the Court will grant the motion to dismiss with leave to amend

24   and defer consideration of the special motion to strike.

25

26

27   _____

28        [1]      This disposition is not designated for publication and may not be cited.

# I. BACKGROUND

1    Verizon[2] is one of the former Bell Operating Companies which was spun off from AT&T in

2  1983.  Verizon controls the local telecommunications networks in its regions.  Verizon also offers a high

3  speed internet access service known as "digital subscriber line" ("DSL") service.  Among Verizon's

4  competitors in the DSL market is Covad Communications Company ("Covad").  In order to provide its

5  DSL service, Covad buys access to Verizon's telephone infrastructure buy purchasing "loops" of

6  copper wire which connect Covad's customers to the infrastructure.  Thus, Covad is both Verizon's

7  competitor and customer.

8    The relationship between Verizon and Covad has become increasingly contentious.  In 1998,

9  Covad complained about Verizon to the Telecommunications Task Force ("Task Force") created by

10  the United States Department of Justice ("DOJ").  Covad met with the Task force several times

11  throughout 1999 and 2000 to discuss Verizons's alleged anticompetitive conduct.

12    In 1999, Covad filed suit against Verizon in the U.S. District Court for the District of Columbia

13  alleging that Verizon violated federal antitrust laws by, inter alia, denying Covad access to its telephone

14  network and thereby unlawfully excluding Covad from the DSL market.  Fifteen days later, Verizon

15  filed a patent suit against Covad in the Eastern District of Virginia.  That district court granted summary

16  judgment in favor of Covad with respect to the patent suit, which ruling was affirmed by the Court of

17  Appeals for the Federal Circuit.

18    Covad additionally has advocated against Verizon before the FCC, state public utilities

19  commissions and Congress.  Finally, Covad has voiced its opposition to Verizon's agendas to the press

20  on numerous occasions.

21    On June 11, 2001, Verizon filed the instant complaint against Covad, alleging claims of (1)

22  intentional misrepresentation, (2) negligent misrepresentation, (3) false advertising in violation of the

23  Lanham Act and (4) unfair competition in violation of Cal. Bus. & Prof. Code § 17200.  Covad moves

24  to dismiss the complaint for failure to state a claim and moves to strike it under Cal. Civ. Pro. Code §

---

[2]    The action names Verizon Communications, Inc. and several of its regional subsidiaries
as plaintiffs; for the sake of simplicity, these entities are referred to collectively as "Verizon."

2

Case No. C-01-20524-JF
ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND ETC.
(JFLC2)

Case 2:18-cv-02217-SJO-FFM   Document 98-2   Filed 11/13/18   Page 52 of 63   Page ID
#:2938
Case 5:01-cv-20524-JF   Document 77   Filed 11/27/01   Page 3 of 6

1   425.16.

## II. MOTION TO DISMISS

For purposes of a motion to dismiss, the plaintiff's allegations are taken as true, and the Court must construe the complaint in the light most favorable to the plaintiff. <u>Jenkins v. McKeithen</u>, 395 U.S. 411, 421 (1969); <u>Argabright v. United States</u>, 35 F.3d 472, 474 (9th Cir. 1994). Leave to amend must be granted unless it is clear that the complaint's deficiencies cannot be cured by amendment. <u>Lucas v. Department of Corrections</u>, 66 F.3d 245, 248 (9th Cir. 1995). However, where amendment would be futile, dismissal may be ordered with prejudice. <u>Albrecht v. Lund</u>, 845 F.2d 193, 195-96 (9th Cir. 1988); <u>Beezley v. Fremont Indemnity Co.</u>, 804 F.2d 530, 531 (9th Cir. 1986); <u>see also</u> <u>Dumas v. Kipp</u>, 90 F.3d 386, 393 (9th Cir. 1996) (holding that dismissal without leave to amend was appropriate where the plaintiff had filed four complaints and yet continued to allege insufficient facts).

It is unclear from the complaint precisely what conduct forms the basis for Verizon's first cause of action for intentional misrepresentation and second cause of action for negligent misrepresentation. The claims appear to be based in part upon Covad's submission of numerous false and unjustified "trouble tickets." Covad is entitled to submit a trouble ticket if and when Verizon fails to install a loop properly. Verizon must respond to each such ticket by dispatching a technician. However, if Verizon's technician determines that there is no problem with the loop, Verizon charges Covad for the unjustified dispatch. Verizon alleges that Covad submitted thousands of false trouble tickets to Verizon (22,000 in the year 2000 alone). To the extent the fraud claims are based upon these tickets, Verizon fails to state a claim because no details are given regarding the tickets in question (e.g., when they were submitted, the circumstances of submission, to whom they were submitted, in what respects they were false). Verizon attaches to its complaint the declarations of twenty-six anonymous declarants, purportedly former Covad employees. Assuming without deciding that this method of pleading is proper, the declarations do not provide any specific details with respect to any of the 22,000-plus allegedly false trouble tickets which form the basis for the fraud claims.

