# EXHIBIT W

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA            :

     -v.-                               :       18 Cr. 602 (WHP)

MICHAEL COHEN,                  :

             Defendant.         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## THE GOVERNMENT'S SENTENCING MEMORANDUM

ROBERT KHUZAMI
Acting United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Andrea M. Griswold
Rachel Maimin
Thomas McKay
Nicolas Roos
Assistant United States Attorneys
     -Of Counsel-

## <u>TABLE OF CONTENTS</u>

BACKGROUND ....................................................................................................... 2

   A.   COHEN'S OFFENSE CONDUCT ............................................................... 2

      1.   Background ........................................................................... 3

      2.   Cohen's Willful Tax Evasion ................................................ 4

      3.   Cohen's False Statements to Financial Institutions .............. 8

      4.   Cohen's Illegal Campaign Contributions .............................. 11

      5.   Cohen's False Statements to Congress ................................. 14

   B.   COHEN'S MEETINGS WITH LAW ENFORCEMENT ............................. 14

APPLICATION OF THE SENTENCING GUIDELINES ................................. 17

   A.   THE PROBATION DEPARTMENT'S CALCULATION ............................ 17

   B.   COHEN'S CHALLENGES TO THE GUIDELINES CALCULATION ........... 17

      1.   The PSR's Grouping Analysis is Correct ............................. 17

      2.   The Guidelines Enhancements Are Not "Overlapping" ......... 20

   C.   THE PROBATION DEPARTMENT'S RECOMMENDATION ................... 22

DISCUSSION .......................................................................................................... 22

   A.   A SUBSTANTIAL TERM OF IMPRISONMENT IS WARRANTED ........... 22

      1.   The Nature and Seriousness of the Offenses ...................... 22

      2.   The Need to Promote Respect for the Law and to Afford Adequate Deterrence ......... 28

   B.   COHEN'S REQUEST FOR A SENTENCE OF TIME SERVED IS MERITLESS ............... 30

CONCLUSION ....................................................................................................... 38

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA              :

    -v.-                              :       18 Cr. 602 (WHP)

MICHAEL COHEN,                 :

            Defendant.        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## **PRELIMINARY STATEMENT**

Defendant Michael Cohen is scheduled to be sentenced on December 12, 2018.  The United States Attorney's Office for the Southern District of New York (the "Office") respectfully submits this memorandum in connection with that sentencing and in response to the defendant's sentencing memorandum dated November 30, 2018 ("Def. Mem.").

Cohen, an attorney and businessman, committed four distinct federal crimes over a period of several years.  He was motivated to do so by personal greed, and repeatedly used his power and influence for deceptive ends.  Now he seeks extraordinary leniency – a sentence of no jail time – based principally on his rose-colored view of the seriousness of the crimes; his claims to a sympathetic personal history; and his provision of certain information to law enforcement.  But the crimes committed by Cohen were more serious than his submission allows and were marked by a pattern of deception that permeated his professional life (and was evidently hidden from the friends and family members who wrote on his behalf).

Cohen did provide information to law enforcement, including information that assisted the Special Counsel's Office ("SCO") in ongoing matters, as described in the SCO's memorandum to the Court, and the Office agrees that this is a factor to be considered by the Court pursuant to Title

18, United States Code, Section 3553(a).  But Cohen's description of those efforts is overstated in some respects and incomplete in others.  To be clear:  Cohen does not have a cooperation agreement and is not receiving a Section 5K1.1 letter either from this Office or the SCO, and therefore is not properly described as a "cooperating witness," as that term is commonly used in this District.

As set forth in the Probation Department's Presentence Investigation Report ("PSR"), the applicable United States Sentencing Guidelines ("Guidelines") range is 51 to 63 months' imprisonment.  This range reflects Cohen's extensive, deliberate, and serious criminal conduct, and this Office submits that a substantial prison term is required to vindicate the purposes and principles of sentencing as set forth in Section 3553(a).  And while the Office agrees that Cohen should receive credit for his assistance in the SCO investigation, that credit should not approximate the credit a traditional cooperating witness would receive, given, among other reasons, Cohen's affirmative decision not to become one.  For these reasons, the Office respectfully requests that this Court impose a substantial term of imprisonment, one that reflects a modest downward variance from the applicable Guidelines range.[1]

## BACKGROUND

A.      **Cohen's Offense Conduct**

As described in the PSR, in Criminal Information 18 Cr. 602, as well as in Criminal Information 18 Cr. 850, Cohen committed four separate and serious crimes over the course of several years.  These crimes – willful tax evasion, making false statements to a financial institution, illegal campaign contributions, and making false statements to Congress – were distinct in their harms, but bear a common set of characteristics:  They each involve deception, and were each

---

[1] The Probation Department has similarly recommended a modest variance from the Guidelines range, recommending a sentence of 42 months' imprisonment, albeit for different reasons.

motivated by personal greed and ambition.  While Cohen – as his own submission makes clear – already enjoyed a privileged life, his desire for even greater wealth and influence precipitated an extensive course of criminal conduct, described below.

### 1.  Background

Cohen is a licensed attorney and has been since 1992.  (PSR ¶ 149.)  Until 2007, Cohen practiced as an attorney for multiple law firms, working on, among other things, negligence and malpractice cases.  (PSR ¶¶ 156-157.)  For that work, Cohen earned approximately $75,000 per year.  (*Id.*)  In 2007, Cohen seized on an opportunity.  The board of directors of a condominium building in which Cohen lived was attempting to remove from the building the name of the owner ("Individual-1") of a Manhattan-based real estate company (the "Company").  (PSR ¶ 155.)  Cohen intervened, secured the backing of the residents of the building, and was able to remove the entire board of directors, thereby fixing the problem for Individual-1.  (*Id.*)  Not long after, Cohen was hired by the Company to the position of "Executive Vice President" and "Special Counsel" to Individual-1.  (*Id.*)  He earned approximately $500,000 per year in that position.  (*Id.*)

In January 2017, Cohen formally left the Company and began holding himself out as the "personal attorney" to Individual-1, who at that point had become the President of the United States.  In January 2017, Cohen also launched two companies: Michael D. Cohen and Associates, P.C., a legal practice, and Essential Consultants LLC, a consulting firm.  (PSR ¶ 152.)  Both businesses were operated from the offices of a major law firm located in New York, and that firm paid Cohen $500,000 per year as salary.  (*Id.*)  Cohen also secured a substantial amount of consulting business for himself throughout 2017 by marketing to corporations what he claimed to be unique insights about and access to Individual-1.  But while Cohen made millions of dollars from these consulting arrangements, his promises of insight and access proved essentially hollow.

Documents obtained by the Government and witness interviews revealed that Cohen performed minimal work, and many of the consulting contracts were ultimately terminated.

During and subsequent to his employment with the Company, Cohen also maintained additional sources of income.  Most significantly, Cohen owned taxi medallions in New York City and Chicago worth millions of dollars.  Cohen held these medallions as investments and leased them to operators who paid Cohen a specified monthly rate per medallion.  (PSR ¶¶ 158-160.) Cohen has also made substantial investments in real estate and other business ventures.  (PSR ¶¶ 161-162.)

### 2.   *Cohen's Willful Tax Evasion*

Between tax years 2012 and 2016, Cohen evaded taxes by failing to report more than $4 million in income to the Internal Revenue Service ("IRS"), which resulted in the avoidance of more than $1.4 million due to the United States Treasury Department.  Specifically, Cohen failed to report several different streams of income on his tax returns, which he swore were true and accurate.  (PSR ¶¶ 18-19.)

The largest source of undisclosed income was more than $2.4 million that Cohen received from a series of personal loans that he made to a taxi operator to whom Cohen leased certain of his Chicago taxi medallions ("Taxi Operator-1"), between 2012 and 2015, for a total principal of $6 million.  Each of these loans carried an interest rate in excess of 12 percent.  Cohen funded the majority of these loans from a line of credit with an interest rate of less than 5 percent (such that Cohen was earning a substantial spread on the difference between the two loan rates).  At Cohen's direction, Taxi Operator-1 made the interest payment checks to Cohen personally.  The checks were deposited in Cohen's personal bank account or in an account in his wife's name.  In total, Cohen received more than $2.4 million in interest payments from Taxi Operator-1 between 2012

and 2016. Cohen did not inform his accountant of this arrangement or provide him with documentation in support of these loans and interest payments, and intentionally reported none of that income to the IRS in order to hide it and evade paying taxes. (PSR ¶¶ 20-23.)

Cohen also concealed more than $1.3 million in income he received from another taxi operator to whom Cohen leased some of his New York taxi medallions ("Taxi Operator-2"). This income took two forms. First, in 2012, Taxi Operator-2 paid Cohen a bonus of at least $870,000 to induce Cohen to allow him to operate some of Cohen's taxi medallions. Cohen did not report $710,000 of this bonus payment. (PSR ¶ 25). In addition, Cohen arranged with Taxi Operator-2 to receive a portion of the medallion income personally – as opposed to having the income paid to Cohen's medallion entities. That is, while most of the medallion income was paid to Cohen's medallion entities – whose bank statements were provided to his accountant for the purpose of calculating the income for these entities and preparing Cohen's tax returns – certain income was provided by Taxi Operator-2 directly to Cohen personally and deposited into his personal account. Cohen again chose not to notify his accountant of this arrangement or identify this additional income to be reported. (PSR ¶ 26).

Finally, Cohen hid several other sources of income from his accountant and the IRS. For example, in 2014, Cohen received $100,000 for brokering the sale of a piece of property in a private aviation community in Florida. In 2015, Cohen made approximately $30,000 in profit from the sale of a rare and highly valuable French handbag. In 2016, Cohen received more than $200,000 in consulting income from an assisted living company. Cohen reported none of this to the IRS or his accountant. (PSR ¶ 27.)

Cohen's evasion of these taxes was willful. In his sentencing submission and his submissions to the Probation Department in connection with the preparation of the PSR, Cohen

repeatedly attempted to minimize the seriousness of his decision not to report millions of dollars of income over a period of years by blaming his accountant for not uncovering the unreported income. Specifically, Cohen's submission to the Probation Department asserted that "all relevant bank records were provided annually by Cohen to [his accountant] for the relevant years." (PSR at 45). Cohen repeats these efforts to blame his accountant in his sentencing submission:

> Michael's case stands out for comparative purposes in that a failure to reasonably identify all income to a tax preparer *who received all client-related bank statements* is quite different in kind from the sophisticated and complex schemes typical of criminal tax evasion cases.

(Def. Mem. at 15) (emphasis added). Cohen's assertions are simply false. As the Government was prepared to prove at trial, the defendant did *not* provide his accountant with "all client-related bank statements" (Def. Mem. at 15 n.8), and the information Cohen did provide to his accountant could not have led his accountant to uncover the unreported income. Between 2014 and 2016, but not for 2012 or 2013, Cohen provided his accountant with certain bank records and instructed his accountant to identify potential tax deductions. Cohen's accountant did not go through Cohen's bank statements looking for potential sources of income, nor did Cohen ever request this. Indeed, Cohen routinely refused to pay for any work by his accountant not specifically approved by Cohen.

In addition, even if Cohen's accountant had gone beyond the agreed scope of the assignment, the accountant was not provided with records that would have allowed him to reasonably identify the unreported income. Specifically, the bank records Cohen provided to his accountant were limited to monthly statements and did not include images of deposited checks or deposit slips. The records thus included reference to certain "deposit" or "credit" entries in particular amounts, but did not include additional detail that would have allowed the accountant to identify the source of these deposits or credits. For example, a page from Cohen's bank records from May 12, 2015 included a $15,312.50 "deposit." While the Office's investigation identified

6

this as a loan interest payment from Taxi Operator-1 to Cohen, his accountant had no information indicating the source of the deposit, nor that it concerned interest income that source was paying to Cohen.  In sum, any bank records provided by Cohen to his accountant "were insufficient for [the accountant] to identify additional sources of income absent additional information from Cohen." (PSR at 47.)  As the Probation Department noted in evaluating Cohen's efforts to blame his accountant for Cohen's voluntary and intentional efforts to evade taxes, "the defendant's contention that he provided the accountant with all relevant bank records appears to minimize his responsibility in the instant offense and attempts to place the burden on his accountant." (PSR at 46).

Finally, not only did Cohen fail to identify the unreported income for Accountant-1, on at least two occasions Cohen took steps to conceal the interest income he was receiving from Taxi Operator-1.  Specifically, in a memorandum that Cohen's accountant prepared in 2013 when Cohen became a client, the accountant flagged the fact that a personal financial statement prepared by Cohen's prior accountant "shows Loans Receivables of $4,250,000, but there is no related interest income reported on your 2012 personal income tax returns relative to this loan."  Cohen and his accountant did not discuss the "loans receivables" further at the time because Cohen told his accountant he did not ask for and would not pay for the memorandum.  Later, when Cohen's accountant was helping him prepare an updated personal financial statement to provide to Bank-2, discussed below, in connection with the renegotiation of certain medallion loans, Cohen crossed out the "loans receivable" line item altogether from his personal financial statement, leading his accountant to conclude that the entry was mistaken and there was no outstanding personal loan, or that it had been paid off, neither of which was true.

Case 2:18-cv-02217-SJO-FFM   Document 103-1   Filed 12/17/18   Page 11 of 89   Page ID
#:2869
Case 1:18-cr-00602-WHP   Document 27   Filed 12/07/18   Page 10 of 40

### 3.   *Cohen's False Statements to Financial Institutions*

In December 2015, Cohen contacted a bank ("Bank-3") to apply for a home equity line of credit ("HELOC").  In his application for the HELOC, Cohen made false statements about his net worth and monthly expenses.  Specifically, Cohen failed to disclose more than $20 million in debt he owed to another bank ("Bank-2"), and also materially understated his monthly expenses to Bank-3 by omitting at least $70,000 in monthly interest payments due to Bank-2 on that debt. (PSR ¶ 34).  These statements were the latest in a series of false statements Cohen made to financial institutions in connection with credit applications.

By way of background, by February 2013, Cohen had obtained a $14 million line of credit from another bank ("Bank-1"), collateralized by his taxi medallions.[2]  In November 2014, Cohen refinanced this medallion debt at Bank-1 with Bank-2.[3]  The transaction was structured as a package of individual loans to the entities that owned Cohen's New York medallions, totaling more than $20 million, and personally guaranteed by Cohen.  Following the closing of these loans, the $14 million line of credit with Bank-1 was closed.  (PSR ¶¶ 28-30.)

In 2013, Cohen made a successful application to Bank-3 – the bank to which he later would make false statements in connection with the HELOC application – for a mortgage on his Park Avenue condominium.  In that application, Cohen did not disclose the $14 million line of credit he had with Bank-1 at the time.  (PSR ¶ 31.)

In February 2015, Cohen attempted to secure financing from Bank-3 to purchase a summer home for approximately $8.5 million.  Once again, he concealed the $14 million line of credit,

---

[2] Cohen separately maintained a $6.4 million medallion-related loan with Bank-1.  This loan was disclosed in Cohen's subsequent credit applications to Bank-2 and Bank-3.

[3] Bank-2 shared the debt with a New York-based credit union, pursuant to a participation agreement.  For ease of reference, this memorandum will simply refer to the debt at Bank-2.

which by this point took the form of the $20 million in refinanced loans with Bank-2.   In connection with the summer home application, Cohen had to go to great and deliberate lengths to keep the debt hidden from Bank-3.   Specifically, in connection with this proposed transaction, Bank-3 obtained a personal financial statement that Cohen had provided to Bank-2 in connection with the $20 million refinancing with Bank-2 in 2014.   This personal statement listed the $14 million line of credit Cohen was seeking to refinance and increase with Bank-2.   A representative of Bank-3 specifically asked Cohen about the $14 million line of credit reflected on that statement (which, as noted, had not been reflected on Cohen's 2013 application to Bank-3 for a mortgage). Cohen falsely stated that the $14 million line of credit was undrawn and that he would close it.   In truth, Cohen had effectively overdrawn the line of credit, by swapping it out for a fully drawn, larger $20 million loan from Bank-2.   Moreover, when Bank-3 informed Cohen that it would only provide financing if Cohen closed the line of credit, Cohen lied again, misleadingly stating in an email that "[t]he medallion line was closed in the middle of November 2014."   (PSR ¶¶ 32-33.)