The complaint also contains numerous allegations regarding alleged fraudulent statements made by Covad to the press and others. To the extent Verizon's fraud claims are based upon such

Case No. C-01-20524-JF
ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND ETC.
(JFLC2)

Case 2:18-cv-02217-SJO-FFM   Document 98-2   Filed 11/13/18   Page 53 of 63   Page ID
#:2829
Case 5:01-cv-20524-JF   Document 77   Filed 11/27/01   Page 4 of 6

1 statements, the nature of such claims is unclear and Verizon has not alleged specific facts as required by

2 Fed. R. Civ. P. 9(b).

3   Verizon's third cause of action is for false advertising in violation of the Lanham Act.  The

4 elements of a false advertising claim under the Lanham Act are:  (1) a false statement of fact by the

5 defendant in a commercial advertisement about its own or another's product; (2) the statement actually

6 deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is

7 material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false

8 statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result

9 of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the

10 goodwill associated with its products.  Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134,

11 1139 (9th Cir. 1997); Cook, Perkiss and Liehe, Inc. v. Northern California Collection Service, Inc.,

12 911 F.2d 242, 244 (9th Cir. 1990).   Verizon has failed to identify any specific commercial

13 advertisement containing false statements or what those false statements were.

14   Verizon's fourth cause of action is for unfair business practices in violation of § 17200.  This

15 claim is based upon the fraud and false advertising claims and fails to state a claim for the reasons

16 discussed above.

17   Accordingly, the motion to dismiss will be granted with leave to amend.

18       **III. SPECIAL MOTION TO STRIKE**

19   Covad moves to strike the complaint pursuant to Cal. Civ. P. Code § 425.16.  That section

20 provides for the early dismissal of meritless suits aimed at chilling the valid exercise of the rights of free

21 of speech and petition for the redress of grievances.  Cal.Code Civ.P. § 425.16(a); Braun v. Chronicle

22 Publishing Co., 52 Cal.App.4th 1036, 1042 (1997).  These meritless suits often are referred to as

23 "Strategic Lawsuits Against Public Participation" or "SLAPP" suits, with the result that § 425.16 has

24 come to be called the "anti-SLAPP statute."

25   A defendant filing an anti-SLAPP motion must make an initial prima facie showing that the

26 plaintiff's suit arises from an act in furtherance of the defendant's rights of free speech or petition.

27 Braun, 52 Cal.App.4th at 1042-43.   If the defendant makes this showing, the burden shifts to the

28

<div align="center">4</div>

Case No. C-01-20524-JF
ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND ETC.
(JFLC2)

1  plaintiff to demonstrate a probability of prevailing on the challenged claims.  <u>Conroy v. Spitzer</u>, 70

2  Cal.App.4th 1446, 1450 (1999).

3         It is unclear to the Court, based upon the current record, whether Verizon's claims in fact are

4  based upon acts in furtherance of Covad's rights of free speech and petition.  While the complaint

5  appears to be based in part upon communications between Covad and Verizon, the complaint also

6  appears to be based in part upon communications between Covad and regulatory bodies and/or the

7  public.  Claims based upon private communications between the parties likely would not be subject to

8  § 425.16; however, claims based upon communications to regulatory bodies and/or the public may well

9  be barred by § 425.16.  The Court has requested Verizon to amend its pleading in order to resolve the

10  ambiguities as to the bases for its claims.  The Court concludes that under these circumstances, it is

11  appropriate to wait until the scope and bases of Verizon's claims are more clearly defined before

12  attempting to determine whether Verizon's claims are based upon Covad's protected conduct.  The

13  Court therefore will defer consideration of the special motion to strike pending Verizon's amendment of

14  its pleading.

## IV. ORDER

16         The motion to dismiss is granted with leave to amend.  Any amended pleading shall be filed and

17  served within twenty (20) days after service of this order.