This series of lies culminated in Cohen's application for a HELOC.   As noted, Cohen failed to disclose the more than $20 million in refinanced medallion liability on that application, and Bank-3 had no reason to question Cohen about the omission of this liability, because he had affirmatively told the bank that the $14 line of credit was closed.

In addition to failing to disclose more than $20 million in medallion liability, Cohen also intentionally omitted the tens of thousands in monthly interest payments he was making on that debt.   Cohen's monthly cash flow or "debt ratio" of expenses to income was a core component of Bank-3's underwriting processes that considered an applicant's ability to make loan payments and guard against the bank's need to enter into lengthy foreclosure proceedings.   In evaluating prospective loans, Bank-3 typically required that a borrower's monthly expenses represent no more

than 45 percent of his monthly income.  Based on the incomplete information contained in the HELOC application, Cohen's debt ratio appeared to be below the benchmark set by Bank-3.  Had Cohen truthfully disclosed his expenses, including the extent of the monthly interest payments he was required to make to Bank-3, Cohen's debt ratio would have significantly exceeded the benchmark.  In April 2016, Bank-3 approved Cohen for a $500,000 HELOC, which it would not have approved but for Cohen's concealment of truthful information about his financial condition. (PSR ¶¶ 34-35.)

Notably, each of the foregoing false statements involved Cohen overstating his assets or understating his liabilities, as in these instances it served his purposes to appear to have a higher net worth.  In contrast, when it served Cohen's purposes to understate his net worth to financial institutions, he did so by concealing income and assets from his creditors.  Specifically, documents and witness interviews from the Government's investigation revealed that in 2017 and early 2018, Cohen wanted Bank-2 to restructure his more than $20 million in medallion debt on terms more favorable to Cohen.  Cohen thus shifted gears, halting monthly payments to Bank-2 and falsely representing orally and in writing that he had a negative net worth and less than $1.5 million in cash, despite his receipt of nearly $4 million in "consulting" fees between January 2017 and March 2018.  By early April 2018, Bank-2 and Cohen reached a deal in principle, premised on Bank-2's receipt of an updated personal financial statement confirming, in writing, the negative financial information represented by Cohen.  On April 9, 2018, the FBI executed a series of search warrants on Cohen, including at his residence, hotel, and office, which put him on notice that he was being investigated for, among other things, bank fraud and explicitly referenced Bank-2.  Following the execution of the warrants, counsel for Cohen informed Bank-2 that Cohen would be unable at that time to provide the previously promised updated personal financial statement.  To save the deal,

Cohen agreed to post his Park Avenue residence as collateral, which he had previously refused to do.  An updated financial statement Cohen provided at closing reflected a positive $17 million net worth in addition to previously undisclosed liquid assets, a nearly $20 million increase from the false financial information Cohen had provided to Bank-2 just weeks earlier in the negotiations.

Thus, the false statement to Bank-3 to which Cohen pleaded guilty was far from an isolated event:  It was one in a long-series of self-serving lies Cohen told to numerous financial institutions.

### 4.  Cohen's Illegal Campaign Contributions

On approximately June 16, 2015, Individual-1, for whom Cohen worked at the time, began an ultimately successful campaign for President of the United States.  Cohen had no formal title with the campaign, but had a campaign email address, and, at various times advised the campaign, including on matters of interest to the press.  Cohen also made media appearances as a surrogate and supporter of Individual-1.  (PSR ¶ 39).

During the campaign, Cohen played a central role in two similar schemes to purchase the rights to stories – each from women who claimed to have had an affair with Individual-1 – so as to suppress the stories and thereby prevent them from influencing the election.  With respect to both payments, Cohen acted with the intent to influence the 2016 presidential election. Cohen coordinated his actions with one or more members of the campaign, including through meetings and phone calls, about the fact, nature, and timing of the payments.  (PSR ¶ 51).  In particular, and as Cohen himself has now admitted, with respect to both payments, he acted in coordination with and at the direction of Individual-1.  (PSR ¶¶ 41, 45).  As a result of Cohen's actions, neither woman spoke to the press prior to the election.  (PSR ¶ 51).

<u>Cohen Causes the Magazine to Pay Woman-1</u>

In approximately June 2016, a model and actress ("Woman-1") began attempting to sell

Case 2:18-cv-02217-SJO-FFM   Document 103-1   Filed 12/17/18   Page 15 of 89   Page ID
#:2873
Case 1:18-cr-00602-WHP   Document 27   Filed 12/07/18   Page 14 of 40

her story of her alleged extramarital affair with Individual-1. Woman-1 knew that the story would be of considerable value because of Individual-1's candidacy for president. Woman-1 retained an attorney ("Attorney-1") to represent her in this matter. (PSR ¶ 41).

Attorney-1 then contacted the editor-in-chief ("Editor-1") of a popular tabloid magazine ("Magazine-1") and offered to sell the story to Magazine-1. The Chairman and Chief Executive Officer ("Chairman-1") of the media company that owns Magazine-1 ("Corporation-1") had a prior relationship with Individual-1 and Cohen. In August 2014, Chairman-1 had met with Cohen and Individual-1, and had offered to help deal with negative stories about Individual-1's relationships with women by identifying such stories so that they could be purchased and "killed." Consistent with that offer, after Editor-1 told Chairman-1 about Woman-1's story, they contacted Cohen to tell him about the offer. (PSR ¶¶ 40-41).

At Cohen's urging and with his promise that Corporation-1 would be reimbursed, Editor-1 began negotiating the purchase of Woman-1's story. On August 5, 2016, Corporation-1 entered into an agreement with Woman-1 to acquire the "limited life rights" to the story of her relationship with "any then-married man," in exchange for $150,000 and a commitment to feature her on two magazine covers and publish over one hundred magazine articles authored by her. The agreement's principal purpose was to suppress Woman-1's story so as to prevent the story from influencing the election. (PSR ¶¶ 41-42).

Between August 2016 and September 2016, Cohen agreed with Chairman-1 to assign the rights to the non-disclosure portion of Corporation-1's agreement with Woman-1 to Cohen for $125,000. Cohen then incorporated a shell entity called "Resolution Consultants LLC" to be used in the transaction. Both Chairman-1 and Cohen ultimately signed the agreement, and a consultant for Corporation-1, using his own shell entity, provided Cohen with an invoice for the payment of

$125,000. That assignment was never completed, however. (PSR ¶¶ 43-44).

<u>Cohen Pays Woman-2</u>

On October 8, 2016, an agent for an adult film actress ("Woman-2") informed Editor-1 that Woman-2 was willing to make public statements and confirm on the record her alleged past affair with Individual-1. Chairman-1 and Editor-1 contacted Cohen and put him in touch with Attorney-1, who was also representing Woman-2. Over the course of the next few days, Cohen negotiated a $130,000 agreement with Attorney-1 to purchase Woman-2's silence. Cohen received a signed confidential settlement agreement and a separate side letter from Attorney-1. (PSR ¶ 45).

Cohen did not immediately execute the settlement agreement, nor did he pay Woman-2. On the evening of October 25, 2016, with no final deal in place with Woman-2, Attorney-1 told Editor-1 that Woman-2 was close to completing a deal with a media outlet, under which she would make her story public. Editor-1 texted Cohen that "[w]e have to coordinate something on the matter [Attorney-1 is] calling you about or it could look awfully bad for everyone." Chairman-1 and Editor-1 then called Cohen through an encrypted telephone application. Cohen agreed to make the payment and then called Attorney-1 to finalize the deal. (PSR ¶ 46).

On October 26, 2016, Cohen emailed an incorporating service to obtain the corporate formation documents for another shell corporation, Essential Consultants, LLC, which he had incorporated a few days prior. That afternoon, he directed that $131,000 from his HELOC – the same HELOC he had obtained by means of false statements, *see* p. 8-10, *supra* – be deposited into an account he had just opened in the name of Essential Consultants LLC. The next day, Cohen wired $130,000 from that account to Attorney-1. On the wire form, Cohen falsely indicated that the purpose of the wire was to pay a "retainer." On November 1, 2016, Cohen received copies of the final, signed confidential settlement agreement and side letter agreement from Attorney-1.

(PSR ¶¶ 47-50).

After the election, Cohen sought reimbursement for election-related expenses, including the $130,000 payment he had made to Woman-2.  Cohen presented an executive of the Company with a copy of a bank statement reflecting the $130,000 wire transfer.  Cohen also requested reimbursement of an additional $50,000, which represented a claimed payment for campaign-related "tech services."  Executives of the Company agreed to reimburse Cohen by adding $130,000 and $50,000, "grossing up" that amount to $360,000 for tax purposes, and adding a $60,000 bonus, such that Cohen would be paid $420,000 in total.  Executives of the Company decided to pay the $420,000 in monthly installments of $35,000 over the course of a year.  (PSR ¶¶ 52-53).

At the instruction of an executive for the Company, Cohen sent monthly invoices to the Company for these $35,000 payments, falsely indicating that the invoices were being sent pursuant to a "retainer agreement."  The Company then falsely accounted for these payments as "legal expenses."  In fact, no such retainer agreement existed and these payments were not "legal expenses" – Cohen in fact provided negligible legal services to Individual-1 or the Company in 2017 – but were reimbursement payments.  Cohen then received the $420,000 during the course of 2017.  (PSR ¶¶ 54-56).

### 5.  Cohen's False Statements to Congress

Cohen also deliberately made false statements to the Congress.  The offense conduct regarding Cohen's false statements in set forth in the sentencing submission being filed by the SCO in 18 Cr. 850 (WHP).  (*See also* PSR ¶¶ 62-73).

### B.  Cohen's Meetings with Law Enforcement

Since his guilty plea, Cohen has provided information to various law enforcement entities,

including representatives of this Office and the SCO.  As set forth in the submission being filed by the SCO in 18 Cr. 850 (WHP), this Office understands that the information provided by Cohen to the SCO was ultimately credible and useful to its ongoing investigation.

To be clear, neither the SCO nor this Office is making a motion under U.S.S.G. § 5K1.1. No such motion is being made because, as detailed herein, Cohen repeatedly declined to provide full information about the scope of any additional criminal conduct in which he may have engaged or had knowledge.  However, this Office acknowledges and agrees that Cohen's provision of information to the SCO in connection with its investigation is a mitigating factor that the Court should consider in imposing sentence.  Indeed, Cohen's provision of information to the SCO is the reason that this Office is not seeking a Guidelines sentence here, but rather is acknowledging that a modest variance is appropriate.

While Cohen's provision of information to the SCO merits credit, his description of his actions as arising solely from some "personal resolve" – as opposed to arising from the pendency of criminal charges and the desire for leniency – ignores that Cohen first reached out to meet with the SCO at a time when he knew he was under imminent threat of indictment in this District.  As such, any suggestion by Cohen that his meetings with law enforcement reflect a selfless and unprompted about-face are overstated.

With respect to Cohen's provision of information to this Office, in its two meetings with him, this Office assessed Cohen to be forthright and credible, and the information he provided was largely consistent with other evidence gathered.  Had Cohen actually cooperated, it could have been fruitful:  He did provide what could have been useful information about matters relating to ongoing investigations being carried out by this Office.  But as Cohen partially acknowledges, it was *his* decision not to pursue full cooperation, and his professed willingness to continue to provide

information at some later unspecified time is of limited value to this Office, both because he is under no obligation to do so, and because the Office's inability to fully vet his criminal history and reliability impact his utility as a witness.

Indeed, his proffer sessions with the SCO aside, Cohen only met with the Office about the participation of others in the campaign finance crimes to which Cohen had already pleaded guilty. Cohen specifically declined to be debriefed on other uncharged criminal conduct, if any, in his past.[4]  Cohen further declined to meet with the Office about other areas of investigative interest. As the Court is undoubtedly aware, in order to successfully cooperate with this Office, witnesses must undergo full debriefings that encompass their entire criminal history, as well as any and all information they possess about crimes committed by both themselves and others.  This process permits the Office to fully assess the candor, culpability, and complications attendant to any potential cooperator, and results in cooperating witnesses who, having accepted full responsibility for any and all misconduct, are credible to law enforcement and, hopefully, to judges and juries. Cohen affirmatively chose not to pursue this process.  Cohen's efforts thus fell well short of cooperation, as that term is properly used in this District.[5]

For this reason, Cohen is not being offered a cooperation agreement or a 5K1.1 letter.

---

[4] At the time that Cohen met twice with this Office, through his attorneys, he had expressed that he was considering – but not committing to – full cooperation.  Cohen subsequently determined not to fully cooperate.

[5] Cohen's provision of information to the Office of the New York Attorney General ("NY AG") warrants little to no consideration as a mitigating factor.  This Office's understanding is that the information Cohen provided was useful only to the extent that he corroborated information already known to the NY AG.  More importantly, Cohen provided information to the NY AG not as a cooperating witness who was exposing himself to potential criminal or civil liability but instead as a witness who could have been compelled to provide that testimony.  Fulfilling that basic legal responsibility voluntarily does not warrant a reduced sentence – particularly when one waits until he is charged with federal crimes before doing so. Similarly, this Office's understanding is that the New York State Department of Taxation and Financial Services ("NYSDTF") subpoenaed Cohen for information about the payment *of his own state taxes*, and any claimed "cooperation" with NYSDTF  appears to consist solely of providing that entity information that they would otherwise have obtained via subpoena.

Within the confines of the SCO investigation itself, the Office does not dispute that Cohen's assistance to the SCO was significant. But because Cohen elected not to pursue more fulsome cooperation with this Office, including on other subjects and on his own history, the Office cannot assess the *overall* level of Cohen's cooperation to be significant. Therefore, the Office submits that, in fashioning a sentence on *its* case, the Court afford Cohen credit for his efforts with the SCO, but credit that accounts for only a modest variance from the Guidelines range and does not approach the credit typically given to actual cooperating witnesses in this District.

## APPLICATION OF THE SENTENCING GUIDELINES

### A.   The Probation Department's Calculation

The Office agrees with the Probation Department's calculation of the total offense level as 24, *see* PSR ¶ 110, and the Criminal History Category as I, *see* PSR ¶ 114. Based upon these calculations, Cohen's advisory Guidelines range is 51 to 63 months' imprisonment. (PSR ¶ 174.)

### B.   Cohen's Challenges to the Guidelines Calculation

Cohen challenges the Probation Department's calculation on two grounds. (Def. Mem. at 22-26.) Each claim is meritless.

#### 1.   The PSR's Grouping Analysis is Correct

Cohen claims that the Probation Department's grouping of the tax evasion counts with the other counts in Information 18 Cr. 602 was incorrect because the counts are not "closely related." This argument is contrary to the text of the applicable Guidelines and controlling Second Circuit precedent.

The PSR groups all eight counts in Information 18 Cr. 602 pursuant to U.S.S.G. § 3D1.2, which provides that "[a]ll counts involving substantially the same harm shall be grouped together

into a single Group."[6] Subsection (d) of the Guideline specifies that "substantially the same harm" includes "[w]hen the offense level is determined largely on the basis of the total amount of harm or loss." U.S.S.G. § 3D1.2(d). The subsection also includes a list of specifically enumerated Guidelines that are to be grouped. *Id.* All three of the Guidelines at issue here – U.S.S.G. § 2B1.1, which applies to the false statements count, § 2C1.8, which applies to the illegal campaign contribution counts, and § 2T1.1, which applies to the tax evasion counts – are included on that list. Thus, using the plain text of the Guidelines, all of the offenses here should be grouped.[7] The commentary to the Guidelines further supports this conclusion. It states that "counts involving offenses to which different offense guidelines apply are grouped together under subsection (d) if the offenses are of the same general type," and further specifies that "[t]he 'same general type' of offense is to be construed broadly." U.S.S.G. § 3D1.2 app. n. 6.