18         The Court defers consideration of the special motion to strike for the reasons stated herein.

22  DATED: _____

(electronic signature authorized)

_____
JEREMY FOGEL
United States District Judge

27  **THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

Case No. C-01-20524-JF
ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND ETC.
(JFLC2)

Case 2:18-cv-02217-SJO-FFM   Document 98-2   Filed 11/13/18   Page 55 of 63   Page ID
#:2841
Case 5:01-cv-20524-JF   Document 177   Filed 11/27/01   Page 6 of 6

1   Daniel H. Bookin    dbookin@omm.com

2   William K. Brinkley   kbrinkley@mdbe.com

3   Randall Edwards   redwards@omm.com

4   Neil M. Gorsuch   ngorsuch@khhte.com,

5   Alfred C. Pfeiffer   apfeiffer@mdbe.com,

6   Margaret A. Robbins   mrobbins@covad.com,

7   Jason A. Yurasek   jyurasek@mdbe.com

8
9   Steven F. Benz
    John R. Gerstein
    Ross Dixon & Bell, LLP
10  2001 K Street, N.W.
    Washington, DC 20006-1040
11
    Mark C. Hansen
12  Kellogg, Huber, Hansen, Todd & Evans
    Summer Square
13  1615 M. Street, N.W.
    Washington, DC 20036-3209
14
    Merril Hirsh
15  Ross Dixon & Bell, LLP
    2001 K Street, N.W.
16  Washington, DC 20006-1040

17  Gabriela Richeimer
    Ross Dixon & Bell, LLP
18  2001 K Street, N.W.
    Washington, DC 20006-1040
19

20  **Dated:**                              **Richard W. Wieking, Clerk**

21

22                                          **By:**_____
                                            **Margaret Halstead-Shick**
23                                          **Courtroom Deputy**

24

25

26

27

28

6

Case No. C-01-20524-JF
ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND ETC.
(JFLC2)

# EXHIBIT 4

# Michael Avenatti is hit with $4.85-million judgment for unpaid debt as court orders eviction of his law firm

By MICHAEL FINNEGAN and JAVIER PANZAR    OCT 22, 2018 | 3:55 PM



Save more for your future with a Money Market Savings account.

Apply Now

ADVERTISEMENT

Two found dead in Malibu car may have gotten confused fleeing from...

...ey fire structure ...ge doubles; 2 who died got lost while trying ...

Trump couldn't just express empathy for California fire victims. What's the matter...

Two new fires break out in Ventura County

ss, place your bookmarks here on the bookmarks bar. Import bookmarks now...

TOPICS SEARCH Los Angeles Times

SUBSCRIBE
4 weeks for only 99¢
StateFarmBank
FDIC

Michael Avenatti, the lawyer for porn actress Stormy Daniels, was hit with a personal judgment of $4.85 million Monday for his failure to pay a debt to a former colleague at his longtime Newport Beach firm.

Less than an hour after his defeat in the Los Angeles lawsuit, Avenatti suffered another setback at a trial in Orange County: The Irvine Co. won a court order evicting him and his staff from their offices because the firm, Eagan Avenatti, skipped the last four months of rent.

LATEST POLITICS

Trump calls to end recounts in

OPICS    Q SEARCH

**Los Angeles Times**

ADVERTISEMENT

SUBSCRIBE
4 weeks for on

The twin blows came as Avenatti was heading to New Hampshire for his third visit to the state that kicks off the 2020 presidential primaries. The celebrity lawyer is exploring a run for the Democratic nomination. His troubled financial history could emerge as a significant campaign issue if he joins the race.

The personal judgment against Avenatti by Judge Dennis J. Landin in Superior Court in Los Angeles was his latest in a series of courtroom losses in a protracted dispute with Jason Frank, the former colleague.

Essential Politics: In California's
House races, the vote tallies are
trending toward Republicans

3:00 AM

Eleni Kounalakis can carve out a
meaningful role as lieutenant
governor. It's in her genes

12:05 AM

TOPICS   Q SEARCH

**Los Angeles Times**

By CHMU

Eagan Avenatti emerged from federal bankruptcy protection in March after Avenatti promised that it would pay millions of dollars to Frank and other creditors, including the Internal Revenue Service. It has defaulted on nearly every payment that was due.

No one has pursued Avenatti more relentlessly than Frank, who has been fighting in federal court to collect on a $10-million judgment that he won against the firm in May.

"My client has had an awful lot of money owed to him for a lengthy period of time," said Frank's attorney, Eric George, "and it has been delayed through one tactic or another. Today, finally, the right thing happened."