Second Circuit case law supports the plain-text reading of the Guidelines. The Second Circuit has held that Section 3D1.2(d) must be used to group tax crimes with fraud and other offenses for which the offense level is principally determined by the amount of loss. *United States v. Gordon*, 291 F.3d 181, 192 (2d Cir. 2002); *see also United States v. Fitzgerald*, 232 F.3d 315, 320 (2d Cir. 2000) (holding that tax evasion, fraud and conversion should be grouped under Section 3D1.2(d) because they are offenses of the same general type); *United States v. Petrillo*,

---

[6] The false statements to Congress count charged in 18 Cr. 850 does not group with the other counts, but it does not affect the Guidelines calculation. (PSR ¶ 88).

[7] Cohen argues that the listing of specific Guidelines in this subsection does not make grouping mandatory. *See* Def. Mem. at 23 (citing *United States v. Napoli*, 179 F.3d 1, 9 n.4 (2d Cir. 1999)). But saying that grouping is not *mandatory* does not mean that it is not *appropriate* – particularly where, as here, the Guidelines in question are each ones in which the offense level is determined largely on the basis of the total amount of loss. *See Napoli*, 179 F.3d at 9 n.4 (citing as an example where grouping would not be appropriate fraud and drug counts, because one measures harm by dollar losses whereas the other measures harm by drug weights). Here, each of the listed offenses measures harm by dollar amounts, meaning that *Napoli*, cited by Cohen, actually supports the Office's position.

Case 2:18-cv-02217-SJO-FFM   Document 103-1   Filed 12/17/18   Page 22 of 89   Page ID
#:2880
Case 1:18-cr-00602-WHP   Document 27   Filed 12/07/18   Page 21 of 40

237 F.3d 119, 124-25 (2d Cir. 2000) (holding that tax evasion and mail fraud should be grouped under Section 3D1.2(d)); *United States v. Bernstein*, 43 Fed. App'x 429, 431 (2d Cir. 2002) (affirming grouping of mail fraud and tax fraud offenses under Section 3D1.2(d)).[8]

Cohen attempts to distinguish *Petrillo*, arguing that the tax and mail fraud offenses in that case were factually intertwined and that it was decided at a time when the tax and fraud tables had the same thresholds.  (Def Mem. at 24).  But even if *Petrillo* were read as limited to the facts of that case, *Gordon* resolves any uncertainty.  Analyzing *Petrillo* and *Fitzgerald*, the Second Circuit held in *Gordon* that even if those cases do not require grouping under Section 3D1.2(d), the structure of the Guidelines does in fact "require" that "crimes falling within the special category of quantifiable-harm offenses" be grouped under § 3D1.2(d).  *Gordon*, 291 F.3d at 193.  That was so even though, at the time, the tax and fraud offense tables no longer had identical thresholds.  Nevertheless, the Circuit held that the district court committed clear and obvious error by not applying Section 3D1.2(d) to group the fraud and tax evasion offenses in that case.  *Id.*[9]

Moreover, Cohen's position – that the campaign finance and false statements counts should group, but the tax evasion counts should not – does not make sense.  All three sets of counts are offenses for which the offense level is based principally on a quantifiable amount of harm or loss, and qualify as offenses of "the same general type" as each other.  But even if the foregoing precedent were set aside, and the phrase "general type" were construed narrowly so that tax crimes were not of the same general type as false statements or campaign finance offenses, then the false

---

[8] Cohen argues that the "vast majority of Circuit courts" have held otherwise, citing *United States v. Doxie*, 813 F.3d 1340, 1345 (11th Cir. 2016).  But as *Doxie* recognizes, the Second Circuit has concluded that "fraud counts and tax counts should be grouped together under § 3D1.2(d)."  *Id.* at n.3.  That holding is binding here in the Second Circuit.

[9] The concurrence in *Gordon* cited by Cohen did not command a majority of the panel and thus is not controlling precedent.

statements and campaign finance crimes would similarly not be of the same "general type." Indeed, the false statements and campaign finance crimes are no more similar as a general matter or related as a factual matter than the tax crimes are with the other offenses. Thus, there is no rational basis to group some but not all of the offenses in this case. [10]

### 2. The Guidelines Enhancements Are Not "Overlapping"

In the plea agreement, the parties have stipulated that two-level enhancements are warranted for both (i) Cohen's used of "sophisticated means," and (ii) his use of his "special skill" as a licensed attorney in a manner that significantly facilitated the commission and concealment of his crimes. The PSR also applies these enhancements. (PSR ¶¶ 92, 94). While not contesting their applicability as a legal matter, Cohen argues that they address overlapping conduct, such that the resulting Guidelines range overstates the offense. (Def. Mem. at 24-25). This argument is meritless. The "sophisticated means" and "special skill" enhancements address different aspects of Cohen's conduct, and each serves a unique purpose under the Guidelines.

The "sophisticated means" enhancement is addressed to Cohen's use of complex means to carry out and disguise his crimes. For example, Cohen created shell companies for his commission of the campaign finance crimes, including one shell entity (Resolution Consultants) for use in the transaction with Woman-1 and another shell entity (Essential Consultants) for use in the transaction with Woman-2. (PSR ¶¶ 43, 47.) Cohen also agreed to structure the reimbursement for his payment to Woman-2 in monthly installments, and to disguise those payments by creating fake invoices that referenced a non-existent "retainer." (PSR ¶ 54.) These actions clearly constitute the use of "sophisticated means," and Cohen does not and cannot argue to the contrary. *See, e.g.*, U.S.S.G. § 2B1.1 cmt. n. 9(B) ("[c]onduct such as hiding assets or transactions, or both,

---

[10] If that were the case – that *none* of the counts grouped – then the total offense level would likely be 27, yielding a much higher Guidelines range of 70 to 87 months' imprisonment.

through the use of fictitious entities [or] corporate shells . . . ordinarily indicates sophisticated means"); *United States v. Amico*, 416 F.3d 163, 169 (2d Cir. 2005) (creation of false bank documents, appraisals, and blueprints constituted sophisticated means); *see also United States v. Regensberg*, 381 F. App'x 60, 62 (2d Cir. 2010) (creation of fake loan documents and fraudulent earnings statements constituted sophisticated means).

By contrast, the "special skill" enhancement is directed at a different aspect of Cohen's conduct – his use of his education, training, and licensure as an attorney to facilitate and conceal the campaign finance crimes.  For example, in order to facilitate the hush money payment to Woman-2, Cohen used his skills and experience as an attorney to negotiate and finalize a settlement agreement with Woman-2, which included both a principal agreement and a separate side letter that was designed specifically to conceal the identities of the parties.  (PSR ¶ 45). Moreover, Cohen's role as the attorney for one of the individuals involved in both settlement agreements allowed him to use his position to attempt to cloak his criminal conduct under the veil of attorney-client privilege.  Indeed, in conversations he recorded with reporters, he claimed that beyond his public statements on the matter, he could not answer questions about his role in the payments because of attorney-client privilege.  This sort of conduct implicates the "special skill" enhancement.  *See, e.g.*, *United States v. Mancuso*, 428 Fed. Appx. 73, 2011 WL 2580228, at *7 (2d Cir. June 30, 2011) (enhancement warranted where attorney used legal skills to create a power of attorney, draft a backdated partnership agreement, and form a company in furtherance of the offense); *United States v. Kelly*, 147 F.3d 172, 178 (2d Cir. 1998) (defendant used his skill as an experienced attorney to prepare an assignment of income in an effort to avoid income tax).

These two enhancements are thus directed at different actions that carry unique harms.  For that reason, Cohen's argument that the enhancements are "overlapping" and should thus be

discounted is meritless. *See, e.g.*, *United States v. Minneman*, 143 F.3d 274, 283 (7th Cir. 1998) (rejecting "double-counting" argument where the special skill adjustment focused on the defendant's use of his legal training, while the sophisticated means enhancement was based on his use of multiple accounts and corporate names); *United States v. Rice*, 52 F.3d 843, 851 (10th Cir. 1995) (noting that "[t]he purpose of the special skill enhancement is to punish those criminals who use their special talents to commit crime," whereas the sophisticated means enhancement is "designed to target criminals who engage in complicated criminal activity because their actions are considered more blameworthy and deserving of greater punishment than a perpetrator of a simple version of the crime").

C.     **The Probation Department's Recommendation**

Taking into account the factors set forth in 18 U.S.C. § 3553(a), including Cohen's age and background, the nature and circumstances of his offenses, and the need to avoid unwarranted sentencing disparities, the Probation Department recommends a sentence of 42 months' imprisonment and a $100,000 fine. (PSR at 53-54.)  The Probation Department's recommendation does not, however, consider Cohen's provision of information to the SCO.

**<u>DISCUSSION</u>**

A.     **A Substantial Term of Imprisonment Is Warranted**

As set forth herein, consideration of the factors set forth in 18 U.S.C. § 3553(a) weighs heavily in favor of a substantial term of imprisonment.  In particular, the nature and seriousness of the offenses and the need to promote respect for the law and afford adequate deterrence are especially weighty considerations.

   *1.     The Nature and Seriousness of the Offenses*

In his submission, Cohen states that "the facts and circumstances surrounding this case are

unique and unprecedented." (Def. Mem. at 28-29.)  That may be so, but it is not exclusively for the reasons given by Cohen.  It is also unique because Cohen managed to commit a panoply of serious crimes, all while holding himself out as a licensed attorney and upstanding member of the bar.  His offenses strike at several pillars of our society and system of government: the payment of taxes; transparent and fair elections; and truthfulness before government and in business.

*First*, Cohen's commission of two campaign finance crimes on the eve of the 2016 election for President of the United States struck a blow to one of the core goals of the federal campaign finance laws: transparency.  While many Americans who desired a particular outcome to the election knocked on doors, toiled at phone banks, or found any number of other legal ways to make their voices heard, Cohen sought to influence the election from the shadows.  He did so by orchestrating secret and illegal payments to silence two women who otherwise would have made public their alleged extramarital affairs with Individual-1.  In the process, Cohen deceived the voting public by hiding alleged facts that he believed would have had a substantial effect on the election.

It is this type of harm that Congress sought to prevent when it imposed limits on individual contributions to candidates.  To promote transparency and prevent wealthy individuals like Cohen from circumventing these limits, Congress prohibited individuals from making expenditures on behalf of and coordinated with candidates.  Cohen clouded a process that Congress has painstakingly sought to keep transparent.  The sentence imposed should reflect the seriousness of Cohen's brazen violations of the election laws and attempt to counter the public cynicism that may arise when individuals like Cohen act as if the political process belongs to the rich and powerful.

Cohen's submission suggests that this was but a brief error in judgment.  Not so.  Cohen knew exactly where the line was, and he chose deliberately and repeatedly to cross it.  Indeed, he

was a licensed attorney with significant political experience and a history of campaign donations, and who was well-aware of the election laws.[11]  In fact, Cohen publicly and privately took credit for Individual-1's political success, claiming – in a conversation that he secretly recorded – that he "started the whole thing . . . started the whole campaign" in 2012 when Individual-1 expressed an interest in running for President.  Moreover, not only was Cohen well aware of what he was doing, but he used sophisticated tactics to conceal his misconduct.   He arranged one of the payments through a media company and disguised it as a services contract, and executed the second non-disclosure agreement with aliases and routed the six-figure payment through a shell corporation.  After the election, he arranged for his own reimbursement via fraudulent invoices for non-existent legal services ostensibly performed pursuant to a non-existent "retainer" agreement. And even when public reports of the payments began to surface, Cohen told shifting and misleading stories about the nature of the payment, his coordination with the candidate, and the fact that he was reimbursed.

This was not a blind act of loyalty, as Cohen has also suggested.  His actions suggest that Cohen relished the status of ultimate fixer – a role that he embraced as recently as May 2018.[12] Cohen was driven by a desire to further ingratiate himself with a potential future President—for whose political success Cohen himself claimed credit—and arranged for the payments in an attempt to increase his power and influence.  Indeed, after Cohen caused the media company to

---

[11] Cohen was previously the subject of an FEC complaint for making unlawful contributions to Donald Trump's nascent campaign for the 2012 presidency.  The complaint was dismissed for jurisdictional reasons, but it certainly put Cohen on notice of the applicable campaign finance regulations.  *See In the Matter of Donald J. Trump, Michael Cohen, et al.*, MUR 6462 (Sept. 18, 2013).

[12]   Michael Cohen (@michaelcohen212), Twitter (May 8, 2018, 6:19 PM), https://twitter.com/michaelcohen212/status/971933570146201600?lang=en (thanking @CNN "for your accurate depiction of me and my role for our @POTUS @realDonaldTrump!  #loyalty #RayDonovan #fixer).  The phrase "#RayDonovan" is a reference to the fictional "fixer" character on the Showtime television crime drama *Ray Donovan*.

make an illegal expenditure, in a secretly recorded meeting Cohen took credit for the payment and assured Individual-1 that he was "all over" the transaction.  And after making the payment to the second woman, and after Individual-1 was elected President, Cohen privately bragged to friends and reporters, including in recorded conversations, that he had made the payment to spare Individual-1 from damaging press and embarrassment.

Cohen's criminal violations of the federal election laws were also stirred, like his other crimes, by his own ambition and greed.  During and after the campaign, Cohen privately told friends and colleagues, including in seized text messages, that he expected to be given a prominent role and title in the new administration.  When that did not materialize, Cohen found a way to monetize his relationship with and access to the President.  Cohen successfully convinced numerous major corporations to retain him as a "consultant" who could provide unique insights about and access to the new administration.  Some of these corporations were then stuck making large up-front or periodic payments to Cohen, even though he provided little or no real services under these contracts.  Bank records reflect that Cohen made more than $4 million dollars before the contracts were terminated.

*Second*, Cohen undertook similar acts of deception in his private life.  He concealed significant amounts of income from the IRS, and lied about his financial status in his dealings with banks.  These offenses warrant significant punishment.  For at least half a decade, Cohen willfully evaded paying taxes.  Cohen, who himself studied tax in law school and displayed an awareness of complicated tax laws in real estate transactions, took purposeful steps to avoid paying taxes on millions of dollars in income over a five-year period.  He made private loans at double-digit interest rates and did not report the millions of dollars in income it generated.  The fact that these loans were cash generators was not lost on Cohen:  At one point, he offered to sell the loans to other

investors.  Cohen also failed to report hundreds of thousands of dollars in consulting income and legal work, and underreported payments he received from his ownership of taxi medallions.

Cohen's sentencing memorandum attempts to downplay the seriousness of this conduct, labeling it "unsophisticated" because this case does not involve unreported cash transactions, offshore accounts, phony deductions, or obstructive conduct.  (Def. Mem. at 14.)  But the nature of Cohen's criminal conduct is apparent from the manner in which he dealt with his own accountant:  Cohen provided incomplete information to his accountant, lied about the existence or value of certain assets and income sources, and rebuffed questions that would have revealed income he deliberately concealed.  Moreover, Cohen's crimes were not ones of necessity.  To the contrary, he relied on his unreported income to maintain his opulent lifestyle and purchase luxury items.  Indeed, in some years, the amount of money that Cohen spent on expenses – including credit card bills, fine art purchases, and payments for private school – exceeded the gross amount of income listed on Cohen's tax returns.