Avenatti has been the managing partner of Eagan Avenatti since its founding in 2007.

He recently told a U.S. Bankruptcy Court judge that his other firm, Avenatti & Associates, wholly owned by Avenatti, had acquired 100% of the equity in Eagan Avenatti, buying out his minority partner, Michael Eagan of San Francisco.

But Avenatti told the Los Angeles Times on Monday that he hadn't owned Eagan Avenatti for months. He refused to identify the new owner.

"Any judgment issued against me will be deducted from the over $12 million that Jason Frank owes me and my law firm Avenatti & Associates as a result of his fraud," Avenatti said by email.

TOPICS   Q SEARCH

# Los Angeles Times

No court has found Frank engaged in fraud, and Avenatti is not pursuing any court case alleging that he did. When Frank and two others left Eagan Avenatti to form their own firm, some clients went with them, angering Avenatti.

Frank alleges that Eagan Avenatti cheated him out of millions of dollars in compensation.

As part of its bankruptcy settlement, Eagan Avenatti agreed to pay Frank $4.85 million. Avenatti guaranteed that if the firm missed the deadlines for making the payment, which it did, he would personally be required to pay Frank.

To enforce the personal guarantee, Frank sued Avenatti, and on Monday he won the case.



MUST READS

Stormy Daniels lawyer Michael Avenatti tested legal boundaries as his firm maneuvered into bankruptcy

JUN 04, 2018   |   11:05 AM

Daniels, the adult film star whose real name is Stephanie Clifford, is represented by Avenatti & Associates, which operates out of the same offices as Eagan Avenatti and uses the same attorneys. Daniels is trying to void a nondisclosure agreement that bars her from discussing her alleged sexual affair in 2006 with Donald Trump.

Last week, a judge dismissed the defamation suit that Avenatti filed on Daniels' behalf against Trump, finding the president was exercising his right to free speech when he attacked her

place your bookmarks here on the boundaries bar. Import bookmarks from...

## Los Angeles Times

OPICS    Q   SEARCH

JUN 01, 2018  |  11:05 AM

Stormy Daniels lawyer Michael Avenatti tested legal boundaries as his firm maneuvered into bankruptcy

the president was exercising his right to free speech when he attacked her credibility on Twitter.

Avenatti had another reversal last month at the confirmation hearings of Supreme Court Justice Brett M. Kavanaugh. The Senate Judiciary Committee refused to interview an Avenatti client, Julie Swetnick, who alleged that Kavanaugh attended a 1982 party where where she said she was gang-raped.

In the Santa Ana trial, 520 Newport Center Drive LLC, an arm of the Irvine Co., alleged that Eagan Avenatti missed $213,254 in rent payments over the last four months for its ocean-view suite on the 14th floor of an office building at Fashion Island.

Nobody from Eagan Avenatti showed up for the trial.

Superior Court Judge Robert J. Moss ordered the firm to vacate the premises and pay the landlord the full amount of overdue rent. He also canceled the remaining three months of the lease. If the firm fails to move out, it could take a few weeks for the Orange County Sheriff's Department to enforce the eviction.

In court papers filed by Avenatti, the firm claimed it deducted the cost of needed repairs from its rent payments but did not receive proper credit.

The Irvine Co. denied that the offices needed any serious repairs. And the lease, signed by Avenatti, says the tenant "understands that it shall not make repairs at landlord's expense or by rental offset."

# Los Angeles Times

The Irvine Co. denied that the offices needed any serious repairs. And the lease, signed by Avenatti, says the tenant "understands that it shall not make repairs at landlord's expense or by rental offset."

At the short morning trial, Mark A. Kompa, an Irvine Co. attorney, called just three witnesses. He asked one of them, Irvine Co. assistant manager Abigail Yocam, what happened to the last rent payments received from Eagan Avenatti in July.

She testified: "The checks bounced."

**3:55 p.m.:** The article was updated with the testimony of Irvine Co.'s Abigail Yocam and background on Stormy Daniels and the Brett Kavanaugh confirmation hearings.

**1:45 p.m.:** The article was updated with additional details on the court cases.

**11:50 a.m.:** The article was updated with background on Michael Avenatti exploring a run for president and the Stormy Daniels litigation against President Trump.

**11:15 a.m.:** The article was updated with a comment from Michael Avenatti, background on Eagan Avenatti and the eviction judgment.

*The article was originally published at 10:15 a.m.*