*Third,* Cohen similarly flouted his obligation to be truthful in business when seeking financing.  To secure loans, Cohen falsely understated the amount of debt he was carrying, and omitted information from his personal financial statements, to induce a bank to lend based on incomplete information.  To explain why he submitted a false statement to a bank that failed to disclose more than $20 million in liabilities as well as tens of thousands in monthly expenses, Cohen notes that it was his private banker who provided Cohen with an inaccurate application, which Cohen failed to correct.  But this was no mere error of omission:  As noted above, Cohen was specifically asked about the omission, and covered it up by misleadingly telling Bank-3 that the liabilities had been expunged, when in fact they had been re-established at another bank.  This false statement was the latest in a series of false statements Cohen had made to this banker and

Case 2:18-cv-02217-SJO-FFM   Document 103-1   Filed 12/17/18   Page 30 of 89   Page ID
#:2888
Case 1:18-cr-00602-WHP   Document 27   Filed 12/07/18   Page 29 of 40

others.  *See* p. 8-11, *supra*.  And indeed it was one of these prior false statements – in which Cohen told the banker that he had closed the $14 million line of credit in question – that led the banker to omit that liability from the draft of his application.

Cohen is loath to acknowledge these false statements to banks.  Likewise at his guilty plea proceeding, the Court had to press Cohen to acknowledge that he understood he was lying to a bank.  This signals that Cohen's consciousness of wrongdoing is fleeting, that his remorse is minimal, and that his instinct to blame others is strong.  While he has legally accepted responsibility, the Court should consider at sentencing these transparent efforts at minimizing Cohen's false statements and criminal conduct.  As the Probation Department recognized in rejecting these arguments, Cohen is attempting "to lessen [his] culpability and place the burden on Bank-3."  (PSR at 48.)[13]

*Finally*, Cohen has pled guilty to making false statements to Congress in connection with a congressional investigation.  This offense is described in detail in the SCO's sentencing submission.

Taken alone, these are each serious crimes worthy of meaningful punishment. Taken together, these offenses reveal a man who knowingly sought to undermine core institutions of our democracy.  His motivation to do so was not borne from naiveté, carelessness, misplaced loyalty, or political ideology.  Rather, these were knowing and calculated acts – acts Cohen executed in

---

[13]   In a further attempt at undermining the seriousness of this offense, Cohen observes that there has been no monetary loss to any bank.  (Def. Mem. at 18.)  Financial loss, however, should not be the only measure of the seriousness of the offense.  Cohen's argument fails to recognize the important federal interest at stake, which is reflected in the purpose and history of 18 U.S.C. § 1014.  Section 1014 was designed to "protect federally insured institutions from losses stemming from false statements or misrepresentations that mislead the institutions into making financial commitments, advances, or loans," and thereby to "protect the integrity of the system of credit generated and maintained by federally insured banks."  *United States v. Zahavi*, No. 12 Cr. 288 (JPO), 2012 WL 5288743, at *2 (S.D.N.Y. Oct. 26, 2012).  If borrowers obtain loans based on false information, and cannot fulfill their obligations, that can have tremendous negative effects on lenders and the banking system as a whole.

order to profit personally, build his own power, and enhance his level of influence. The nature and seriousness of each of Cohen's crimes warrant a substantial sentence in this case. *See* 18 U.S.C. § 3553(a)(1), (2)(A).

### 2.  The Need to Promote Respect for the Law and to Afford Adequate Deterrence

The need for the sentence to promote respect for the law and to afford adequate deterrence further supports imposition of a significant sentence of imprisonment. Congress provided for strong criminal sanctions as a general deterrent to tax evasion, false statements to financial institutions, and campaign finance violations. Given the magnitude and brazenness of the conduct in this case, the interests of deterrence are best served by the imposition of a substantial term of imprisonment.

Cohen's years-long pattern of deception, and his attempts to minimize certain of that conduct even now, make it evident that a lengthy custodial sentence is necessary to specifically deter him from further fraudulent conduct, whether out of greed or for power, in the future. Certainly, Cohen has no prior convictions, and is well-educated and professionally successful. Generally, such characteristics suggest that a defendant is unlikely to re-offend in the future. But where, as here, the nature, multitude, and temporal span of criminal behavior betray a man whose outlook on life was often to cheat – an outlook that succeeded for some time – his professional history and lack of prior convictions are not a significant mitigating factor.

For much the same reasons, the time-served sentence that Cohen seeks would send precisely the wrong message to the public. General deterrence is a significant factor here. Campaign finance crimes, because they are committed in secret and hidden from the victims, are difficult to identify and prosecute. Nonetheless, they have tremendous social cost, described above, as they erode faith in elections and perpetuate political corruption. Effective deterrence of

Case 2:18-cv-02217-SJO-FFM   Document 103-1   Filed 12/17/18   Page 32 of 89   Page ID
#:2890
Case 1:18-cr-00602-WHP   Document 27   Filed 12/07/18   Page 31 of 40

such offenses requires incarceratory sentences that signal to other individuals who may contemplate conduct similar to Cohen's that violations of campaign finance laws will not be tolerated.  Particularly in light of the public interest in this case, the Court's sentence may indeed have a cognizable impact on that problem by deterring future candidates, and their "fixers," all of whom are sure to be aware of the Court's sentence here, from violating campaign finance laws.

Additionally, a significant sentence of imprisonment would also generally deter tax evasion and other financial crimes by sending the important message that even powerful individuals cannot cheat on their taxes and lie to financial institutions with impunity, because they will be subject to serious federal penalties.  This is particularly important in the context of a tax evasion prosecution.  Hundreds of billions of dollars are lost annually because people like Cohen – who otherwise take full advantage of all that taxes bring, such as schools, paved roads, transit systems, and Government buildings – shirk their responsibilities as American taxpayers. Meaningful sentences – that is, ones that, through their terms, speak loudly and clearly – must be given in cases like this one so that others are forewarned of the consequences for engaging in tax crimes.  As the United States Sentencing Commission has explained, "[b]ecause of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would be violators."  U.S.S.G. Ch. 2, Part T, intro. Cmt.  Where the incidence of prosecution is lower, the level of punishment must be higher to obtain the same level of deterrence.  *See generally* Louis Kaplow and Steven Shavell, "Fairness Versus Welfare," 114 Harv. L. Rev. 961, 1225-1303 (2001); *see also United States v. Hassebrock*, 663 F.3d 906, 922 (7th Cir. 2011) (affirming as reasonable a within-Guidelines 32-month sentence for a tax

evader when the district court explained that "a sentence of probation would not promote respect for the law, but encourage people to flaunt it").  Indeed, "[s]tudies have shown that salient examples of tax-enforcement actions against specific taxpayers, especially those that involve criminal sanctions, have a significant and positive deterrent effect." Joshua D. Blank, *In Defense of Individual Tax Privacy*, 61 Emory L.J. 265, 321 (2011-2012).  Our system of voluntary compliance would be undermined if wealthy and successful individuals such as Cohen come to believe that the most severe sanctions that they will face, in the relatively unlikely case that they are caught cheating on their taxes, are the payment of back taxes, interest, and penalties.  The Guidelines therefore recognize the harm tax crimes inflict on society and recommend prison sentences for cases like this one.

In sum, the nature of Cohen's conduct underscores the need for a substantial period of incarceration as a means both to promote respect for the law and to deter future abuses by other individuals seeking improperly to influence the electoral process, evade taxes, or lie to financial institutions. 18 U.S.C. § 3553(a)(2)(A) & (a)(2)(B).

## B.   Cohen's Request for a Sentence of Time Served is Meritless

In his submission, Cohen requests a sentence of time served, which would effectively be a sentence of a matter of hours – 99.5% lower than what the Sentencing Guidelines and Probation Department recommend.  When considering "the kinds of sentences available," 18 U.S.C. § 3553(a)(3), this Court should view with great skepticism a request for a non-incarceratory sentence when the Guidelines recommend a substantial prison term.  *See United States v. Goldberg*, 491 F.3d 668, 673 (7th Cir. 2007) ("When the guidelines, drafted by a respected public body with access to the best knowledge and practices of penology, recommend that a defendant be sentenced to a number of years in prison, a sentence involving no . . . imprisonment

can be justified only by a careful, impartial weighing of the statutory sentencing factors.").  Cohen presses four principal arguments in support of his request, but none warrants the extraordinary variance that he seeks.

*First*, Cohen argues that the emotional toll of his convictions on him and his family, the loss of his law license and other business, and civil tax penalties, "amount[] to an alternative form of punishment," which warrants a sentence of time served.  (Def. Mem. at 26.)  They do not.  Congress, through the Guidelines, has pointedly addressed and rejected this "I've been punished enough" argument from privileged citizens who bemoan the collateral consequences of a guidelines sentence to persons like themselves.  *See* 28 U.S.C. § 994(d) ("The Commission shall assure that the guidelines and policy statements are entirely neutral as to . . . socioeconomic status of offenders."); U.S.S.G. § 5H1.10 (socioeconomic status not relevant); see also U.S.S.G. § 5H1.2 (vocational skills and education not ordinarily relevant); U.S.S.G. § 5H1.5 (employment record not ordinarily relevant); U.S.S.G. § 5H1.6 (family ties and responsibilities not ordinarily relevant).  The federal courts have repeatedly agreed.  *See, e.g.*, *United States v. Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012) ("[I]t is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction."); *United States v. Musgrave*, 761 F.3d 602, 608–09 (6th Cir. 2014) (impermissible for the district court to rely heavily on the fact that the defendant had already "been punished extraordinarily" through years of legal process, the loss of his CPA license, and his felony conviction).

There is nothing about Cohen's family circumstances warranting the extraordinary sentence that he seeks. On the contrary, rather than a factor warranting any decreased imprisonment, Cohen's education, resources and opportunities should, in the event that they are

relevant at all, weigh in favor of holding him to an exacting standard.  Cohen did not need to commit the crimes that he did, yet he committed them for personal gain.  He was motivated in part by greed and the desire to live an opulent and lavish lifestyle.  And for all of Cohen's outward rectitude, he has lived a double life, which weighs heavily against a variance.  While Cohen has submitted letters describing his good nature, the evidence collected and witnesses interviewed in this investigation paint a decidedly different picture – a picture of someone who was threatening and abusive when he wanted to get his way.  For instance, in 2015, Cohen threatened a journalist for investigating a negative story about Individual-1, telling him:

> I will make sure that you and I meet one day while we're in the courthouse. And I will take you for every penny you still don't have. And I will come after your [employer] and everybody else that you possibly know. . . . So I'm warning you, tread very fucking lightly, because what I'm going to do to you is going to be fucking disgusting. You understand me?[14]

On another call – which Cohen secretly recorded – with bankers from Bank-2 with whom Cohen was seeking to renegotiate his medallion debt on terms more favorable to him, Cohen threatened:

> I'm gonna teach [the bank and its government conservator] a lesson they've never seen before in their life. Because I'm gonna hit everybody up with a lawsuit that's gonna spin everyone's head. And I'm looking forward to that, by the way. And I'm not saying it as a threat. It's a fact.

Cohen himself said in an interview in 2011 that, "If you do something wrong, I'm going to come at you, grab you by the neck and I'm not going to let you go until I'm finished."[15]  These are just a few of the many examples of Cohen's abuse of both his standing as an attorney and his relationship to a powerful individual – examples of the type of conduct that is repugnant from anyone, let alone an attorney of the bar.  They stand in marked contrast to the letters of support for

---

[14] The full recording is available at: www.npr.org/player/embed/615843930/615845621.

[15] *See* ABC News, *Meet Michael Cohen* (Apr. 16, 2011), *available at*: https://abcnews.go.com/Politics/donald-trumps-political-pit-bull-meet-michael-cohen/story?id=13386747.

Cohen.

On balance, like most others who stand before this Court for sentence, Cohen is neither all good nor all bad.  His personal interactions in private life should not be this Court's principal consideration.  Rather, it is Cohen's serious crimes that should be the Court's lodestar.

*Second*, in support of his argument for a time-served sentence, Cohen makes mention of his financial support and fundraising for his children's former school, as well as his support for other charitable causes.  (Def. Mem. at 9-11.)  But charitable "and similar prior good works are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range."  U.S.S.G. § 5H1.11.  For good reason: Prior charitable works, however commendable and extensive, by professionally successful defendants rarely, if ever, are materially mitigating factors at sentencing because courts recognize that it is not extraordinary for such defendants to be involved in charities and to have strong professional and personal relationships.  *See, e.g.*, *United States v. Barbera*, No. 02 Cr. 1268 (RWS), 2005 WL 2709112, at *12-13 (S.D.N.Y. Oct. 21, 2005); *see also United States v. Fishman*, 631 F. Supp. 2d 399, 403 (S.D.N.Y. 2009) (a defendant's "good name and good works" should not serve as "the human shield he raises to seek immunity or dramatic mitigation of punishment when he is caught").  Moreover, it is no doubt far easier to give generously to charities when the donor is simultaneously evading the payment of taxes on millions of dollars in income.  Cohen was, in effect, donating other people's money.  As Chief Judge McMahon has explained, "Using other people's money to do what qualifies as good works by your likes and then suggesting to me that I give you credit for the fact that you didn't use the money to buy a Lamborghini is something that I find and have always found to be contemptible, especially since all too frequently charity is a means to bolster the esteem in which one is held by others." *United States v. Binday*, 12 Cr. 152 (CM), Dkt. 349, at 44-45.

*Third*, in support of his request for a time-served sentence, Cohen cites several cases in which the defendant received little or no jail time. (Def. Mem. at 15-17, 19-20.)  The cases selected by Cohen do not bear any particular factual similarity to the instant case.  Indeed, in none of the cases cited by Cohen did the defendant commit the particular array of crimes that Cohen has.  As set forth below, the Court can just as easily identify numerous examples of cases where more substantial sentences were imposed.  Thus, the cases cited by Cohen do not provide a template for sentencing in this matter, and the Court must decide it based on the particular facts and circumstances of this case.

For instance, Cohen highlights *United States v. Lacy Doyle* as a case in which Judge Carter imposed a non-incarceratory term of four years' probation.  Cohen fails, however, to acknowledge that the advisory guidelines range in that case was just 6 to 12 months' imprisonment based on a guilty plea to one count of subscribing to a false and fraudulent tax return for a single year.[16] Cohen also highlights the sentence imposed in the prosecution of Earl Simmons, a tax evasion case in which the defendant received a year of imprisonment.  In that case, Judge Rakoff focused on the need for imprisonment in tax evasion cases, regardless of their complexity, to ensure general deterrence: "People who are considering tax evasion . . . greatly exaggerate their chances of getting away with it . . . .  That is why prison is important."  Sent. Tr. at 32, *United States v. Earl Simmons*, 17 Cr. 172 (JSR) (S.D.N.Y. Mar. 23, 2018) (ECF No. 39).  While it is true that the methods by which Simmons evaded taxes may have been more complex than here, both men made the calculated decision that they could get away with not paying taxes.  Finally, in contrast to Simmons, tax evasion is but one of the crimes for which sentence is to be imposed in this case.

Cohen also overlooks several tax evasion cases in which courts have recently imposed

---

[16] In addition, because the advisory guidelines in *Doyle* were in Zone B, a term of probation was considered explicitly authorized.  U.S.S.G. § 5B1.1(a)(2).

custodial terms. *See United States v. Trupin*, 475 F.3d 71, 76 (2d Cir. 2007) (holding that seven-month prison sentence for multi-year tax evasion scheme with a tax loss of $1.2 million failed to reflect seriousness of offense, observing that a tax evader, in effect, "steal[s] from his fellow taxpayers through his deceptions"); Sent. Tr. at 22-23, *United States v. Joseph Ciccarella*, 16 Cr. 738 (AKH) (S.D.N.Y. March 3, 2017) (imposing an 18-month sentence for a defendant who caused a tax loss between $250,000 and $550,000, noting that "the obligation to pay taxes is basic to our civilization"). Finally, in *United States v. Erwin Mayer*, 09 Cr. 581 (WHP), this Court imposed a custodial term of imprisonment on a cooperating defendant whose level of cooperation was described as "unequaled in [that] case, and essentially in any other white-collar case, in which the[] experienced prosecutors had been engaged." Sent. Tr. at 32, *United States v. Erwin Mayer*, 09 Cr. 581 (WHP) (S.D.N.Y. Aug. 19, 2014) (ECF No. 849). In imposing a custodial sentence on such a cooperating defendant, this Court noted the "need in these kinds of cases for general deterrence." (*Id.*)

Cohen also asserts that "numerous allegations of unpaid taxes are routinely asserted by the IRS outside of the criminal context," and cites to news articles about individuals who failed to pay their taxes. (Def. Mem. at 16-17.) But Cohen did not just fail to pay assessed taxes. He willfully evaded taxes by hiding entire income streams over a period of years. His acts were fraudulent and evasive, and not the product of mistake, negligence, or a failure of his accountant. Cohen's suggestion that his case should have been handled outside the criminal process ignores the fact that his tax crimes were uncovered in the midst of an investigation of his numerous *other* crimes. And his complaints about pre-charge process ignore the fact that Cohen was well aware he was under investigation for months before he was charged, and his counsel was given several opportunities to present to the Office as to why he should not be charged and in fact made such a

presentation.  Finally, Cohen's complaints about process and his attempts to blame his accountant make evident the need for an incarceratory sentence to reflect what Cohen still plainly does not perceive: His actions were not just technically criminal, but serious offenses against the Government and the public.

The two unlawful campaign contribution cases cited by Cohen are similarly of little value in crafting an appropriate sentence here.  (Def. Mem. at 19.)  The defendants in those cases made excessive contributions through straw donors, but the amounts of money involved were less substantial, and the effect of the crimes were less severe.  Cohen's crimes are particularly serious because they were committed on the eve of a Presidential election, and they were intended to affect that election.  Thus, the gravity of the offense is considerably greater than the offenses committed in *United States v. Dinesh D'Souza*, No. 14 Cr. 34 (RMB), or *United States v. Jia Hou and Xing Wu Pan*, No. 12 Cr. 153 (RJS).  Moreover, neither case related to the making of a coordinated expenditure – a different offense under the campaign finance laws.

Cohen omits the numerous campaign finance cases, including many more analogous to the facts here, where substantial custodial sentences were imposed for campaign finance offenses. *See, e.g.*, *United States v. Stephen Stockman*, No. 17 Cr. 116 (S.D. Tex. 2018) (defendant sentenced to 120 months' incarceration for making excessive campaign contributions, wire fraud, money laundering, and filing false tax returns); *United States v. Tyler Harber*, No. 14 Cr. 373 (LO) (E.D. Va. 2015) (defendant sentenced to 24 months' incarceration following guilty plea for making coordinated expenditures and false statements to the FBI); *United States v. John Rowland*, No. 14 Cr. 79 (JBA) (D. Conn. 2015) (defendant sentenced to 30 months' incarceration for making illegal campaign contributions, falsifying records, and causing false statements to be made to the FEC); *United States v. Joseph Bigica*, No. 2:12 Cr. 318 (FSH) (D.N.J. 2012) (defendant sentenced to 60

months' incarceration following guilty plea to tax violation and conduit scheme involving $98,600 in illegal contributions); *United States v. Robert Braddock, Jr.,* No. 3:12 Cr. 58 (LRH) (D. Conn. 2013) (defendant sentenced to 38 months' incarceration following jury trial involving nearly $28,000 conduit scheme).   As these cases amply demonstrate, custodial sentences for serious violations of the campaign finance laws are a regular occurrence, and the Court should impose such a sentence here for the reasons stated above.

*Lastly*, Cohen places heavy reliance on his provision of information to law enforcement. (Def. Mem. at 1-5).   To be sure, this case is in some respects unique, and Cohen's decision to plead guilty and provide information to law enforcement in matters of national interest is deserving of credit.   Indeed, it is the principal reason the Office is not seeking a Guidelines sentence here.   But as noted in more detail above, Cohen was well aware of the standard debriefing process in which cooperators in this District regularly participate, and declined to participate.   While he answered questions about the charged conduct, he refused to discuss other uncharged criminal conduct, if any, in which he may have participated.   This precludes him from being given credit for "substantial assistance" and obtaining a 5K1.1 letter.   The Court should not sentence Cohen as if he has one.   That is, the credit given to Cohen should not approximate the credit that a witness with a cooperation agreement and a 5K1.1 letter would merit.

Finally, Cohen's further assertion that he is deserving of leniency because he "could have fought the government and continued to hold the party line, positioning himself for a pardon or clemency" reflects a continuation of his mindset that, at his own option, he is above the laws reflected in his crimes of conviction.   (Def. Mem. at 5).   Every defendant in every criminal case has the right to fight the charges against him.   But where, as here, the evidence of their guilt is overwhelming, defendants often make the choice to plead guilty.   After cheating the IRS for years,

lying to banks and to Congress, and seeking to criminally influence the Presidential election, Cohen's decision to plead guilty – rather than seek a pardon for his manifold crimes – does not make him a hero.

## **CONCLUSION**

For the reasons set forth above, the Office respectfully requests that this Court impose a substantial term of imprisonment, one that reflects a modest variance from the applicable Guidelines range.  The Office also requests that the Court impose forfeiture in the amount of $500,000, and a fine.

Dated:   December 7, 2018
             New York, New York

                                        Respectfully submitted,

                                        ROBERT KHUZAMI
                                        Acting United States Attorney

                        By:   _Nicolas Roos_____
                                        Andrea M. Griswold
                                        Rachel Maimin
                                        Thomas McKay
                                        Nicolas Roos
                                        Assistant United States Attorneys

# EXHIBIT X

ICCQCOHs


1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
   UNITED STATES OF AMERICA
3            v.                              18 CR 602 (WHP)
                                             18 CR 850 (WHP)
4                                            Sentence
   MICHAEL COHEN
5
                   Defendant
6  ------------------------------x

7                                            New York, N.Y.
                                             December 12, 2018
8                                            11:00 a.m.

9  Before:
                      HON. WILLIAM H. PAULEY III
10                                           District Judge

11
                          APPEARANCES
12 GEOFFREY S. BERMAN
        United States Attorney for the
13      Southern District of New York
   NICHOLAS ROOS
14 THOMAS McKAY
   RACHEL MAIMIN
15 ANDREA GRISWOLD
        Assistant United States Attorneys
16

17 UNITED STATES DEPARTMENT OF JUSTICE
        Special Counsel's Office
18 JEANNIE S. RHEE
   ANDREW D. GOLDSTEIN
19 L. RUSH ATKINSON
        Assistant United States Attorneys
20

21 PETRILLO KLEIN & BOXER LLP
        Attorneys for Defendant
22 GUY PETRILLO
   AMY LESTER
23
   -Also Present-
24 HEATHER D'AGOSTINO, FBI
   MICKEY ROBINSON, FBI
25

ICCQCOHs

1              (Case called)

2              DEPUTY CLERK:  Appearances for the United States

3    Attorney's Office.

4              MR. ROOS:  For the United States Attorney's Office,

5    good morning.

6              Nicks Roos, Thomas McKay, Rachel Maimin and Andrea

7    Griswold.

8              DEPUTY CLERK:  Appearances for Special Counsel's

9    Office.

10             MS. RHEE:  Jeannie Rhee on behalf of Special Counsel's

11   Office.  I'm joined here today by Andrew Goldstein and Rush

12   Atkinson.  Also in the courtroom in the back, we're joined by

13   FBI Heather D'Agostino and Mickey Robinson.

14             DEPUTY CLERK:  Appearances for the defendant.

15             MR. PETRILLO:  Good morning, your Honor.

16             Guy Petrillo and Amy Lester for Michael Cohen.

17             THE COURT:  Good morning to all of you, and I note the

18   presence of the defendant, Mr. Cohen, at counsel table.

19             This matter is on for sentencing.  Are the parties

20   ready to proceed?

21             MR. ROOS:  Yes, your Honor.

22             MR. PETRILLO:  Yes, your Honor.

23             MS. RHEE:  Yes, your Honor.

24             THE COURT:  First, Mr. Petrillo, have you reviewed

25   with your client the presentence investigation report?

ICCQCOHs

1            MR. PETRILLO:  I have, your Honor.

2            THE COURT:  Are there any factual matters set forth in

3    the report that you believe warrant modification or correction?

4            MR. PETRILLO:  Not at this time, your Honor.  Thank

5    you.

6            THE COURT:  Mr. Roos, are there any factual matters

7    set forth in the presentence report that the government

8    believes warrant modification or correction?

9            MR. ROOS:  No, your Honor.

10            THE COURT:  What about the Special Counsel's Office?

11            MS. RHEE:  No, your Honor.

12            THE COURT:  Very well.

13            MR. PETRILLO:  Your Honor, just to confirm, did the

14    Court receive our letter of last night?

15            THE COURT:  I did.

16            MR. PETRILLO:  Very well.

17            THE COURT:  I did.

18            Now, the parties here, before I hear from them, have a

19    difference of opinion concerning the guidelines calculation,

20    and, in particular, the grouping analysis for 18 CR 602.

21            Defense counsel argues that the tax evasion counts are

22    not closely related to the other counts and, therefore, should

23    not be grouped together.  The government counters that Section

24    3D1.2 specifically enumerates guidelines that are to be

25    grouped, which include Section 2T1.1 for the tax evasion

ICCQCOHs

1   counts, Section 2B1.1 for the false statement count, and

2   Section 2C1.8 for the illegal campaign contributions counts.

3        This Court finds the government's argument to be

4   correct as a matter of law where the offense levels are

5   principally determined by the amount of loss.  *See United*

6   *States v. Gordon*, 291 F.3d 181, 192 (2d.Cir 2002).

7        Accordingly, this Court makes the following guidelines

8   calculations:  Grouping all eight counts of 18 CR 602 together,

9   the base offense level is 7.  Because the loss here exceeded

10  $1.5 million, but was less than $3.5 million, an increase of 16

11  levels is warranted.

12       Further, because the offense involved the use of

13  sophisticated means, including Mr. Cohen's creation of shell

14  companies and fake invoices, a further two-level enhancement is

15  appropriate.

16       Finally, because Mr. Cohen used special skills as a

17  licensed attorney to facilitate the commission and concealment

18  of these offenses, a further two-level enhancement is

19  warranted.  Thus, the adjusted offense level for group one,

20  that is, the counts charged in 18 CR 602, is 27.

21       Now, Mr. Cohen pled guilty to these crimes in a timely

22  manner before me and, accordingly, I grant him a three-level

23  reduction for acceptance of responsibility.  Thus, his total

24  offense level is 24.  The defendant has no prior criminal

25  convictions, and, therefore, his Criminal History Category is a

ICCQCOHs

1   I.  With a total offense level of 24 and a Criminal History

2   Category of I, Mr. Cohen's guideline range is 51 to 63 months

3   of imprisonment on the eight charges of income tax evasion,

4   making false statements to a banking institution, and the two

5   campaign finance crimes.

6          Now, with respect to Mr. Cohen's plea to making false

7   statements to Congress, that is separately grouped and has a

8   base offense level of 6.  This Court agrees with the Special

9   Counsel's Office and Mr. Cohen that no enhancements are

10  appropriate.  Mr. Cohen pled guilty to this crime before my

11  colleague, Judge Carter, and, accordingly, I grant him a

12  two-level reduction for acceptance of responsibility on this

13  offense.  So, with a total offense level of 4 and a Criminal

14  History Category of I, his guidelines range for making false

15  statements to Congress is zero to six months of imprisonment.

16  Accordingly, no multiple account adjustment applies.

17         And so with the guidelines calculation resolved, I

18  will hear now from the parties.

19         Mr. Petrillo, do you wish to be heard on behalf of

20  Mr. Cohen?

21         MR. PETRILLO:  I do, your Honor.  Thank you.

22         Your Honor, may it please the Court, thank you.

23         My partner, Amy Lester, and I have the privilege of

24  representing Michael Cohen and the honor of having met some of

25  the members of his family who are present here today.  The

ICCQCOHs

1    group is larger than I've met, but it includes his mother and

2    father, his mother-in-law and his father-in-law, his wife and

3    children, and his brother and sisters, along with a niece and a

4    cousin.

5         Your Honor, we have made a sentencing submission with

6    numerous letters in support of the character of Mr. Cohen, and

7    it would not be our purpose today to repeat all of what we have

8    already written.  Rather, unless your Honor would like me to

9    proceed otherwise, I would like first to address the remarkable

10   nature and significance of the life decision made by Mr. Cohen

11   to cooperate with the DOJ Special Counsel and the relevance

12   and, respectfully, the importance of that cooperation, not only

13   to this specific man and your Honor's evaluation of this

14   specific man, but also to the Court's consideration of how

15   Mr. Cohen's cooperation promotes respect for law and the

16   courage of the individual to stand up to power and influence.

17        When Mr. Cohen authorized us to contact the Special

18   Counsel's Office in July, he did so to offer his relevant

19   knowledge to the investigation knowing that he would face as a

20   result when his offer became public a barrage of attack by the

21   President.  He knew that the President might shut down the

22   investigation, and he knew that there might come a time when he

23   would appear in court, and there would be no Special Counsel to

24   stand up for him, as there is today.

25        He moved forward nonetheless.  So it is true, as has

ICCQCOHs

1    been pointed out by the government, that part of what Mr. Cohen

2    did in coming forward is similar to what many folks who are

3    expecting criminal charges do in that expectation.  At that

4    time he acknowledged that it was more than possible that his

5    case might proceed from mere investigation to charges and that

6    his offer to assist could help him in some fashion should there

7    be charges and should there be a proceeding.  But it is also

8    the case that his decision was an importantly different

9    decision from the usual decision to cooperate.  He came forward

10   to offer evidence against the most powerful person in our

11   country.  He did so not knowing what the result would be, not

12   knowing how the politics would play out, and not knowing

13   whether the Special Counsel would even survive, nor could he

14   anticipate the full measure of attack that has been made

15   against him; not only by the President, who continues to say

16   that people like Mr. Cohen who cooperate with the Special

17   Counsel are weaklings and those who hold fast and clam up are

18   heroes, but also attacks by partisans and by citizens who

19   happen to be aligned with the President.  And those attacks

20   have included threats against him and his family.

21        So, respectfully, this is not a standard case of

22   cooperation.  The cooperation here should be viewed under a

23   non-standard or in a non-standard framework.  The SCO's

24   investigation, the Special Counsel's investigation is of the

25   utmost national significance, no less than seen 40 plus years

ICCQCOHs

1   ago in the days of Watergate.  In the light of that reality,

2   respectfully, your Honor, it is important that others in

3   Mr. Cohen's position who provide assistance to this historic

4   inquiry take renewed courage from this proceeding, and that law

5   enforcement and the promotion of respect for law also receive a

6   boost from what happens here today.  Mr. Cohen would want me to

7   say that he's always respected law enforcement.  He's always

8   supported it.

9           In the plea agreement with the Special Counsel, the

10  Special Counsel committed, subject to conditions that have been

11  fully satisfied, to bring to your Honor's attention for

12  sentencing purposes in both cases the nature and extent of

13  Mr. Cohen's cooperation with that office.  The Special Counsel

14  says Mr. Cohen has gone to significant lengths to assist the

15  investigation, providing information on core topics under

16  investigation, and is committed to continue to assist.

17          The office says the information provided has been

18  credible and consistent with other evidence obtained in its

19  investigation.  The office further says that it has been useful

20  cooperation in four specific respects that are detailed in the

21  Special Counsel letter to the Court.  And, finally, Mr. Cohen,

22  according to the Special Counsel, has made substantial and

23  significant efforts to remediate his own misconduct, accept

24  responsibility for his actions, and assist the Special

25  Counsel's investigation.

ICCQCOHs

1          Even the Southern District which has submitted a

2     somewhat sharp memo, which I will comment on in a few minutes,

3     to the Court, agrees that Mr. Cohen's assistance to the Special

4     Counsel was significant.  That's at page 17 of its memo.  And

5     that his provision of information to law enforcement in matters

6     of national interest is deserving of credit.  And that's at

7     page 37 of the memo.

8          Your Honor, in this exceptionally important matter,

9     Mr. Cohen's cooperation is overwhelmingly the factor, we

10    submit, that should substantially mitigate his sentence, and

11    his action stands in profound contrast to the decision of some

12    others not to cooperate and allegedly to double deal while

13    pretending to cooperate.

14         But that's not all.  We also ask the Court

15    respectfully that it consider Mr. Cohen's life of good works as

16    it considers the sentence in this case.  As we set forth in our

17    memo, and as supported by the letters sent with the memo, he

18    has been a prodigious fundraiser for the St. Jude's Children's

19    Hospital.

20         He has been the key figure at a Manhattan private

21    school in the raising of funds committed to financial aid for

22    students without means to attend and who otherwise would not be

23    able to attend absent his efforts.

24         He has done likewise impressive fundraising for

25    Operation Smile and assisted the Weatherford Foundation with

ICCQCOHs

1    active personal efforts to advance the role model program of

2    that athletes' organization.

3              Your Honor has read, I have no doubt, of the aid and

4    assistance Mr. Cohen provides regularly to children and friends

5    when they need to find medical care and stands by them in their

6    times of illness and hard times.

7              Whatever millions of words are said and written about

8    Mr. Cohen, and certainly he's in the paper every day, and on TV

9    there's coverage, sometimes it appears 24/7, this is a man of

10   generous spirit and the submissions to the Court demonstrate

11   that.

12             There is some mention in the Southern District's memo

13   regarding emphasis on his own contributions financially, but I

14   don't find it in our memo.  The crux of what we're saying is

15   that he puts himself out to raise money for very, very

16   worthwhile organizations.  He puts his whole body into it, and

17   this is a man whose first instinct is to help.

18             When it comes to Mr. Cohen's capacity to follow

19   through in his commitment to lead a good and law-abiding life,

20   I would also like to underscore what the Court has been

21   informed of by several members of the bar.  All portray a man

22   of integrity and honorable intentions and care for the

23   underserved, a man who does not engage in sharp business

24   practices.

25             To be sure, the Southern District points out that like

ICCQCOHs

1  many clients that lawyers meet from time to time, Mr. Cohen has

2  occasionally erupted in frustration at what he perceives to be

3  wrongs.  For example, as the Southern District points out, he

4  became very angry when a bank refused to focus on a transaction

5  that would have allowed him to sell his taxi medallions at a

6  time when doing so would have been lucrative, waited so long

7  before they approved the transactions, that the transaction

8  melted away as the market dipped.  He expressed frustration,

9  and that is cited in the Southern District's memo as evidence

10 of a bad character.  I have so many clients who come into my

11 office on a regular basis frustrated with life.  That's an

12 immature and meaningless observation in my view as to his

13 character.  It's simplistic and it's unfair.

14      Mr. Alpstein says, a lawyer who's worked with

15 Mr. Cohen on transactions, "Every seller of a transaction on

16 which I've represented Michael would say without equivocation

17 that Michael was and is an honest, responsible, and fair

18 businessman."

19      The man is 52 years old.  There's a long record of how

20 he has conducted himself in business and with financial

21 institutions.  No bank has ever lost money dealing with Michael

22 Cohen.  I'll say that again:  No bank has ever lost money

23 dealing with Michael Cohen.  No friend in need has ever been

24 turned away.

25      Your Honor, we addressed the offense conduct, and I

ICCQCOHs

1  had not planned to say more than a few words about it until I

2  read the Southern District's memo, and I just want to say few

3  words in response to the memo.  And I don't want to belabor it;

4  I know that you've read all the materials.  No one is saying,

5  least of all, Michael Cohen, or has said that a false statement

6  to a bank is other than serious.  In this case, we simply made

7  the point that the home equity line of credit as to which the

8  application was false was ten times oversecured at the time of

9  the application and that no money damage resulted.  Does that

10  make it right?  No.  It does not make it right.  But it puts

11  the conduct into some kind of proportion.

12          No one is saying, least of us, Michael Cohen, that tax

13  evasion of any kind is other than serious.  The speaking

14  information in this case, however, says that the crux of the

15  conduct was failing to identify deposits as income to an

16  accountant who received bank statements.  Does that make it

17  right?  No.  It doesn't make it right.  But it puts in

18  proportion and points out that the Court here is not dealing

19  with a mastermind of tax deception.

20          Ms. Lester and I were given three to four days to

21  speak to the tax charges in this case before they were filed.

22  They were not specified.  When asked questions about what they

23  entailed, I was met with stony silence and no realistic

24  opportunity to meet with the tax division, as is common.  I

25  believe that we would have had a very strong chance of

ICCQCOHs

1    diverting the case from the criminal track had we had that

2    opportunity.

3          But life is tough and Michael Cohen accepts that.  We

4    accept it.  Our point is not to explain the conduct away.  Our

5    point is to say that the offense is well within the heartland

6    of cases that are routinely treated in a non-criminal context,

7    solely so that your Honor can consider the punishment aspect

8    associated with the criminal tax evasion that has been

9    admitted, and that no one is trying to push away as someone

10   else's fault.

11         I will say very little on the campaign charges, the

12   campaign finance charges, and the statement to the legislature.

13   I do want to point out what Mr. Gerber, a lawyer in New York,

14   writes to the Court.  He's a former member of the grievance

15   committee, and he's written on behalf of Mr. Cohen that he's

16   seen many attorneys succumb to the wishes of a particularly

17   persuasive client.  "Mr. Cohen," he writes, "had a client whose

18   extraordinary power of persuasion got him elected to the

19   highest office in the land."  Again, the conduct is quite

20   serious, but Mr. Gerber's experience is certainly worthy of

21   note, as the Court takes into account the human element of what

22   happened here.

23         Based on all these factors, your Honor, most

24   importantly cooperation, good works, and the nature of the

25   offenses, we respectfully submit that the case calls for a full

ICCQCOHs

consideration of mercy as your Honor sentences our client,

Michael Cohen.

A few words on what the Southern District has

submitted.  It is not the case that Mr. Cohen has declined to

answer questions from the Southern District or from our duly

authorized U.S. Attorney's Offices, state law enforcement

entities, and Congress.  He's ready to do that.  He is wary of

a long-term cooperation agreement for personal reasons and

because he wants both to remove himself and to remove his

family from the glare of the cameras and try to work his way

and their way back from an abnormal life.  The period of such

an agreement would be indeterminate.  The press is overwhelming

in this case.  But none of this is to say he will not make

himself available for questioning on investigated matters, and

indeed, as you know, he's already met with the Southern

District on one of those matters.

But it's also unfair and it's mere innuendo that

Mr. Cohen would not describe his own misconduct, as the

government says twice, "if any."  I know the Court is aware

that search warrants were executed in this case.  As a result,

all of his papers, computers, devices, phones, and recordings

were seized and dozens of agents, and at least four Assistant

U.S. Attorneys and supervisors questioned dozens and dozens of

witnesses and reviewed the evidence.  They know what is there.

He pled to what he pled to, and the plea agreement immunized

ICCQCOHs

1   him for the conduct that the plea agreement immunized him for.

2   When the government repeats twice that Mr. Cohen declined to

3   disclose his prior bad acts "if any," they come forward with

4   nothing to suggest that they don't know everything already,

5   much less that there's anything there.

6        At the end of the day, it's not that important, your

7   Honor.  I just don't think it's fair.  I don't really

8   understand the strident tone of the memo, and trying to put it

9   into context, I'm looking at the beginning of the case.  First,

10  an unwillingness to delineate charges, a claim that I should

11  already know what they are.  A few days to respond once three

12  categories of alleged offenses were set forth.  And then after

13  the plea, a courthouse press conference on a plea of guilty.  I

14  submit, your Honor, that no other defendant would be treated in

15  this fashion on these offenses, but Mr. Cohen had the

16  misfortune to have been counsel to the President.

17        This rush to charge and media display suggest,

18  respectfully, that the Court should take with a healthy grain

19  of salt the contentions by the Southern District of New York

20  that Mr. Cohen left them at the altar of a Southern District

21  cooperation agreement.  Rather, he made a personal and rational

22  decision that he would respond truthfully to any investigative

23  topic, but that it was not in his or his family's interest to

24  remain in the constant glare and under the requirements of a

25  cooperation agreement which could go on for months and months

ICCQCOHs

1    and years and years.  And he sat down with Southern, and they

2    found him "forthright and credible."  Page 15.

3         The rules of the Southern District of New York as to

4    how every case of cooperation should proceed, of course, were

5    given to us by the minor gods and woe unto those who fail to

6    follow their scriptures, but they don't mean that they work in

7    every situation, no matter the facts, no matter the

8    circumstances.  They don't mean the prosecutor is always right

9    about how the standard procedure will play out.

10        And, effectively, your Honor, the Southern District

11   would have this Court penalize Mr. Cohen because he did not

12   follow their standard form agreement and procedure even though

13   he cooperated with the Special Counsel, provided them with

14   forthright and credible information, and offered, and hereby

15   offers, to respond to any other questions, and they would do it

16   without putting forth anything to suggest that there's any

17   there there by way of prior bad acts.  This approach, your

18   Honor, is erroneous.  It's error to consider what they are

19   asking you to consider.  It's fundamentally unfair for a

20   prosecutor to ask a Court to sentence a defendant on

21   hypothetical facts and circumstances rather than based on the

22   facts and circumstances that the Court actually knows.  Those

23   facts and circumstances do not present a mystery of the kind

24   that the office's memorandum seeks to suggest.  I don't know

25   what's behind it, and it's peculiar in a context in which a

ICCQCOHs

1    sibling office of the DOJ agrees that Mr. Cohen cooperated as

2    set forth in the plea agreement and as reported to your Honor

3    in the Special Counsel's letter.

4         I'm not going to overly speculate about what's going

5    on here.  I think the Court has as much experience as I in

6    these matters, but I would suggest that power to the Southern

7    District if they want to make a bigger case than they've

8    already made, God bless them.  And maybe there's a little bit

9    of pride involved here in not being at the center of attention.

10   Who knows?  Maybe all those articles about a big financial

11   fraud case and a big taxi medallion case followed by these

12   pleas is somehow disappointing.  It's not for me to say.

13        We respectfully request, your Honor, a variance under

14   the guidelines and the exercise of leniency in the imposition

15   of sentence on Mr. Cohen, and we request that on behalf of our

16   client and his family.  He has done, Michael has, a good deal

17   to help, not only the Special Counsel but a lot of people.  He

18   is a very good man.

19        Thank you.

20        THE COURT:  Thank you, Mr. Petrillo.

21        Ms. Rhee, does the Special Counsel's Office wish to be

22   heard?

23        MS. RHEE:  Yes, your Honor.

24        Thank you, your Honor.  On behalf of the Special

25   Counsel's Office, our remarks will be brief.  We rely, and we

ICCQCOHs

1   speak primarily through our written submission which has

2   already been submitted to this Court.  In supplement to that,

3   we just have two discrete, important points that we want to

4   highlight for the Court's attention.

5           The first is that the offense that Mr. Cohen pled to

6   in 18 CR 850 was a serious criminal violation.  As Mr. Petrillo

7   alluded to, the subject at issue here that Mr. Cohen actively

8   misled Congress about was an issue of national importance and

9   interest, and Mr. Cohen intentionally repeated many of the

10  false statements to us at the Special Counsel's Office

11  initially when we met with him in July.  And those false

12  statements were intended to limit ongoing investigations into

13  Russian interference in a U.S. presidential election, and the

14  question of any links or coordination between a campaign and a

15  foreign government.  Our submission elucidates why those lies

16  were material, why those lies were consequential.

17          But what we really want to leave with the Court today

18  for the Court's consideration is Mr. Cohen's interactions with

19  the Special Counsel's Office since that initial voluntary

20  interview in July.  The government has agreed with Mr. Cohen to

21  bring his assistance to your attention for due consideration at

22  this sentencing, and what we want to say about that is that

23  Mr. Cohen has endeavored from his second session with us in

24  September of this year going forward to this day, he has

25  endeavored to account for his criminal misconduct in numerous

ICCQCOHs

1   ways.  He has fully accepted responsibility for the lies that

2   he told Congress.  He has provided our office with credible and

3   reliable information about core Russia-related issues under

4   investigation and within the purview of the Special Counsel's

5   Office.  There is only so much that we can say about the

6   particulars at this time given our ongoing investigation, but

7   we hope that we have sufficiently outlined for the Court that

8   they were ranging, and that they were helpful.

9          Finally, your Honor, what we want to highlight for

10  this Court is that one of the things that we and the Special

11  Counsel's Office have most appreciated about Mr. Cohen's

12  assistance is that he has provided valuable information,

13  investigative information, to us while taking care and being

14  careful to note what he knows and what he doesn't know.  Rather

15  than inflate the value of any information that he has brought

16  forward to us in what he had to provide, Mr. Cohen has sought

17  to tell us the truth, and that is of utmost value to us as we

18  seek in our office to determine what in fact occurred.

19         And so we want to highlight that for the Court and to

20  underscore what we set out in our submission about the value,

21  the nature, the reliability, and the credibility of Mr. Cohen's

22  assistance.

23         THE COURT:  Thank you, Ms. Rhee.

24         MS. RHEE:  Thank you, your Honor.

25         THE COURT:  Mr. Roos, does the United States

ICCQCOHs

1    Attorney's Office wish to be heard?

2            MR. ROOS:  Yes, your Honor.  Thank you.

3            Your Honor, I'd like to start where Mr. Petrillo

4    ended, which is to share a few words about the information that

5    Mr. Cohen provided to law enforcement and the credit that is

6    appropriate.

7            Now, we agree that Mr. Cohen's decision to provide

8    information to the Special Counsel's Office in matters of

9    national interest is deserving of credit, and we defer to SCO's

10   description of Mr. Cohen's assistance to them and in their

11   investigation.  We don't dispute any of that assessment or the

12   assessment, frankly, that defense counsel has made.

13           But for the reasons that we've detailed in our

14   sentencing memorandum, any downward variance that Mr. Cohen

15   receives should be modest.  Any successful assistance Mr. Cohen

16   provided was in the context of a case where the guidelines

17   range is zero to six months.  It's within the context of the

18   Special Counsel Office's case.

19           But here, he is facing three additional categories of

20   crimes, eight total charges, and didn't come anywhere close to

21   assisting this office in an investigation.  There is no mystery

22   about this.  No one is attempting to penalize Mr. Cohen for not

23   cooperating.  Quite the opposite, there is no obligation to

24   cooperate, but for all the hypothesizing that Mr. Petrillo has

25   done, Mr. Cohen can't have it both ways.  There is a standard

ICCQCOHs

1    way in which this office conducts cooperation.  Your Honor is

2    familiar with it.  There is no reason, no matter the

3    significance or the nature of the case, whether or not it

4    receives public attention, for us to depart from that practice.

5    We've treated Mr. Cohen just the way we treat every other

6    defendant that deals with the United States Attorney's Office.

7            Now, Mr. Cohen, he chose not to pursue the path of

8    full cooperation.  He didn't provide substantial assistance to

9    the government in this investigation, and he doesn't have a 5K

10   letter.  And for these reasons, our view is that a significant

11   variance, the variance urged by the defendant isn't warranted

12   here.  To do so would send the wrong message.  It would send

13   the message that a defendant who chooses a different path, a

14   selective cooperation on only particular subjects can receive

15   the credit that so many defendants seek when they expose

16   themselves completely to the government.

17           Now, I'd like to touch on two points, two of the

18   3553(a) factors that in the government's view are so important

19   here, and they really go to what Mr. Petrillo said about the

20   nature and the seriousness of these offenses.

21           So, first, the defendant pled guilty to four crimes

22   here, your Honor, and Mr. Petrillo, he identified areas in

23   which certain crimes in their view may not be as serious, but

24   he pled guilty to four different crimes, and your Honor is

25   sentencing Mr. Cohen not only on four different charges but

ICCQCOHs

1   four separate crimes.  Each of those charges is itself serious.

2   Each merits punishment in its own right.  Each cause a distinct

3   harm, and taken together there is a compounding effect.

4   Collectively, the charges portray a pattern of deception, of

5   brazenness, and of greed that manifested in multiple aspects of

6   Mr. Cohen's professional life.

7           In particular, Mr. Cohen's conduct related to the

8   election is serious because of the tremendous societal cost

9   associated with the campaign finance crimes and the lies to

10  Congress.  Mr. Cohen committed these deceptive acts to protect

11  the political campaign from allegations of impropriety, and, by

12  his own admission, he committed the campaign finance crimes for

13  the purpose of influencing the election.

14          He also, quite brazenly, stole millions of dollars in

15  income from the IRS.  And on this subject, defense counsel

16  describes the ways in which this is really nothing more than a

17  civil matter.  But that is not the case, your Honor.  These tax

18  crimes went on for at least five years.  They involve millions

19  of dollars of income that was deliberately not reported to the

20  IRS.  This is not a case of an assessed tax not being paid.

21  It's something quite different.  It was deliberate, it was

22  willful, and that's what the defendant's plea reflects.

23          Now, together these crimes implicate core defining

24  parts of our democracy:  Government funded by the people, free

25  and transparent elections.  And in committing these crimes,

ICCQCOHs

1   Mr. Cohen has eroded faith in the electoral process and

2   compromised the rule of law.  And so just as he asks for

3   leniency because of what he claims he's done for the republic,

4   the same can be true in the way in which he's undermined it.

5   All of these facts, your Honor, favor a substantial custodial

6   sentence.

7        But the second reason why a substantial custodial

8   sentence is warranted here is because of the need to promote

9   deterrence.  And when it comes to Mr. Cohen, his training and

10  experience as an attorney should have been a deterrent to his

11  own criminal conduct.  Instead, he used his legal license in

12  furtherance of his crimes, and that is a significant point that

13  should be taken into consideration in sentencing.  A

14  substantial sentence would serve as a deterrent to future

15  criminal conduct by this particular defendant.

16        But more importantly, your Honor, a substantial

17  sentence would also serve as a general deterrent to future

18  criminal conduct by individuals like Mr. Cohen.  This is

19  particularly important in the context of tax evasion and the

20  campaign's finance crimes, crimes that are difficult to detect,

21  that are so frequently orchestrated through private

22  transactions kept secret from the public.  The unfairness here

23  is not to Mr. Cohen.  It's to the public.  Particularly in

24  light of the public interest in this case, a meaningful

25  sentence of imprisonment, one that sends a message, an

ICCQCOHs

1    appropriate message about the seriousness of these crimes is

2    appropriate.  That sort of message must be sent in this case,

3    that even powerful and privileged individuals cannot violate

4    these laws with impunity.

5        Unless the Court has any questions for the government,

6    we otherwise rest on our submission

7        THE COURT:  Thank you, Mr. Roos.

8        MR. PETRILLO:  Just a point of clarification, your

9    Honor, if I may.

10        THE COURT:  Yes.  Go ahead, Mr. Petrillo.

11        MR. PETRILLO:  I just want to be clear because I

12    wasn't sure whether Mr. Roos affirmed or failed to affirm that

13    the government; that is, the Southern District, by a letter

14    dated November 29 in this case captioned with this case number

15    that is the first plea before your Honor, agreed that the

16    defendant's provision of information to the Special Counsel is

17    a factor to be considered by the Court under Title 18

18    U.S. Code, Section 3553(a) in the first case, not just the

19    second case.  And I wasn't sure whether I heard properly that

20    Mr. Roos was delineating between the two cases.  I may just

21    have misheard, but I want to make sure it's clear.

22        MR. ROOS:  Your Honor, if I may?

23        THE COURT:  You may.

24        MR. ROOS:  I believe this was the first point I

25    addressed, but to clarify any confusion, the government's view

ICCQCOHs

1    is that the defendant provided information that was valuable to

2    the Special Counsel's Office.  We don't dispute that.  And

3    that's the reason why the government is seeking or recommends a

4    modest variance in this case as opposed to seeking a guideline

5    sentence.  So I guess the answer to Mr. Petrillo's question is

6    yes.

7                THE COURT:  All right.  Thank you.

8                Mr. Petrillo, does your client wish to address the

9    Court before sentence is imposed?

10               MR. PETRILLO:  He does, your Honor, and he's asked me

11   just to clarify because he heard -- and, again, I may have

12   heard it incorrectly, that -- the amount of restitution in this

13   case; that is, the amount due and owing to the IRS is

14   approximately $1.393 million, and he's under the impression the

15   Court may have said that the guidelines range started where it

16   did because the loss amount was one and a half million.  And he

17   just wanted to make sure that that point was entered into the

18   record.  It doesn't change our position on the guidelines

19   though, and I am only noting it for the record.

20               And Mr. Cohen would like to be heard, your Honor.

21               THE COURT:  Fine.  I'll hear from Mr. Cohen now.

22               THE DEFENDANT:  Your Honor, stand here or to the

23   podium?

24               THE COURT:  I think it would be best to take the

25   podium.

ICCQCOHs

1          THE DEFENDANT:  Thank you, your Honor.

2          I stand before your Honor humbly and painfully aware

3     that we are here today for one reason:  Because of my actions

4     that I pled guilty to on August 21, and as well on November 29.

5          I take full responsibility for each act that I pled

6     guilty to, the personal ones to me and those involving the

7     President of the United States of America.  Viktor Frankl in

8     his book, "Man's Search for Meaning," he wrote, "There are

9     forces beyond your control that can take away everything you

10    possess except one thing, your freedom to choose how you will

11    respond to the situation."

12         Your Honor, this may seem hard to believe, but today

13    is one of the most meaningful days of my life.  The irony is

14    today is the day I am getting my freedom back as you sit at the

15    bench and you contemplate my fate.

16         I have been living in a personal and mental

17    incarceration ever since the fateful day that I accepted the

18    offer to work for a famous real estate mogul whose business

19    acumen I truly admired.  In fact, I now know that there is

20    little to be admired.  I want to be clear.  I blame myself for

21    the conduct which has brought me here today, and it was my own

22    weakness, and a blind loyalty to this man that led me to choose

23    a path of darkness over light.  It is for these reasons I chose

24    to participate in the elicit act of the President rather than

25    to listen to my own inner voice which should have warned me

ICCQCOHs

1  that the campaign finance violations that I later pled guilty

2  to were insidious.

3        Recently, the President Tweeted a statement calling me

4  weak, and he was correct, but for a much different reason than

5  he was implying.  It was because time and time again I felt it

6  was my duty to cover up his dirty deeds rather than to listen

7  to my own inner voice and my moral compass.  My weakness can be

8  characterized as a blind loyalty to Donald Trump, and I was

9  weak for not having the strength to question and to refuse his

10 demands.  I have already spent years living a personal and

11 mental incarceration, which no matter what is decided today,

12 owning this mistake will free me to be once more the person I

13 really am.

14       Your Honor, I love my family more than anything in the

15 world:  My dad who is here today, my mom, my in-laws, siblings,

16 love of my life, my wife Laura, my pride and joy, my daughter

17 Samantha, my son, Jake.  There is no sentence that could

18 supersede the suffering that I live with on a daily basis,

19 knowing that my actions have brought undeserved pain and shame

20 upon my family.  I deserve that pain.  They do not.

21       I also stand before my children, for them to see their

22 father taking responsibility for his mistakes, mistakes that

23 have forced them to bear a shameful spotlight which they have

24 done nothing to deserve, and this breaks my heart.  For me, the

25 greatest punishment has been seeing the unbearable pain that my

ICCQCOHs

1  actions and my associations have brought to my entire family.

2  My mom, my dad, this isn't what they deserve to see in their

3  older age, especially when as a child they emphasized to all of

4  us the difference between right and wrong.  And I'm sorry.

5       I believed during this process that there were only

6  two things I could do to minimize the pain to my family:  Admit

7  my guilt and move these proceedings along.  This is why I did

8  not enter into a cooperation agreement.  I have elected to be

9  sentenced without asking for adjournment.  I have given

10 information during countless hours of meetings with prosecutors

11 that have been cited as substantial, meaningful and credible.

12 I have chosen this unorthodox path because the faster I am

13 sentenced, the sooner I can return to my family, be the father

14 I want to be, the husband I want to be, and a productive member

15 of society again.  I do not need a cooperation agreement to be

16 in place to do the right thing.  And I will continue to

17 cooperate with government, offering as much information as I

18 truthfully possess.

19      I stand behind my statement that I made to George

20 Stephanopoulos, that my wife, my daughter, my son have my first

21 loyalty and always will.  I put family and country first.  My

22 departure as a loyal soldier to the President bears a very

23 hefty price.

24      For months now the President of the United States, one

25 of the most powerful men in the world, publicly mocks me,

ICCQCOHs

1  calling me a rat and a liar, and insists that the Court

2  sentence me to the absolute maximum time in prison.  Not only

3  is this improper; it creates a false sense that the President

4  can weigh in on the outcome of judicial proceedings that

5  implicate him.  Despite being vilified by the press and

6  inundated with character assassinations over the past almost

7  two years, I still stand today, and I am committed to proving

8  my integrity and ensuring that history will not remember me as

9  the villain of his story.  I now know that every action I take

10  in the future has to be well thought out and with honorable

11  intention because I wish to leave no room for future mistakes

12  in my life.

13        And so I beseech your Honor to consider this path that

14  I am currently taking when sentencing me today.  And I want to

15  apologize to my entire family for what my actions have put them

16  through.  My family has suffered immeasurably in the home and

17  the world outside.  I know I have let them all down, and it

18  will be my life's work to make it right, and to become the best

19  version of myself.

20        Most all, I want to apologize to the people of the

21  United States.  You deserve to know the truth and lying to you

22  was unjust.  I want to thank you, your Honor, for all the time

23  I'm sure you've committed to this matter and the consideration

24  that you have given to my future.

25        Again, I want to thank my family, my friends, many who

ICCQCOHs

1    are here today, who are with me, especially all the people who

2    wrote letters on my behalf.  In addition, I would like to thank

3    the tens of thousands of strangers who despite not knowing me

4    at all, not knowing me personally have shown kindness and

5    empathy in writing letters to me and offering support and

6    prayer.  And I thank you, your Honor, I am truly sorry, and I

7    promise I will be better.

8              THE COURT:  You may be seated, Mr. Cohen.

9              THE DEFENDANT:  Thank you.

10             THE COURT:  The defendant, Michael Cohen, comes before

11   this Court, having pled guilty to five counts of income tax

12   evasion, one count of making false statements to a banking

13   institution, one count of causing an unlawful corporate

14   contribution, and one count of an excessive campaign

15   contribution in the 18 CR 602 criminal case, and one count of

16   making false statements to the U.S. Congress in 18 CR 850.

17   Each of these crimes is a serious offense against the United

18   States.

19             Now, I've reviewed the revised presentence

20   investigation report, and I adopt the findings of fact in that

21   report as my own.  I will cause the report to be docketed and

22   filed under seal as part of the record in each of these cases.

23   I have also reviewed all of the memoranda submitted by counsel

24   for the parties and the letters submitted on Mr. Cohen's

25   behalf.

ICCQCOHs

1        I previously reviewed the guidelines with all of you.

2    Suffice it to say at this juncture that with respect to the

3    first case, the guidelines range is 51 to 63 months of

4    imprisonment, and the guideline range on the second case is

5    zero to six months of imprisonment.  Of course, the Sentencing

6    Guidelines should be the starting point and the initial

7    benchmark.

8        Turning to the 3553(a) factors, the question for this

9    Court is what is the appropriate and just sentence for these

10   crimes and this defendant.  Mr. Cohen pled guilty to a

11   veritable smorgasbord of fraudulent conduct:  Willful tax

12   evasion, making false statements to a financial institution,

13   illegal campaign contributions, and making false statements to

14   Congress.  Each of the crimes involved deception and each

15   appears to have been motivated by personal greed and ambition.

16       His extensive criminal conduct also has broader public

17   consequences.  Mr. Cohen evaded more than $1.3 million in

18   personal income taxes for the tax years 2012 through 2016.  He

19   willfully failed to report $4 million earned through various

20   streams of income from leasing taxi medallions to consulting

21   fees and brokerage commissions.  As Justice Oliver Wendell

22   Holmes famously said, "Taxes are the price we pay for a

23   civilized society."

24       Now, Mr. Cohen also made a series of false statements

25   to financial institutions regarding his liabilities and monthly

ICCQCOHs

1   expenses so that he would be approved for a $500,000 home

2   equity line of credit.

3          Further, Mr. Cohen committed two campaign finance

4   crimes on the eve of the 2016 presidential election with the

5   intent to influence the outcome of that election.  He made or

6   facilitated payments to silence two women who threatened to go

7   public with details of purported extramarital affairs, and

8   Mr. Cohen admitted that he did so in coordination with and at

9   the direction of Individual One.

10         Finally, in a separate criminal proceeding filed by

11  the Special Counsel's Office, Mr. Cohen admitted that he made

12  false statements about a proposed business project in Moscow to

13  congressional committees investigating possible interference by

14  the Russian government with the 2016 presidential election.

15  Each of these crimes standing alone warrant serious punishment.

16         The financial harms are readily ascertainable.

17  Mr. Cohen's tax evasion offenses cheated the federal government

18  out of $1,393,858.  His deception caused a bank to approve a

19  $500,000 line of credit he did not deserve.  And even his

20  campaign finance crimes may be measured by the amount of

21  unlawful contributions:  The $150,000 hush money payment that

22  he coordinated, and the $130,000 hush money payment that he

23  funneled from his home equity loan through a shell corporation.

24         While this is his first conviction, the magnitude,

25  breadth, and duration of his criminal conduct requires specific

ICCQCOHs

1    deterrence.  Tax and campaign finance prosecutions are rare,

2    but unlike the mine-run tax evasion or campaign finance

3    violation, Mr. Cohen's crimes implicate a far more insidious

4    harm to our democratic institutions, especially in view of his

5    subsequent plea to making false statements to Congress.  Thus,

6    the need for general deterrence is amplified in this case.

7          Now, Mr. Cohen had a comfortable childhood and enjoyed

8    all the privileges of growing up in a close-knit, upper class

9    suburb on Long Island.  He and his siblings had loving parents

10   who worked hard to provide everything for their children.  He

11   graduated from law school and practiced law in various law

12   firms until the Trump organization hired him as an attorney in

13   2007.  Thereafter, his entire professional life apparently

14   revolved around the Trump organization.  He thrived on his

15   access to wealthy and powerful people, and he became one

16   himself.

17         The letters submitted on his behalf reveal a man

18   dedicated to his family and generous with his time and money to

19   help people in his own orbit.  A number of individuals have

20   written to me describing how Mr. Cohen came to their aid

21   without seeking anything in return.  Of course, that kind of

22   generosity is laudable.  But somewhere along the way Mr. Cohen

23   appears to have lost his moral compass and sought instead to

24   monetize his new-found influence.  That trajectory,

25   unfortunately, has led him to this courtroom today.

ICCQCOHs

1          While Mr. Cohen does not have a formal cooperation

2     agreement with the United States Attorney's Office, he has

3     nevertheless met with prosecutors on a number of occasions.

4     The Special Counsel's Office notes that he has voluntarily

5     provided information "about his own conduct and that of others

6     on core topics under investigation" by the Special Counsel and

7     that the information he has provided has been "relevant and

8     useful."Further, the Special Counsel urges that any sentence

9     imposed in connection with 18 CR 850 should be concurrent to

10    any sentence imposed in the earlier case.

11          While the United States Attorney's Office acknowledges

12    that Mr. Cohen's assistance to the Special Counsel's Office was

13    "significant" and warrants a modest variance from the

14    guidelines range, they contend that it should not approach the

15    type of credit typically given to cooperating witnesses in this

16    district.

17          However, cooperation, even when it is not the product

18    of a formal agreement, should be encouraged where information

19    is provided that advances criminal investigations.  Our system

20    of justice would be less robust without the use of cooperating

21    witnesses to assist law enforcement.

22          Based on the submissions of the parties, this Court

23    agrees that Mr. Cohen should receive some credit for providing

24    assistance to the Special Counsel's Office.  While Mr. Cohen

25    pledges to assist the Special Counsel's Office in further

ICCQCOHs

1    investigations, that is not a matter that this Court can

2    consider now.

3            There is an acute need for the sentence here to

4    reflect the seriousness of the offenses and to promote respect

5    for the law.  As a lawyer, Mr. Cohen should have known better.

6    Tax evasion undercuts the government's ability to provide

7    essential services on which we all depend.  False statements to

8    banking institutions undermine the integrity of our financial

9    system.  Campaign finance violations threaten the fairness of

10   elections, and false statements to Congress interfere with the

11   fact-finding process in matters of national importance.

12           While Mr. Cohen has taken steps to mitigate his

13   criminal conduct by pleading guilty and volunteering useful

14   information to prosecutors, that does not wipe the slate clean.

15   Mr. Cohen selected the information he disclosed to the

16   government.  This Court cannot agree with the defendant's

17   assertion that no jail time is warranted.  In fact, this Court

18   firmly believes that a significant term of imprisonment is

19   fully justified in this highly publicized case to send a

20   message to those who contemplate avoiding their taxes, evading

21   campaign finance laws or lying to financial institutions or

22   Congress.  Our democratic institutions depend on the honesty of

23   our citizenry in dealing with the government.  And so it is

24   against that backdrop that I am prepared to sentence the

25   defendant.

ICCQCOHs

1        Mr. Cohen I'd ask, sir, that you stand at this time.

2        Mr. Cohen, it's my judgment, sir, that on 18 CR 602

3   that you be sentenced to a term of 36 months of imprisonment to

4   be followed by three years of supervised release on each count

5   to be served concurrently with the sentence that I will impose

6   in a moment on 18 CR 850.  I'm imposing all of the standard

7   conditions of supervised release and the following special

8   condition:  That you provide the probation department with

9   access to any requested financial information.

10       Further, I'm going to enter an order of forfeiture in

11  this case in the amount of $500,000, and I'm going to enter an

12  order for restitution in the amount of $1,393,858.  I am also

13  going to impose a fine of $50,000, and the mandatory special

14  assessment of $800.

15       Now, with respect to 18 CR 850, I sentence you to two

16  months of imprisonment to be served concurrently with the term

17  imposed in 18 CR 602 to be followed by three years of

18  supervised release, also to be served concurrently with the

19  term imposed in 18 CR 602, and with all of the standard

20  conditions of supervised release.

21       In this case with respect to 18 CR 850, I am also

22  going to impose a $50,000 fine in that case to recognize the

23  gravity of the harm of lying to Congress in matters of national

24  importance.  And, once again, I will impose the mandatory

25  special assessment in that case of $100.

ICCQCOHs

1          Just to be clear, the sentence in the earlier case is

2   concurrent on all counts in that information.

3          And so, Mr. Cohen, this constitutes the sentence of

4   this Court.  I advise you that to the extent you have not

5   previously waived your right to appeal, you have the right to

6   appeal.  I advise you further that if you cannot afford

7   counsel, counsel will be provided to you free of cost.

8   Mr. Petrillo has done a superb job in navigating you through

9   this matter and bringing the sentencing submissions before the

10  Court.  I'm confident that he and Ms. Lester will advise you

11  further with respect to your appellate rights.  You may be

12  seated, sir.

13          Are there any further applications at this time?

14          MR. ROOS:  Not from the government, your Honor.

15          THE COURT:  Ms. Rhee.

16          MS. RHEE:  Your Honor, the Special Counsel's Office

17  would just like to confirm that there will be a separate

18  $50,000 fine.

19          THE COURT:  Yes.

20          MS. RHEE:  Not to run concurrently.

21          THE COURT:  No, it's a separate fine.  It's a separate

22  harm, and the guidelines in my view do not recognize the

23  gravity of the offense of making false statements to Congress.

24          MS. RHEE:  Thank you for the clarification.

25          THE COURT:  Mr. Petrillo.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

ICCQCOHs

1        MR. PETRILLO:  Your Honor, if you would, would the

2    Court give consideration to voluntary surrender by the

3    defendant and consider recommending the designation of

4    Otisville as the place of imprisonment?

5        THE COURT:  I will make that recommendation, and I

6    will allow for a voluntary surrender in this case.  What

7    surrender date are you seeking?

8        MR. PETRILLO:  I don't have one particularly in mind,

9    but from past experience it seems to take about 10 or 12 weeks

10   for the BOP to --

11       THE COURT:  Right.  Is March 6 all right?  And if for

12   some reason you've not been notified of a designated

13   institution, just write a short note to me, and I will put the

14   surrender date over.

15       MR. PETRILLO:  Very well.

16       THE COURT:  Go ahead.

17       MR. PETRILLO:  I have one other thing for the record

18   that doesn't require a ruling, but as you know, under *United*

19   *States v. Ganais* in the Second Circuit, it's incumbent upon the

20   defendant to demand his property back post a search procedure

21   as part of protecting his rights under the Fourth Amendment.

22   And so for the record, I'd like to make that demand and thus

23   have no confusion as to where that stands.

24       THE COURT:  All right.  I'm confident there will be

25   further briefing with respect to that matter after this

39

ICCQCOHs

1    proceeding is concluded, and I will await receipt of some

2    submission.

3         This matter is concluded.  Have a good afternoon

4         (Adjourned)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT Y

# Michael Cohen talks to George Stephanopoulos: TRANSCRIPT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

abcnews.go.com/Politics/michael-cohen-talks-george-stephanopoulos-transcript/story

Dec 14, 2018, 7:00 AM ET

- 0 Shares
- 
- 
- 
- Email
- Star



PlayABC News

WATCH Cohen on Trump as president: 'He's a very different individual'

Michael Cohen, the president's former personal attorney and fixer, said Donald Trump directed him to make payments to two women who said they had affairs with the then-candidate because Trump "was very concerned about how this would affect the election."

A lightly edited transcript of Cohen's interview with ABC News Chief Anchor George Stephanopoulos, which aired today on "Good Morning America," follows here:



Play
Trump knew payments were wrong, Cohen says

## Part 1

**George Stephanopoulos:** Michael, thank you for doing this.

**Michael Cohen:** George, good to see you.

**Stephanopoulos:** Emotional day in court yesterday, and I was struck by that line you had ... you said you felt like you had your freedom back.

**Cohen:** Yes.

**Stephanopoulos:** How does it feel today?

**Cohen:** Like I have my freedom back. Though I have to be honest. It has been very rough to be before the court with my family in attendance, my mother, my father, my wife, my children, my sisters, my brother, my niece, cousins, friends, it was ... ummm, it was a very rough day.

**Stephanopoulos:** And then you wake up today, and the president is tweeting from very early in the morning several different things ... what struck me most is his claim that you agreed to this plea deal for this reason he said, "Those charges were just agreed to him in order to embarrass the president and get a much reduced prison sentence."

**Cohen:** I know which tweets you are talking about. First of all, it is absolutely not true. I did not do it to embarrass the president. He knows the truth. I know the truth, many people know the truth. Under no circumstances do I want to embarrass the president of the United States

of America. The truth is, I told the truth. I took responsibility for my actions. And instead of him taking responsibility for his actions, what does he do? He attacks my family. And after yesterday, again being before the court and taking the responsibility and receiving a sentence of 36 months, the only thing he could do is to tweet about my family?

**Stephanopoulos:** He said in the tweets and repeated in an interview later on that basically he says -- his claim -- you are lying about him to protect your wife, to protect your father in-law.

**Cohen:** Inaccurate. He knows the truth, I know the truth, others know the truth, and here is the truth: The people of the United States of America, people of the world, don't believe what he is saying. The man doesn't tell the truth. And it is sad that I should take responsibility for his dirty deeds.

**Stephanopoulos:** You lied for him for a long time.

**Cohen:** More than 10 years.

**Stephanopoulos:** Why?

**Cohen:** Out of loyalty. Out of loyalty to him. I followed a bad path and hence how we started this conversation. I have my freedom, and I will not be the villain -- as I told you once before -- I will not be the villain of his story.

**Stephanopoulos:** He is saying very clearly that he never directed you to do anything wrong. Is that true?

**Cohen:** I don't think there is anybody that believes that. First of all, nothing at the Trump organization was ever done unless it was run through Mr. Trump. He directed me, as I said in my allocution and I said as well in the plea, he directed me to make the payments, he directed me to become involved in these matters. Including the one with McDougal, which was really between him and David Pecker and then David Pecker's counsel. I just reviewed the documents ... in order to protect him. I gave loyalty to someone who truthfully does not deserve loyalty.

**Stephanopoulos:** He was trying to hide what you were doing, correct?

**Cohen:** Correct.

**Stephanopoulos:** And he knew it was wrong?

**Cohen:** Of course.

**Stephanopoulos:** And he was doing that to help his election?

**Cohen:** You have to remember at what point in time that this matter came about -- two weeks or so before the election. Post <u>the Billy Bush ["Access Hollywood"] comments</u>, so, yes, he was very concerned about how this would affect the election.

**Stephanopoulos:** To help his campaign?

**Cohen:** <u>To help him and the campaign</u>.

**Stephanopoulos:** You mention dirty deeds in your allocution yesterday. When you think about it, when you look back, did you know what you were doing?

**Cohen:** I am angry at myself because I knew what I was doing was wrong. I stood up before the world yesterday and I accepted the responsibility for my actions. The actions that I gave to a man, who, as I also said in my allocution, I was loyal to. I should not be the only one taking responsibility for his actions.

**Stephanopoulos:** So he's still lying?

**Cohen:** Yes.

**Stephanopoulos:** Do you know why you were loyal to him at the beginning?

**Cohen:** No. No, it was a blind loyalty. It was to a man I admired, but I do not know the answer to it. And I am angry at myself. My family is disappointed that they've taught me, my mother, father, right from wrong. And I didn't display good judgment.

**Stephanopoulos:** You called it blind loyalty -- the prosecutors seem to suggest it was, southern district prosecutors I should add, seem to suggest it was -- you were being driven by greed and ambition.

**Cohen:** That's inaccurate, but, again, I took responsibility for my actions, but I didn't make my money working for Donald Trump. I made a substantial amount of money years before working for Donald Trump. And anybody who knows me knows that to be the truth.

**Stephanopoulos:** So what do you say to people -- and you know there are a lot of people will be watching who are thinking, "But wait a second, he lied for so long why should we believe him now?" What's the answer to that?

**Cohen:** What do you mean, "lied"? Lied about what? <u>At the Trump organization</u>, it is a microcosm of even just a New York real estate market. What do we lie about? It's New York real estate, yes, it is the greatest product ever created, is that a lie?

**Stephanopoulos:** But you pleaded guilty to lying to Congress.

**Cohen:** Yes.

**Stephanopoulos:** So why should we believe you now?

**Cohen:** Because <u>the special counsel</u> stated emphatically that the information that I gave to them is credible and helpful. There is a substantial amount of information that they possessed that corroborates the fact that I am telling the truth.

**Stephanopoulos:** So you're done with the lying?

**Cohen:** I am done with the lying. I am done being loyal to President Trump, and my first loyalty belongs to my wife, my daughter, my son and this country.



ABC News
Michael Cohen sits down for an interview with ABC News Chief Anchor George Stephanopoulos on "Good Morning America," Friday, Dec. 14, 2018.

## Part 2

**Stephanopoulos:** You worked for him a long time. I was around you many, many years ago where you seemed to be having fun.

**Cohen:** Correct -- there was a lot of fun going on at the Trump organization.

**Stephanopoulos:** ... working with Donald Trump ...

**Cohen:** I enjoyed working with my colleagues there as well.

**Stephanopoulos:** When did it change?

**Cohen:** You know, I can't give you a specific time that it went from point A to point B. It was just a change. I will tell you that the gentleman that is sitting now in the Oval Office, 1600 Pennsylvania avenue, is not the Donald trump that I remember from Trump Tower.

**Stephanopoulos:** ... how so?

**Cohen:** He's a very different individual.

**Stephanopoulos:** What's happened to him?

**Cohen:** I think the pressure of the job is much more than what he thought it was going to be. It's not like the Trump organization where he would bark out orders and people would blindly follow what he wanted done. There's a system here, he doesn't understand the system, and it's sad because the country has never been more divisive. And one of the hopes that I have out of the punishment that I've received, as well as the cooperation that I have given, I will be remembered in history as helping to bring this country back together.

**Stephanopoulos:** The special counsel did say that you are doing your best to tell the truth about everything related to the investigation, everything related to Russia. Do you think President Trump is telling the truth about that?

**Cohen:** No.

**Stephanopoulos:** That's a big statement.

**Stephanopoulos:** If he were sitting in this chair right now, what would you say to him?

**Cohen:** Lay off Twitter, run the country the way that we all thought that you would, be able to take the Democrats, Republicans, bring them together and bring the country together instead of dividing the country.

**Stephanopoulos:** Do you think he has ears to hear that?

**Cohen:** I don't know. I don't think so.

**Stephanopoulos:** Was yesterday the hardest day of your life, or is that going too far?

**Cohen:** It's an understatement.

**Stephanopoulos:** Yet you feel you've turned a corner.

**Cohen:** I know I have.

**Stephanopoulos:** And when you look back at the Michael Cohen who spent 10 years with Donald Trump, what would you say to him on that first day?

**Cohen:** "What were you thinking? You knew better. You know better."

**Stephanopoulos:** How does this end for Donald Trump?

**Cohen:** That sort of gets into the whole investigation right now between special counsel's office, the attorney general's office, you also have the Southern District of New York -- I don't want to jeopardize any of their investigations.

**Stephanopoulos:** <u>Are you still cooperating?</u>

**Cohen:** If they want me. I am here and I am willing to answer whatever additional questions that they may have for me.

**Stephanopoulos:** Right, so you're saying there's certain areas that you can't get into because you're still cooperating with them.

**Cohen:** Correct. And out of respect for process.

**Stephanopoulos:** Why do you think President Trump is lashing out against you in such a personal way? Daily, almost now, calling you weak. Calling you a liar. Is he afraid?

**Cohen:** Seems like it. That's what he does. That's what he does.

**Stephanopoulos:** Are you afraid of him?

**Cohen:** It's never good to be on the wrong side of the president of the United States of America. But somehow or another, this task has now fallen onto my shoulders, and, as I also stated, that I will spend the rest of my life in order to fix the mistake that I made.

**Stephanopoulos:** How are you going to do that?

**Cohen:** I don't know. One day at a time.